1 | MARC R. GREENBERG, CASB No. 123115
JOSEPH A. WALSH II, CASB No. 143694
2 | JOHN COX, CASB No. 197687
KEESAL, YOUNG & LOGAN
3 | A Professional Corporation
400 Oceangate, P.O. Box 1730
4 | Long Beach, California 90801-1730
Telephone:     (562) 436-2000
5 | Facsimile:      (562) 436-7416

6 | Attorneys for Defendant
FLEET MANAGEMENT LTD.
7 |

8 | **UNITED STATES DISTRICT COURT**

9 | **NORTHERN DISTRICT OF CALIFORNIA**

10 |

11 | UNITED STATES OF AMERICA,                    ) Case No. CR 08-0160-1 SI-2
                                               )
12 |                          Plaintiff(s),       )
                                               )
13 |              vs.                            ) **DEFENDANT FLEET MANAGEMENT
                                               ) LTD.'S NOTICE OF MOTION AND
14 | JOHN J. COTA, et al.,                        ) MOTION FOR CONSENT TO ENTER PLEA
                                               ) OF *NOLO CONTENDERE*; MEMORANDUM
15 |                          Defendant(s).       ) OF POINTS AND AUTHORITIES IN
                                               ) SUPPORT THEREOF
16 |                                             )
                                               ) **[F. R. Crim. P 11(a)(1)]**
17 |                                             )
                                               ) *REDACTED COPY FILED PER COURT
18 |                                             ) ORDER*
                                               )
19 |                                             ) UNREDACTED COPY FILED UNDER SEAL
                                               )
20 |                                             ) Hearing:        September 22, 2008
                                               ) Time:           11:00 am
21 | _____          ) Courtroom:      4

22 | ///

23 |

24 |

25 |

26 |

27 |

28 | ///

1

# TABLE OF CONTENTS

2

3                                                                                                           **Page**

4    TABLE OF AUTHORITIES ........................................................................................... ii

5    I.      INTRODUCTION ............................................................................................. 2

6    II.     FACTUAL BACKGROUND ............................................................................. 3

7            A.      SUMMARY OF THE EVENTS OF NOVEMBER 7, 2007 .................. 4

8            B.      THE VESSEL AND ITS MANAGERS .................................................. 7

9            C.      PILOT JOHN COTA. ............................................................................. 8

10           D.      UNITED STATES COAST GUARD. .................................................. 10

11                   1.      VTS Has Authority To Direct Ships In The San
                             Francisco Bay. ........................................................................... 10
12
13                   2.      Coast Guard Had Responsibility For Medical Fitness
                             Of Captain Cota. ....................................................................... 11

14           E.      CALIFORNIA STATE BOARD OF PILOT COMMISSIONERS .......... 13

15           F.      CHARLES CALZA, M.D. ................................................................... 13

16           G.      SAN FRANCISCO PILOTS ASSOCIATION. ................................... 13

17           H.      THE PASSAGE PLANS MENTIONED IN THE INDICTMENT DID
                     NOT INFLUENCE COTA'S NAVIGATION OF THE VESSEL. ......... 14
18
19   III.    PROCEDURAL HISTORY .............................................................................. 15

             A.      CIVIL ACTION INITIATED BY THE UNITED STATES. ................ 15
20
             B.      CRIMINAL CASE AGAINST COTA AND FLEET. .......................... 16
21
22   IV.     ACCEPTANCE OF DEFENDANT'S *NOLO CONTENDERE* PLEA  WILL
             BE IN THE INTERESTS OF JUSTICE ......................................................... 17

23           A.      NATURE OF THE CLAIMED OFFENSE. ........................................ 18

24           B.      ROLE OF DEFENDANT. .................................................................... 20

25           C.      IMPACT ON DETERRENCE. .............................................................. 22

26           D.      VIEW OF THE GOVERNMENT. ....................................................... 23

27           E.      CONSERVATION OF JUDICIAL RESOURCES. ............................. 24

28   V.      CONCLUSION .................................................................................................. 25

1

# TABLE OF AUTHORITIES

2

**Page**

3

## FEDERAL CASES

4

Blohm v. C.I.R.,
   994 F.2d 1542 (11th Cir. 1993) ........................................................................ 23

Cooley v. Board of Wardens for the Port of Philadelphia,
   53 U.S. 299 (1852)............................................................................................ 21

Duffy v. Cuyler,
   581 F.2d 1059 (3d Cir. 1978) .......................................................................... 22

Huber v. U.S.,
   838 F.2d 398 (9th Cir. 1988) .......................................................................... 12

Hudson v. United States,
   272 U.S. 451 (1926).......................................................................................... 19

North Carolina v. Alford,
   400 U.S. 25 (1970).................................................................................... 19, 23

Ranke v. U.S.,
   873 F.2d 1033 (7th Cir. 1989) ........................................................................ 22

Tempo Trucking & Transfer Corp. v. G.R. Dickson,
   405 F. Supp. 506 (E.D.N.Y. 1975) ................................................................ 22

U.S. v. Bagliore,
   182 F. Supp. 716 (E.D.N.Y. 1960) .......................................................... 19, 25

U.S. v. Baltimore & Ohio Railroad,
   543 F.2d 821 (D.D.C. 1982)................................................................ 19, 20, 23, 25

U. S. v. Brighton Bldg. & Maintenance Co.,
   431 F. Supp. 1118, 1977-1 Trade Cases ¶ 61,436 (N.D. Ill. May 06, 1977) .......................... 23

U.S. v. Cigarette Merchandisers Association,
   136 F. Supp. 212 (S.D.N.Y. 1955)........................................................... 19, 25

U.S. v. Dynalectric Co.,
   674 F. Supp. 240 (W.D. Ky. 1987).................................................................. 19

U.S. v. Faucette,
   223 F. Supp. 199 (D.C.N.Y. 1963) .................................................................. 26

U.S. v. Hines,
   507 F. Supp. 139 (D.C. Mo. 1981) .................................................................. 23

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FLEET MGMT.'S MEMO./P'S&A'S/SUP./MOT./LV./ENTER PLEA OF *NOLO CONTENDERE*
Case No. CR-08-0160-1 SI-2                                                         KVL-SF466103

U.S. v. Jones,
    119 F. Supp. 288 (S.D. Cal. 1954)...................................................................19, 24, 25

U.S. v. Norris,
    281 U.S. 619 (1930) ..................................................................................................... 19

U.S. v. Prince,
    533 F.2d 205 (5th Cir. 1976) ...................................................................................... 22

U.S. v. Standard Ultramarine & Color Co.,
    137 F. Supp. 167 (S.D.N.Y. 1955)............................................................................ 19

U.S. v. Yonkers Contracting Co.,
    697 F. Supp. 779 (S.D.N.Y. 1988)..................................................................... 20, 26

## STATE CASES

U.S. v. B. Manischewitz Co.,
    1990 WL 86441 (D.N.J. 1990) ................................................................................. 20

## FEDERAL STATUTES

Federal Rules of Criminal Procedure, Rule 11(a)(3).................................................... 19

Federal Rules of Criminal Procedure, Rule 11(f)................................................... 22, 23

Federal Rules of Criminal Procedure, Rule 15 ........................................... 16, 18, 21, 26

Title 33 C.F.R. § 161.11(a) ........................................................................................... 11

Title 33 C.F.R. § 161.11(a)(2)....................................................................................... 12

Title 33 C.F.R. § 161.11(b) ........................................................................................... 12

## MISCELLANEOUS

79 Harv. L. Rev. 1475, at 1480 ..................................................................................... 24

Clean Water Act section 1321(b)(7)............................................................................... 24

Federal Judiciary Conference Benchbook for Federal Judges, section 2.01 ....................... 23

NOAA, United States Coast Pilot, Chapter 7 ................................................................. 15

Wright, Federal Practice and Procedure, 1A Fed. Prac. & Proc. Crim. 2d § 174, 614 (1982)............. 22

FLEET MGMT.'S MEMO./P'S&A'S/SUP./MOT./LV./ENTER PLEA OF *NOLO CONTENDERE*

1    **TO ALL PARTIES TO THIS ACTION AND THEIR ATTORNEYS OF RECORD:**

2       NOTICE IS HEREBY GIVEN that on September 22, 2008 at 11:00 a.m. in Courtroom 4 of the

3    above-entitled Court, the Honorable Susan Illston presiding, Defendant FLEET MANAGEMENT LTD

4    ("Defendant" or "Fleet") will move for the acceptance of a plea of *nolo contendere* pursuant to

5    Rule 11(a)(1) of the Federal Rules of Criminal Procedure ("F.R.Crim.P.") to Counts Three through Ten

6    of the Second Superseding Indictment and thereby forego a trial on the merits.

7       This Motion is based on this Notice of Motion and Motion For Consent To Enter Plea of *Nolo*

8    *Contendere,* this accompanying Memorandum of Points and Authorities, the accompanying Proposed

9    Findings of Fact and Conclusions of Law, Declarations of Marc R. Greenberg and Joseph A. Walsh II and

10    all Exhibits attached thereto, Defendant Fleet's Request for Judicial Notice, the complete files and records

11    in this action and certain related matters, and such other oral and documentary evidence as may be

12    introduced at hearing on this matter.[1]  The matters redacted per Court Order are underlined in the Under

13    Seal version of the brief.

14

15

16    DATED:  September ____, 2008        /s/ John Cox_____

                                             MARC R. GREENBERG

17                                        JOSEPH A. WALSH II

                                       JOHN COX

18                                        KEESAL, YOUNG & LOGAN

                                       Attorneys for Defendant

19                                        FLEET MANAGEMENT LTD.

20

21

22

23

24

25

26

_____

27    [1] This motion and accompanying documents are filed under seal out of respect to the intent of the pro-

posed interim Protective Order presently before the Court relating to the disclosure of certain private

28    information pertaining in particular to Defendant Cota.

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

The Federal Rules of Criminal Procedure expressly provide that a party may plead *nolo contendere*. The guidance provided in the Federal Judicial Benchbook is that *nolo contendere* pleas are not unusual in nonviolent crimes where civil implications may arise from a guilty plea, which is precisely the situation here.

The Government's initial indictment charged Captain John Cota as the proximate cause of the allision. A few months later, the Government then chose to pursue criminal charges against Fleet alleging that it was the proximate cause of the allision. It should be noted that this criminal action by the United States against Fleet arises out of the very same occurrence that is the basis for a civil action it also initiated in November 2007, only 23 days after the allision. In both actions, the United States alleges negligence and strict liability violations as they relate to Fleet and the allision. As evidenced by allegations in the numerous related civil actions, there are other parties absent from this criminal case—including specifically the United States—acting through the Coast Guard, which are absolutely necessary for a fair determination of the issues of responsibility and proximate cause. In addition to the acts and omissions of the Coast Guard, there is also evidence that the California Board of Pilot Commissioners, the San Francisco Bay Pilots Association, as well as Dr. Charles Calza bear some responsibility for the allision. Yet, it is unlikely in the criminal action that the Government will bring the same type of charges against the Coast Guard, California Board of Pilot Commissioners or other entities and individuals responsible for placing Cota on the *COSCO BUSAN* despite knowing that he had medical and drug use disabilities.

Under the circumstances, the criminal process is not well suited to properly apportion responsibility for the allision. A criminal charge of negligence under the Clean Water Act does not allow for apportionment of fault, even if all of the parties involved were charged, which they are not. Only the civil process provides the opportunity for a fair and equitable apportionment of fault. It is for this very reason that the Rule 11 provides for the opportunity for a plea of *nolo contendere*. The purpose of the plea is to fairly resolve the criminal case while preserving the rights of the defendant to a fair trial on the merits of civil actions particularly where other parties share in liability. That the United States is one of those civil litigants makes acceptance of the plea even more compelling and equitable.

Since immediately following the spill, Fleet has been fully engaged in clean-up efforts as well as the processing and paying of damage claims arising from the spill. These efforts are ongoing. Neither Captain Cota, the Coast Guard, the Board of Pilot Commissioners nor Pilots Association have paid those costs; yet as summarized below, each bear some responsibility for the allision and the resulting spill.

Fleet respectfully requests that this Court accept Fleet's plea of a *nolo contendere* so that a fair and proper apportionment of responsibility and relative proximate causes can be obtained through the civil process. While a *nolo contendere* plea has no impact on sentencing, disallowing it will unquestionably impact Fleet's ability to receive a fair judgment in the civil matters now pending. The United States would also be given an unfair advantage in a civil case it initiated for the very same Incident. A *nolo contendere* plea herein will permit a fair and substantial resolution in the interests of justice and serve the "public interest in the effective administration of justice" overall as required by F.R.Crim.P. Rule 11(a)(3).

## II. FACTUAL BACKGROUND[2]

On November 7, 2007, at approximately 0830 Pacific Standard Time, the *M/V COSCO BUSAN* allided with the fendering system at the base of the Delta tower of the San Francisco-Oakland Bay Bridge (Bay Bridge). The ship, carrying 2,529 cargo containers, was outbound from Berth 56, Port of Oakland, bound for Pusan, Korea. As a result of the allision, the vessel sustained damage to its hull including the rupture of two of its bunker fuel tanks. Approximately 53,000 gallons of bunker fuel (oil) escaped from one of those tanks into San Francisco Bay ("Incident").

At the time of the Incident, the movement of the *COSCO BUSAN* was under the direction of Defendant Captain John Cota, a San Francisco Bay bar pilot assigned by the San Francisco Bay Pilot Association under compulsory pilotage mandated by California law. Evidence to be presented will show that Captain Cota was improperly licensed by both the United States Coast Guard and the California Board of Pilot Commissioners based on disqualifying health conditions, medications and history of drug

---

[2] The majority of the facts set forth herein are taken from the Coast Guard's Report of Investigation of the Allision (attached as Exhibit 4 to the Declaration of Marc R. Greenberg, ("Greenberg Decl.").) While there may be points of disagreement on some of the finer details, these can be resolved at sentencing to the extent they matter. As noted below the Court is not required to make particular factual findings with respect to the acceptance of a plea of *nolo contendere*.

FLEET MGMT.'S MEMO./P'S&A'S/SUP./MOT./LV./ENTER PLEA OF *NOLO CONTENDERE*
Case No. CR-08-0160-1 SI 2                                              KVL SE166102

and substance abuse.

Following the Incident, the United States filed a civil action against the Hong Kong-flagged vessel *in rem*, the vessel owner, Fleet and Cota. Various additional lawsuits were also filed in both state and federal courts, including two class actions suits on behalf of fishermen, crabbers, processors, recreational charter vessel operators, marinas, vendors, truckers, unloading and distributors of seafood products. The matters in federal Court have been related to each other and are pending before the Honorable Judge Samuel Conti. (Fleet Request for Judicial Notice ("FRJN"), ¶ __).

A.    **SUMMARY OF THE EVENTS OF NOVEMBER 7, 2007.**

The vessel was scheduled to depart the berth at 0630. Captain Cota, arrived at the vessel about 0620 and went to the bridge where he was joined by the Master[3]. When the pilot, Captain John Cota, arrived on the bridge the Third Mate provided him with a "pilot card" that contained ship characteristics and ship maneuvering performance data normally needed during piloting activities.

Heavy fog severely restricted visibility in the harbor that morning, described by Coast Guard personnel as the heaviest fog they had ever seen. (Greenberg Decl. ¶¶ 3,4 and 5.) Four other pilots on other oceangoing vessels set to depart that same morning decided to wait until the fog lifted before leaving port. The San Francisco Harbor Safety Plan ("HSP") which is mainly enforced by the U.S. Coast Guard established a standard against navigating in less than 1/2 nautical miles of visibility. Captain Cota was either unaware of the 1/2 nautical mile visibility restriction, or simply disregarded it. He did not advise or discuss it with the vessel's Master. U.S. Coast Guard personnel operating the Vessel Traffic Service ("VTS") system in the Bay were acutely aware of the visibility, and were in radio communication with Captain Cota about his plan to depart the berth in the heavy fog. Yet, VTS made no effort to enforce the HSP or even question Cota regarding the restricted visibility.[4]

In an interview with the Coast Guard on November 8, Captain Cota was asked if he felt at any point whether the visibility was too poor to depart. He allegedly responded that he felt comfortable pro-

[3] On a merchant ship, the ship's Captain is commonly referred to as its Master.

[4] Onboard the *COSCO BUSAN* is a Voyage Data Recorder ("VDR") which recorded critical historical data regarding the vessel's movement. The VDR also records radio transmissions and discussions on the bridge of the ship. (A transcript compiled by the NTSB has been provided in discovery, excerpts are attached as Exhibit 4, pg. 13 to Greenberg Decl. ¶ 6)

FLEET MGMT.'S MEMO./P'S&A'S/SUP./MOT./LV./ENTER PLEA OF *NOLO CONTENDERE*

ceeding because he had made the transit may times before and that it was like "driving a bus out of [my] driveway." (Greenberg Decl. ¶ 6; Exh. 4, pg. 23.) Cota and VTS somehow determined that the visibility was safe enough to depart because each was familiar with the local conditions, port practices and HSP requirements.

At about 0808, the vessel departed Berth 56 with the aid of the tractor tug *REVOLUTION* and the ship's bow thruster. The bridge navigation crew consisted of the Master, the Third Mate, a helmsman, and Pilot Cota. Cota had "the conn" (control of the vessel) from departure from berth until after the allision. Instruments on the bridge displayed the vessel's position and movement relative to wharves, the shoreline, buoys and the bridge. The tug trailing behind on a slack line, the *COSCO BUSAN* started making head-way out of the estuary.[5] The dredge *NJORD* was working toward the end and on the west side of the estuary, and the *COSCO BUSAN* passed to the right of it without incident.[6]

Cota has stated that he set the Variable Range Marker ("VRM") on one of the ship's radars at 0.33 nautical miles as was his usual practice. The VRM displays a ring around the vessel, the radius of which is the distance set by the operator. Cota set the VRM at 0.33 nautical miles to keep Yerba Buena Island 0.33 miles off his starboard side first as an indicator when to turn and then to ensure he passed safely under the Delta-Echo span of the bridge. According to Cota, the 0.33 nautical mile distance keeps the vessel at approximately the mid-point of the bridge span between the Delta and Echo towers. Cota <u>did not</u> inform the Master of the purpose of his 0.33 nautical mile VRM. (Greenberg Decl. ¶ 6; Exh. 4, pgs. 23 & 29.) Later when the vessel was more that 0.33 nautical miles away from Yerba Buena Island (0827), only Cota would have known that the vessel was off his intended mark.

At 08:27:24, the VTS controller responsible for vessel traffic in the Central Bay became concerned with the track of the vessel because of his "perception of where the vessel was at in relation to the Delta-Echo span" of the Bay Bridge. (Greenberg Decl. ¶7.) The vessel was heading towards the Charlie-Delta span of the bridge, rather than the Delta-Echo span. The VTS controller then contacted Pilot Cota

---

[5] Referring to the Oakland Bar Channel where the Inner Harbor Entrance Channel and the Outer Harbor Entrance Channel merge.

[6] One of the stated values in requiring a pilot on board is that the pilot will know the navigation details of the port, including temporary hazards or conditions that do not appear on any charts or notices.

FLEET MGMT.'S MEMO./P'S&A'S/SUP./MOT./LV./ENTER PLEA OF *NOLO CONTENDERE*
Case No. CR-08-0160-1 SI 3

by VHF radio to confirm his intentions.

| SPEAKER | TIME | TRANSCRIPT OF COMMUNICATION |
|---------|------|------------------------------|
| VTS | 08:27:48 | *Unit Romeo, Traffic. AIS shows you on a 235 heading. What are your intentions? Over.*[7] |
| Unit Romeo | 08:27:57 | *Um, I'm coming around, I'm steering 280 right now.* |
| VTS | 08:28:04 | *Roger, understand you still intend the Delta Echo span. Over.* |
| Unit Romeo | 08:28:15 | *Yeah, we're still Delta Echo.* |
| VTS | 08:28:21 | *Uh, roger Captain.* |

(Greenberg Decl. ¶ 6; Exh. 4, pg. 13.)

VTS misspoke when it told Cota that they had him on a heading of 235. The reference to 235 was actually the ship's track over the ground, it was not the ship's heading. Equally, wrong was Cota's statement that the ship was steering 280. As shown on the VDR, the ship was actually heading 260 at that moment. According to Cota's post allision statement to the Coast Guard, the VTS only added to his confusion. (Greenberg Decl. ¶ 8.) Unfortunately, only Cota knew that he was confused.

The VTS watch supervisor later stated that, based upon the pilot's "calm" demeanor the VTS personnel did not question the pilot further because they did not want to startle him with the news that he was standing in danger. They have admitted in a recorded interview that they "predicted" that he would hit the bridge, but that they chose not to say anything. (Greenberg Decl. ¶ 9.) Despite its authority and obligation to direct Cota to safety or at least warn him of the impending danger, VTS chose to say nothing after it misreported the ship's heading.

Cota later claimed that after departure from the berth in Oakland that he had lost faith in the vessel's radar and stopped using it. He initially claimed that both radars failed. (Greenberg Decl. ¶ 10.) At the NTSB hearing an expert from Sperry, the radar manufacturer, testified that it was nearly impossible for both radars to fail. Sperry examined both radars after the allision and found them to be in perfect

---

[7] Coast Guard VTS software captured vessel's AIS reported Course Over Ground (COG), and not the vessel's "heading" as the VTS Controller had stated. Heading is the horizontal direction of the vessel's bow, its Course Over Ground or Course Made Good is the course which the vessel makes good over ground, after allowing for the effects of currents, tidal streams, and leeway caused by wind and sea.

FLEET MGMT.'S MEMO./P'S&A'S/SUP./MOT./LV./ENTER PLEA OF *NOLO CONTENDERE*

working order.  As part of its inspection, Sperry found that no adjustments were needed for either radar.  (Greenberg Decl. ¶ 11.)  Cota never informed the Master that he thought that there was something wrong with the radar or that he was no longer relying on it.  Rather, according to Cota, he simply started relying on the vessel's Electronic Chart Data and Information System rather than the radar and the VRM that he personally set.  The VDR confirms that at whatever point Cota stopped relying on the radar, he did not tell the Master or crew.

## B.   THE VESSEL AND ITS MANAGERS.

The *COSCO BUSAN* is a Container Ship built in 2001.  She is approximately 901 feet long, 131 feet across at her widest point ("breadth") and draws nearly 40 feet 3 inches of water when fully loaded ("draft").  The vessel is powered by diesel engine and carries approximately 7,830 cubic meters of Heavy Fuel Oil (commonly referred to as "bunkers" or "bunker fuel").  The vessel is registered under the laws of Hong Kong.  At the time of the Incident, all regulatory certificates were valid and properly endorsed.  (Greenberg Decl. ¶ 6; Exh. 4, pg. 2)

Fleet is a provider of ship management services world wide.  It owns no vessels.  Fleet does, however, manage approximately 192 different types of vessels, under various flag registries, belonging to various owners and chartered to other shipping companies throughout the world.  Fleet Ship Management Inc. contracted with the owners to manage the *COSCO BUSAN* effective on October 24, 2007 when the owners took ownership of the vessel while alongside in Pusan, Korea.  The technical management was subcontracted by Fleet Ship Management Inc. to Fleet Management Europe Ltd., a U.K. corporation, based in London.  Crewing was subcontracted to Gold Fleet Shipping Co. Ltd, and then sub-sub con-tracted to China Marine Seaman Service Corp.

In response to the Incident, Fleet immediately activated its oil spill contingency plan in accordance with federal and state laws.  That plan included notification and activation of a pre-designated Qualified Individual and its contracted U.S.-based Spill Management Team, O'Briens Oil Pollution Services, Inc. ("O'Briens").  Fleet arranged for O'Briens to act on its and the vessel's owners behalf to join with the U.S. Coast Guard and California Office of Spill Prevention and Response ("CA-OSPR") in setting up a Unified Command to respond to and clean-up the spill.  Throughout the cleanup effort, Fleet was actively involved in the response effort interacting on a frequent and regular basis with O'Briens, the U.S. Coast Guard, CA-

- 7 -

1  OSPR and other interested parties and agencies. (Declaration of Joseph A. Walsh II ("Walsh Decl.") ¶ 1.)

2  Fleet also joined as a willing participant the National Transportation Safety Board (NTSB) in its investiga-

3  tion into the cause(s) of the incident.

4       Hudson Marine Management Services ("HMMS") was retained within days of the Incident to

5  establish a claims center for accepting, processing and resolving personal, commercial, and municipal

6  claims from the public for damages and losses resulting from the oil spill. To date, in excess of $48 mil-

7  lion has already been spent in clean up costs, and another $21 million has been paid out toward claims by

8  third parties. Even in cases where the full extent of damages are not yet know, interim payments have

9  been made. (Walsh Decl. ¶ 2.)

10       A cooperative assessment for determining the nature and extent of damage to natural resources has

11  been entered into with federal and state trustees. While that process will take several years, funding of the

12  trustees assessment costs have been provided for on Fleet's behalf. To date, approximately $800,000 has

13  been advanced to the Department of Interior and commitments made to pay the assessment costs and

14  expenses of other federal and state agencies. (Walsh Decl. ¶ 3.)

15  **C.    PILOT JOHN COTA.**

16

17

18

19

20

21

22

23

24

25

26

27       This is not the first case in which sleep apnea has been related to a pilot's loss of situational aware-

28  ness. In 1995, the cruise ship *STAR PRINCESS* grounded on Poundstone Rock in Alaska waters. The

- 8 -

NTSB investigated the accident and issued a formal report that concluded that a contributing cause of the accident was the pilot's sleep apnea, which caused the pilot to run aground in clear, calm weather, on a charted reef marked by a buoy.  Since the NTSB report, the NTSB, the Coast Guard, Board of Pilot Commissioners, and San Francisco Bar Pilots Association have been aware that a pilot suffering from sleep apnea is medically unfit.  (Greenberg Decl. ¶ 14.)  In 2006, the Coast Guard drafted new medical requirements for licensure, listing sleep apnea as a risk to safety.  Under those requirements, a waiver may be given only if the pilot can show that the condition is under control *without medication*.  (Greenberg Decl. ¶ 15.)

In January 2007, Cota reported to the Coast Guard that he had sleep apnea and that he was taking Provigil.  Despite this self-reporting, the Coast Guard authorized Cota to continue to perform his duties as a pilot.  The Coast Guard stated during public hearings before the NTSB in April 2008 that this was as an oversight in the medical review process of the Coast Guard.  (Greenberg Decl. ¶ 6; Exh. 4, pg. 22.)

Cota should have been on the Coast Guard's radar given that in 2006 he ran a ship, the Pioneer, aground in the Bay due to what the Board of Pilot Commissioners described was a "loss of situational awareness."  The Board of Pilot Commissioners reprimanded Cota but took no other action and made no effort to again evaluate his physical or mental fitness despite obligations to do so.  The Commissions' report was provided to the Coast Guard, however they too took no action.  One of the conclusions reached by the Coast Guard in their report on the instant Incident is that:

> numerous examples of impaired sensory perception, cognitive processing, and short-term memory failures by the pilot are highly suggestive of impaired human performance caused by medical and pharmacological human factors.

This conclusion is based only on Cota's use of Provigil and is quite similar to the cause of the Pioneer grounding.  (Greenberg Decl. ¶ 6; Exh. 4, pg. 29.)  What is <u>not</u> noted in the Coast Guard Report is ███

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

---

[8] Fleet is aware that the pharmacy records in question are substantial, but Fleet has yet to receive them from the Government.  Fleet asks that the Government provide the Court with a listing of prescriptions filled by Cota in the two to three months prior to the allision as part of its Opposition Brief since Fleet is unable to present this information in its brief.

FLEET MGMT.'S MEMO./P'S&A'S/SUP./MOT./LV./ENTER PLEA OF *NOLO CONTENDERE*

██████████████████████████████████████

██████████████████████████████████████

████████████████████████████

The failure of the Pilots Association, the Pilots Commission and the Coast Guard to address Cota's apparent drug addiction is central to the issues that need to be addressed if this type of accident is to be avoided in the future.  This will be accomplished, to the extent appropriate, through the civil cases presently before the Honorable Judge Conti.

**D.     UNITED STATES COAST GUARD.**

The U.S. Coast Guard is an agency of the United States which is part of the Department of Homeland Security.  The Coast Guard operates the San Francisco VTS from Yerba Buena Island.  The mission of VTS is to avoid collisions and allisions in the Bay.  The Coast Guard is also responsible for the licensing of merchant mariners including Pilots such as Captain Cota.  The Coast Guard's licensing obligations necessarily include an annual, detailed, review of the medical fitness of the applicants.

**1.     VTS Has Authority To Direct Ships In The San Francisco Bay.**

At VTS San Francisco, the authority to direct vessel movement is applied using the concept of "continuum of control."  Within the continuum of control concept are four levels of control that the VTS controller can exert over a vessel operating within the system.  The four levels of control are *monitor*, *inform*, *recommend*, and *direct*.[9]  At the *direct* level of control, a VTS controller who has determined that certain action is "necessary to enhance navigation and vessel safety, and protect the environment" must provide the Master or pilot with clear and specific action(s) that must be taken to mitigate the risk.[10]  These directions or control measures include "imposing vessel operating requirements," but they do not include specific vessel operational orders such as helm or rudder commands.[11]  In times of "restricted visibility, adverse weather, or other hazardous circumstances, a VTS may control, supervise, or otherwise

---

[9] VTS San Francisco *Standard Operating Procedures* dated May 15, 2007.

[10] Title 33 C.F.R. § 161.11(a) and VTS San Francisco *Standard Operating Procedures* dated May 15, 2007.

[11] Title 33 C.F.R. § 161.11(a)(2).

1    manage traffic, by specifying times of entry, movement or departure to, from, or within a VTS area."[12]

2           VTS contributed to the Incident by failing to follow and enforce the ½ nautical mile requirement

3    when the Bay is affected by fog or conditions of restricted visibility.  It did not instruct nor even question

4    Cota about his decision to get underway in contravention to the HSP.

5           Later, once VTS undertook to involve itself with Cota's navigation of the *COSCO BUSAN*, it had a

6    duty to accurately report the ship's heading.  The Ninth Circuit has recognized that a proceeding in

7    admiralty may be maintained under the Suits and Admiralty Act ("SAA") where a ship owner sought con-

8    tribution from the government for the Coast Guard's negligence in aiding a distressed ship.  See Huber v.

9    U.S., 838 F.2d 398 (9th Cir. 1988).  VTS's inaccurate information fed Cota's confusion at a critical time

10   while piloting the *COSCO BUSAN*.  Finally, when VTS received information from Captain Cota that

11   supported its prediction that the vessel would allide with the bridge, it should have warned Cota that he

12   was standing in danger, but chose to do nothing.  These issues are before the court in the civil cases.

13           **2.    Coast Guard Had Responsibility For Medical Fitness Of Captain Cota.**

14           In addition to VTS, the Coast Guard operates a Regional Exam Center ("REC") which provides

15   licensing services to mariners, including in this case, Captain Cota.  In 1999, Cota sought to renew his

16   license and submitted an application and physical exam report on Coast Guard Form, CG-719K.  The

17   form was signed by Dr. Charles Calza and was accompanied by a letter to the State Board of Pilot

18   Commissioners finding Cota "fit for duty." (Greenberg Decl. ¶ 6; Exh. 4, pg. 21) The REC forwarded the

19   1999 physical to the National Marine Center ("NMC") for a medical evaluation as required by the U.S.

20   Coast Guard's Marine Safety Manual.  In November 1999, the NMC sent an e-mail to the REC:

21   (1) granting Cota a waiver for a medical condition but not indicating what the waiver was for; and

22   (2) directing the REC to issue Cota a license but instructing the REC to physically show the waiver on the

23   license as required by the Marine Safety Manual.  The waiver should have read, "Any deterioration of a

24   waivered medical condition shall be immediately reported to the nearest REC."  (Greenberg Decl. ¶ 6;

25   Exh. 4, pg. 22)  In 2004, Cota again applied for renewal and again submitted medical documentation

26   signed by Dr. Calza. ████████████████████████████████

27   _____

28   [12] Title 33 C.F.R. § 161.11(b).

FLEET MGMT.'S MEMO./P'S&A'S/SUP./MOT./LV./ENTER PLEA OF *NOLO CONTENDERE*

1 ████████████████████████████████████████████████████

2 ████████████████████████

3      Subsequent physicals submitted by Cota (and signed by Dr. Calza) for 2004 and 2006 demon-

4 strated ████████████████████████████████████████████████

5 ████████████████████████████████████ further medical review at both the REC and

6 NMC. These reviews were never done. (Greenberg Decl. ¶ 6; Exh. 4, pg. 22) Moreover, the NMC had

7 issued verbal instructions to the REC Chiefs at a conference in 2006 directing them to review pilot annual

8 physicals using the guidelines in draft NVIC XX07 which included "sleep apnea" as well as drug use as a

9 reason to deny renew of the license. However, the San Francisco REC failed to follow these instructions.

10 (Greenberg Decl. ¶ 6; Exh. 4, pg. 22)

11      The Coast Guard's mistakes of 1999, 2004, and 2006, were compounded and repeated in 2007. █

12 ████████████████████████████████████████████████████

13 ████████████████████ Rather, the Coast Guard renewed his license without the required review

14 of his medical impairments. ████████████████████████████████

15 ████████████████████████████████████████████████████

16 ████████████████████████████████████████████████████

17 ████████████████ Yet, there is "no evidence in the file or in MMLD that the physical was reviewed by an

18 evaluator at the REC San Francisco, and there was no record of the physical being sent to the NMC for a

19 medical review." (Greenberg Decl. ¶ 6; Exh. 4, pg. 22) Not only did the REC fail to apply the new

20 standards as required, it failed to even apply the old ones; it failed to review Cota's file altogether.

21      While the Government has charged Captain Cota for not listing all of the drugs he was taking on

22 his 2007 application, it is undisputed that the drugs listed were sufficient to disqualify him as a pilot. This

23 was confirmed by testimony at a public hearing conducted by the NTSB. Dr. Bourgeois testified that Cota

24 should have been disqualified. (Greenberg Decl. ¶ 18)

25      The U.S. Coast Guard failed to follow its own procedures on multiple occasions which directly

26 resulted in the licensing of a dangerous and medically unqualified person to serve as a pilot on the

27 *COSCO BUSAN.* While the Coast Guard is obviously not going to be a defendant in the criminal case,

28 Fleet had, prior to indictment, filed counterclaim against the United States in a civil lawsuit initiated by

the United States with respect to the Coast Guard failings.  At the appropriate time, a proper apportion-ment of fault will include consideration of the acts and omissions of the VTS on the day of the allision, and the Coast Guard in issuing Cota a license in 2004, 2005, 2006 and 2007, the later of which allowed him to board the *COSCO BUSAN* and direct its navigation November 7, 2007.  These issues are all before the court in the civil cases.

### E.    CALIFORNIA STATE BOARD OF PILOT COMMISSIONERS.

Fleet asserts that the State of California is directly and vicariously liable for the conduct of the Board of Pilot Commissioners in failing to properly train, supervise and discipline Cota following a myriad of incidents involving lack of situational awareness and a well known and documented history of substance abuse.  This too is a matter that is at issue in the civil cases.

### F.    CHARLES CALZA, M.D.

Dr. Calza has repeatedly certified Captain Cota as "fit for duty" under the standards set forth in NVIC2-98, published by the Coast Guard.  Yet, Dr. Calza stated in a post allision interview that he did not have a copy of the NVIC nor did he recall ever reading it.

Dr. Calza is a third-party defendant in one of the civil matters.

### G.    SAN FRANCISCO PILOTS ASSOCIATION.

Fleet obviously bears no responsibility for Cota's licensing or his selection of the pilot for the *COSCO BUSAN*.  However, the Coast Guard, the Pilots Association, and the Pilots Commission all bear responsibility for allowing Cota to continue to act as a pilot on board large vessels traveling in the bay.  While the Government did not charge Cota with negligence based on his drug use, the connection between the drugs and his loss of situational awareness is unavoidable, and was the responsibility of those identified in the civil cases, but not present in the criminal case.  Ultimately it was the Pilots Association that assigned Cota to navigate the *COSCO BUSAN* on the morning of November 7, 2007.  Despite his history of difficulties with situational awareness, his sleep apnea, and his drug use, the Pilots Association made no effort to reassign a more stable pilot to the *COSCO BUSAN*.  The Pilot Commission, along with

- 13 -

the Pilots Association and the Coast Guard, is a defendant in at least one of the civil cases.

## H.    THE PASSAGE PLANS MENTIONED IN THE INDICTMENT DID NOT INFLUENCE COTA'S NAVIGATION OF THE VESSEL.

A path, or track, for the vessel's departure out of San Francisco Bay was depicted on British Admiralty Chart No. 588.  Following the route set out on that chart, the course to steer from the initial waypoint (a position located in the center of the Inner Harbor Entrance Channel just off Berth 56) to way-point #1 (a position outside the Bar Channel) was 287°.  At waypoint #1, the track turned just South of due West in a direction of 259° towards waypoint #2.  At waypoint #2, the track turned to 313° and went under the South-West portion of the Delta-Echo span.

The San Francisco Pilot Association testified before the NTSB that the track depicted on the *COSCO BUSAN*'s chart was a common passage, that it was not improperly drawn on the chart, and that it was acceptable.  (Greenberg Decl. ¶ 19)  In fact, written policy provided by the United States is that "Northbound traffic should use the South West half of span D–E."  (Greenberg Decl. ¶ 6; Exh. 4, pg. 7)

The plan laid out on the paper chart was completely disregarded by Cota.  Cota did not even look at the chart as part of his pilot-exchange with the Master, nor did he look at the chart at any point during the passage. (See Coast Guard Report of Investigation, page 23, Exh. 6 to Greenberg Decl.)  After the casualty Captain Cota explained this conduct by stating that he never uses the ship's passage plan and thus had no reason to review it.  Id.  He likened piloting a ship from the estuary to sea as the equivalent of "driving a bus from my driveway."  (Greenberg Decl. ¶ 6; Exh. 4, pg. 23)  Other testimony before the NTSB was consistent with Cota's view that pilots do not rely on the passage plans set out by the crew. (Greenberg Decl. ¶ 20 & 21.)

In addition to the track set out on the chart, the second officer also accessed a previously created, computer generated, set of waypoints for Oakland to Pusan.  The waypoints in the computer were set by a program called Waypoints for Windows.  Waypoints for Windows is not capable of taking into consideration anomalous conditions in the Bay.  For example, the dredge barge *NJORD* that was tempo-rarily working near the opening of the estuary would not be depicted.  The local pilot is relied upon for navigation details within pilotage waters.  All of the historical Waypoint for Windows printed routes for San Francisco Bay set a course through the South-West side of the Delta-Echo span, near the Delta Tower.

- 14 -

1   Each time, passage under the bridge would have been identical to that set out on the chart on November 7,

2   2007.

3          The Second Mate, Zhao Shun Biao, was interviewed by the government prosecutors on January 7,

4   2008. According to the government's interview report, during that interview the Second Mate stated that

5   it was his job to prepare a "port to port" passage plan for each voyage.

6          The government met again with Zhao again in early June 2008 in order to prepare for his Rule 15

7   testimony which at that time was scheduled for the second week of June. Zhao purportedly disclosed for

8   the first time that he had taken several passage plans from the ship and that he has been hiding them in his

9   hotel room ashore. In June, he provided his counsel with: (1) the original pilot station to pilot station

10  passage plan for Pusan to Long Beach; (2) the original pilot station to pilot station passage plan for Long

11  Beach to Oakland; and (3) the original pilot station to pilot station passage plan for Oakland to Pusan.

12         These documents have since been provided to the Government by Zhao's counsel. These three

13  documents are at the heart of Counts Five through Ten against Fleet. The two passage plans for prior

14  journeys unrelated to the departure from San Francisco on November 7, 2007 could in no way be materi-

15  ally connected to the allision. As for the facts relating to the creation of the passage plan for the departure

16  from Oakland on November 7, 2007, they too are immaterial to the actual cause of the allision since the

17  plan depicted on the chart was acceptable. Moreover, it must be remembered that Captain Cota never

18  looked at the chart or the passage plan and so it could not have influenced his conduct. However, these

19  are points that can be argued at sentencing should the plea be accepted. As noted above, the acceptance of

20  a *nolo contendere* plea does not limit either side as to what may be argued at sentencing. The Court will

21  have the full panoply of sentencing options available to it, the same as would be available if there were a

22  conviction after trial.

23  ///

24                              **PROCEDURAL HISTORY**

25  I.      **CIVIL ACTION INITIATED BY THE UNITED STATES.**

26         On November 30, 2007 the United States first filed a civil lawsuit against the vessel in rem,[13] the

27  _____

28  [13] In lieu of arrest of the vessel, the underwriter for Defendant Fleet provided the United States with
    security in the form of a Letter of Undertaking for its civil claims in the amount of $79,500,000.00.

- 15 -

1  vessel's owners, Fleet and Cota.  In that action as later amended, the United States seeks to recover its

2  removal costs and damages resulting from the Incident, declaratory judgment against future losses and

3  damages, vessel forfeiture, and judicially assessed civil penalties under the Clean Water Act, as amended

4  by the Oil Pollution Act of 1990 ("OPA").  It alleges negligence and strict liability violations of the

5  National Marine Sanctuary Act, The Park Systems Resource Protection Act, OPA and Clean Water Act.

6  Following the indictment of Fleet in the criminal action, the United States made specific reference

7  to the allegations in the indictment in its civil action demonstrating intent to pursue Fleet for much of the

8  same conduct at issue in the instant case:

9  > The United States [civil] complaint alleges that at the time of the Incident . . . Fleet
10 > Management was the operator of the vessel; that Cota was the Pilot of the *COSCO
   > BUSAN*.  With respect to . . . Fleet, and based upon information made public in documents
11 > filed in the criminal case pending against Cota, the United States further alleges, inter alia,
   > that said Defendant's crewmen of the vessel altered and/or deleted and/or created anew
12 > various documents and material evidence and, with respect to operation of the vessel itself,
   > the United States further alleges that the crew of the vessel were not trained by Fleet . . .
13 > with respect to performance of essential duties aboard the vessel, including operation of
   > critical navigation equipment.

14 (Walsh Decl., ¶ 4, Proposed Case Management Plan filed on September 5, 2008).

15 On June 3, 2008 in answer to the government's civil lawsuit, Fleet denied liability, counter

16 claimed back against the United States under maritime and common law theories of negligence seeking

17 entitlement to contribution, setoff and recoupment.  Fleet also asserted third-party claims against the State

18 of California and Dr. Calza.[14]  In short, Fleet alleges that these and other entities were negligent or are

19 otherwise liable for causing or contributing to the cause of the Incident.  The United States has yet to

20 respond or answer the Counterclaim against it.

21 **J.    CRIMINAL CASE AGAINST COTA AND FLEET.**

22 The government designated six of the vessel's crew as material witnesses back in December 2007.

23 At that time, it was contemplated that they might be detained through May 15, 2008.  The material

24 _____

25 (Walsh Decl. ¶ 7.)

26 [14] That action, entitled, United States of America v. M/V COSCO BUSAN, *in rem, et al.*, C-07-06045
   (SC) is pending in this Court before the Honorable Judge Samuel Conti.  Four other civil matters have
27 been related with this civil action.  (FRJN)  Many of the parties to those actions have recommended or
   requested stays or limited/modified stays pending the outcome of the criminal proceedings against Captain
28 Cota and Fleet.  (Walsh Decl. ¶ 6.)

1  witnesses are separately represented, but have not been charged, despite the fact that Fleet's liability is

2  vicarious for their alleged actions or omissions.

3      Defendant Cota was first charged in an Information dated April 22, 2008, with misdemeanor viola-

4  tions of the Migratory Bird Act and Clean Water Act.  The Migratory Bird Act charge is based on strict

5  liability, albeit criminal liability.  Cota's charge under the Clean Water Act is for negligence in causing the

6  spill.  Rule 15 trial testimony of the crew was first scheduled for May 2008.

7      After setting the Rule 15 depositions, the government returned a superseding Grand Jury indict-

8  ment against Captain Cota charging him with making false statements to obtain his mariner's license from

9  the U.S. Coast Guard.  In particular, the government alleged that in 2006 and 2007 Cota failed to fully

10  disclose his medications.

11      The Rule 15 depositions were then continued to July and then taken off calendar because of

12  additional disclosures of information given to Cota.  On July 22, 2008, the Government returned a second

13  superseding indictment alleging that in addition to Cota negligently causing the allision, the crew of the

14  *COSCO BUSAN* also negligently caused the allision.  In addition, the government alleges that various pas-

15  sage plans were created after the allision which, although Fleet asserts are unrelated to the allision, were

16  false and misleading.  The date of the depositions is dependent upon when counsel for Fleet can review

17  the discovery and reasonably prepare for cross-examination and direct examination of the crew.  Counsel

18  for Captain Cota is ready to proceed as soon as Fleet is ready to do so.

19      Based on the recent but not insubstantial discovery produced by the government, it will take

20  several months for Fleet to prepare for taking of trial testimony from the government's material witnesses.

21  (Greenberg Decl. ¶ 23.)  Fleet is presently reviewing volumes of material to prepare a statement for

22  Magistrate Judge Spero in an attempt to identify what addition information it will need to be reasonably

23  ready to take such testimony form those witnesses.

24  ### III.  ACCEPTANCE OF DEFENDANT'S *NOLO CONTENDERE* PLEA

25  ### WILL BE IN THE INTERESTS OF JUSTICE

26      F.R.Crim.P. Rule 11(a)(3) provides that the Court may accept a *nolo contendere* plea after consid-

27  ering "the parties" views and the public interest in the effective administration of justice."

28      The *nolo contendere* plea has always existed in the Federal courts. Advisory Committee Notes for

- 17 -

the 1944 adoption of the F.R.Crim.P., citing <u>Hudson v. United States</u>, 272 U.S. 451 (1926); <u>United States v. Norris</u>, 281 U.S. 619 (1930); <u>see also</u> <u>North Carolina v. Alford</u>, 400 U.S. 25, at 35 (1970). From 1964 to 1980, 97 percent of the *nolo contendere* pleas offered in antitrust cases were accepted where other defendants ultimately proceeded to trial. <u>U.S. v. Baltimore & Ohio R.R.</u>, 543 F. Supp. 821, 823 and n.4 (D.D.C. 1982) (finding that statistics "belie the government's argument that exercise of the Court's discretion should be reserved for exceptional circumstances").

The Court has the discretion whether to accept a *nolo contendere* plea, and does not need to follow government objections to such a plea. <u>See id.</u>; <u>U.S. v. Jones</u>, 119 F. Supp. 288 (S.D. Cal. 1954) (accepting *nolo contendere* plea over government objection); <u>U.S. v. Bagliore</u>, 182 F. Supp. 716 (E.D.N.Y. 1960) (same); <u>U.S. v. Cigarette Merchandisers Ass'n</u>, 136 F. Supp. 212 (S.D.N.Y. 1955) (same).

In the instant case, there is already substantial civil litigation against Fleet based on the very same transactions pled in the Indictment, including civil litigation initiated by the Government. Fleet is willing to resolve the criminal charges lodged against it now but seeks not to create evidence which will be used unfairly, including by the United States in the related civil litigation. Defendant's purpose in seeking a *nolo contendere* plea therefore coincides with the "main, if not only, modern purpose of *nolo contendere*." <u>Jones</u>, 119 F. Supp. at 290 (holding that "to avoid exacting an admission which could be [used as an admission in other potential litigation], is the main, if not only, modern purpose of *nolo contendere*").

"[I]n the absence of some reason why a defendant should not have the benefit of the [*nolo contendere*] plea, the Court will ordinarily allow it to be entered." <u>Id.</u> In determining whether to accept a *nolo contendere* plea, the Court must consider each case in its own particular context. <u>U.S. v. Dynalectric Co.</u>, 674 F. Supp. 240, 241 (W.D. Ky. 1987). Common factors that a Court considers include: the nature of the claimed violations, Defendant's role in the claimed violations, the impact of the *nolo contendere* plea on deterrence, and the views of the government. <u>U.S. v. Standard Ultramarine & Color Co.</u>, 137 F. Supp. 167, 172 (S.D.N.Y. 1955). Another commonly addressed factor is the conservation of judicial resources. <u>See</u> <u>U.S. v. B. Manischewitz Co.</u>, 1990 WL 86441, 6–7 (D.N.J. 1990); <u>U.S. v. Yonkers Contracting Co.</u>, 697 F. Supp. 779, 781–82 (S.D.N.Y. 1988).

A.    <u>**NATURE OF THE CLAIMED OFFENSE.**</u>

Courts have permitted *nolo contendere* pleas even where the defendants' wrongful conduct

- 18 -

spanned nine years, because the defendants did not have prior criminal conduct and would suffer severe financial hardship if required to proceed to trial. See Baltimore, 543 F. Supp. at 824. The allision of the *COSCO BUSAN* with the Bay Bridge was an isolated, unfortunate accident. Fleet has not engaged in prior criminal conduct, has accepted responsibility for the clean-up and processing of claims to the public, and has also willingly cooperated with investigative measures. It is not running away from the Incident and its responsibilities under federal and state pollution laws.

The government has charged Fleet with a strict liability offense. While this is an anathema to the traditional requirement that there cannot be a criminal offense without *mens rea* or intent, the Migratory Bird Act provides for criminal liability without any fault or intent. While intent is not required, it is still required that the Government establish that Fleet was the actual proximate cause of the death of the bird. By charging both Cota and Fleet, the Government necessarily acknowledges that there can be more than a single cause of the loss. Yet, even prior to Indictment, Fleet asserted that the United States and others may have also caused the loss, and the related civil cases are poised to resolve whether others outside of this criminal case, including the United States, are also a cause.

To the extent that the Coast Guard negligently allowed Cota to retain his license despite his medical condition, and despite his drug use, and history of accidents, it should bear responsibility for that conduct. To the extent that the VTS was negligent in its communications to Cota minutes before the allision, VTS should bear responsibility for such negligence. To the extent that the Pilots Association, the Board of Pilots Commissioners and Dr. Calza permitted Cota to continue to pilot ships in port, they should bear the responsibility for their lack of responsible oversight. The picture must be viewed in its entirety, not through the selective narrow lens chosen by the Government, which has a direct financial stake in the outcome of this criminal case.

The government has also charged Fleet, and John Cota with negligent violation of the Clean Water Act. The government, by its charge alone, again acknowledges that there were multiple causes, and even multiple proximate causes. And while the government has not charged the Board of Pilot Commissioners, Dr. Calza, the Pilots Association or the Coast Guard for their respective roles in allowing Cota to be licensed and operate as a pilot; there is substantial evidence to support a claim that Cota should not have been licensed as a pilot given his medical condition, drug use and history of poor performance. However,

- 19 -

1  only in the civil proceedings are all the parties truly present that were involved in allowing Cota to

2  continue to conn ships.

3        The criminal forum lacks all the requisite parties, and lacks a process for apportionment of fault as

4  between parties; thus, the apportionment of negligence should be left to the civil process, which is already

5  underway.  Fleet is presently willing to accept the consequences of a *nolo contendere* plea.  Presumably its

6  sentence would be no more and no less whether it accepts a conviction by *nolo contendere* or is found to

7  be guilty after a long drawn out trial.  It is simply trying to close the criminal proceedings without causing

8  unfair consequences in the various civil proceedings.  Refusal to allow Fleet to enter a *nolo contendere*

9  plea will force the undue hardship of a costly and unnecessary trial.  Moreover, it will advance the Rule 15

10  depositions and allow the release of the material witnesses sooner.

11      **B.**    <u>**ROLE OF DEFENDANT.**</u>

12        The U.S. Supreme Court has described a pilot as the "temporary master" (master pro hoc) (<u>Cooley</u>

13  <u>v. Board of Wardens for the Port of Philadelphia</u>, 23 How. [U.S.] 2890) in regard to navigation, in charge

14  of "the whole conduct of the navigation of the ship." (MINDING THE HELM, p. 81.)

15        Defendant's corporate officers were not present when the events relevant to this case occurred, and

16  had no direct participation in the circumstances leading to the allision.  Fleet's alleged liability is purely

17  vicarious liability for the crew.  The crew of the *COSCO BUSAN* are, at times, temporary agents of Fleet.

18  They are not full time, regular employees.  The crew is hired through a manning agent to sail a single ship

19  for a set period of time.  Thereafter, they may contract again with Fleet for another ship or may contract

20  with any other shipping company.

21        Each crew member is licensed on the basis of an international standard accepted by the United

22  States Coast Guard.  A licensed Master is, by the issuance of such a license, certified as capable and

23  competent to sail a ship as a master.  Neither Fleet, nor the Coast Guard is in a position to dispute or chal-

24  lenge a Master's international license.  The same is true for the Chief Officer, the Second Mate, the Third

25  Mate, and the rest of the licensed crew members.

26        The government's theory is that the conduct of the licensed crew members fell below the

27  international standard of care established for each respective licensed crew member.  To the extent that the

28  crew's conduct fell below the standard of care required by their license, Fleet was not responsible for the

licensing of the crew. Moreover, Fleet, like the Coast Guard, can only assume that when it sends a licensed crew member to a ship that crew member is competent to hold the position for which he contracted. A licensed Second Mate is presumed to be competent to sail as a Second Mate. Moreover, once the crew is on board the ship, there is little opportunity to know exactly how they will perform their duties and sail the ship.

As discussed above, whatever the allegations are against the crew, even if true, there will be no apportionment of fault in the criminal case and hence the criminal justice system would effectively render Fleet entirely at fault. Thus, this prosecution would have a direct, disproportionate impact on a Defendant who was not even present when the incident occurred.

Because the Federal Rules of Criminal Procedure do not require the Court to make factual findings before accepting a *nolo contendere* plea and sentencing based on that plea, a proper apportionment of responsibility can still be made in the various civil cases, despite the entry of the plea. Ranke v. U.S., 873 F.2d 1033, 1036–37 (7th Cir. 1989); see also Duffy v. Cuyler, 581 F.2d 1059, 1063 n.3 (3d Cir. 1978) ("[Fed.R.Crim.P. 11] requires inquiry of the factual basis of a guilty plea, but no such requirement exists for *nolo contendere*."); U.S. v. Prince, 533 F.2d 205, 208 (5th Cir. 1976); Tempo Trucking & Transfer Corp. v. G.R. Dickson, 405 F. Supp. 506, 517 (E.D.N.Y. 1975) ("a court may accept a plea of *nolo contendere* without being satisfied that there is a factual basis for the plea"). This is because "a plea of *nolo contendere* may be accepted from a defendant who is wholly innocent but who does not wish to contest the charge." Ranke, 873 F.2d at 1036, citing WRIGHT, FEDERAL PRACTICE AND PROCEDURE, 1A FED. PRAC. & PROC. CRIM. 2d § 174, 614 (1982).

Rule 11(f) is the only part of Rule 11 that applies to guilty pleas but not to *nolo contendere* pleas. According to Wright, Federal Practice and Procedure, 1A Fed. Prac. & Proc. Crim. 3d § 174, and n.9 (2003), "this is because a plea of *nolo contendere* may be accepted from a defendant who is wholly innocent but who does not wish to contest the charge."

> Guilty pleas must be rooted in fact before they may be accepted. Fed.R. Crim.P. 11(f); Alford, 400 U.S. at 35 n.8, 91 S. Ct. at 166 n.8. No similar requirement exists for pleas of *nolo contendere*. Courts may accept them without inquiring into actual guilty.

1    <u>Blohm v. C.I.R.</u>, 994 F.2d 1542 at 1554 (11th Cir. 1993)[15]

2         Hence, the Federal Judiciary Conference Benchbook for Federal Judges, at Section 2.01:  Taking

3    pleas of guilty or *nolo contendere*, makes clear that courts need not make findings of fact for entry of a

4    *nolo* plea.  The Benchbook further provides that *nolo contendere* are not unusual in nonviolent crimes

5    where civil implications may arise from a guilty plea, which is precisely this case.  BENCHBOOK, <u>id.</u>, at

6    § 2.01.

7         **C.    IMPACT ON DETERRENCE.**

8         First, it must be noted that the Incident was an unfortunate accident.  It does not involve a financial

9    fraud or ponzi scheme.  It does not involve violent crime or loss of human life.  It was an accident.

10   Moreover, it is undisputed that Fleet bears no responsibility for Cota's licensing or his selection and

11   assignment as the pilot for the *COSCO BUSAN*.  It is virtually impossible to equitably evaluate deterrence

12   against Fleet's conduct when there are so many other precipitating factors and other parties which

13   contributed to the cause of the Incident.

14        The existence of parallel civil litigation is often viewed as a "significant factor" that undercuts any

15   concern that a *nolo contendere* plea will be harmful to public deterrence.  <u>See, e.g.</u>, <u>Baltimore & Ohio</u>

16   <u>R.R.</u>, 543 F.2d at 824–825, noting deterrence impact of multiple parallel damage actions seeking treble

17   damages); and <u>Brighton Builders</u>, 431 F. Supp. at 1120 (absence of parallel proceedings supported rejec-

18   tion of a *nolo contendere* plea.)  In this case, there are several parallel proceedings involving the very

19   same Incident.  (Walsh Decl. ¶ 6.)

20        In addition to damage claims in the various civil matters, Fleet also faces judicially assessed civil

21   penalties under section 1321(b)(7) of the Clean Water Act, as amended by OPA '90 based on the amended

22   complaint filed by the U.S. Department of Justice.[16]  Notwithstanding all of those costs and penalties,

23   ────────────────────

24   [15] <u>U.S. v. Hines</u>, 507 F. Supp. 139, 140 (D.C. Mo. 1981) (By the 1966 amendment to Rule 11 . . . the *nolo*
     plea serves a new purpose in that, as distinguished from a guilty plea, a *nolo* plea may be accepted without
25   the usual prerequisite of fully satisfying the Court that the defendant has in fact committed the crime
     charged.)

26   [16] Fleet have also been sued for civil penalties under state law, <u>City of San Francisco, et al. v. Regal Stone,</u>
     <u>Ltd; Fleet Management Ltd., et al.</u>, CGC-07-469876, and while there is apparently a jurisdictional battle
27   between the Plaintiffs and CA-OSPR as to standing to bring such penalties, the point remains that Fleet is
     still subject to additional penalties for the very same Incident as it being prosecuted in the criminal action.
28

FLEET MGMT.'S MEMO./P'S&A'S/SUP./MOT./LV./ENTER PLEA OF *NOLO CONTENDERE*

1  there is the matter of the tens of millions of dollars already spent in cleanup costs, third-party claims and

2  restoration.  So far approximately 70 million dollars has been spent on paying claims to third parties and

3  for cleanup costs.  It is inconceivable that anyone could suggest that there is a lack of deterrence.  A ship

4  was damaged and tens of millions of dollars have been spent and more will be spent as a result.  There is

5  plenty of general deterrence already built into the system.

6      **D.      <u>VIEW OF THE GOVERNMENT.</u>**

7          Since 1953, the Executive has had a written policy against *nolo contendere* pleas.  Attorney

8  General Herbert Brownell, in 1953, instructed his office that in an effort to discourage the widespread use

9  of plea of *nolo contendere*, they were not to consent to a *nolo* plea, except in the most unusual circum-

10  stances and then only after approval of the Assistant Attorney General.  Quoted in <u>U.S. v. Jones</u>, 119 F.

11  Supp. 288 at 292 n.1 (S.D. Cal. 1954).  Policy of the Government regarding *nolo contendere* pleas has

12  remained unchanged since the time of Attorney General Brownell.  The current U.S. Attorney's Manual

13  contains essentially the same policy—they are to be opposed unless approved by the Deputy Attorney

14  General.  Consequently, Fleet has been informed repeatedly that a *nolo* plea was a "non-starter."

15  (Greenberg Decl. ¶ 2.)  The idea was immediately dismissed, as a matter of policy.

16          A 1996 Harvard Law Review survey for the years 1959 to 1965 reviewed the history of acceptance

17  of *nolo contendere* pleas in antitrust cases.  During the six years reviewed, the government opposed

18  60 percent of the *nolo contendere* pleas, courts accepted the *nolo contendere* pleas in 96 percent of those

19  cases.  Courts accepted 100 percent of *nolo contendere* pleas in the cases where the government agreed to,

20  or did not oppose such a plea.  79 HARV. L. REV. 1475, at 1480 and at n.37.

21          Thereafter, in 1982, District Judge Barrington Parker updated these statistics in <u>United States v.</u>

22  <u>Baltimore & Ohio Railroad</u>, 543 F.2d 821, 823 (D.D.C. 1982):

23          At the request of the Court, the parties gathered data on courts' acceptance of the plea in
            antitrust cases.  The data shows that from 1955 to 1980, 2,845 *nolo contendere* pleas were
24          accepted and only 76 were denied.  The pleas were accepted in 1,299 instances over gov-
            ernment opposition.
25

26          The Judiciary has a long history of deciding to accept a *nolo contendere* plea in appropriate cir-

27  cumstances, over the objection of the government.  Unquestionably, the Court has the discretion whether

28  to accept a *nolo contendere* plea, and does not need to follow government objections.  See <u>Baltimore,</u>

1  543 F.2d at 823; Jones, 119 F. Supp. 288; Bagliore, 182 F. Supp. 716; Cigarette Merchandisers Ass'n,

2  136 F. Supp. at 213.  The Court retains its discretion whether to accept a *nolo contendere* plea even if the

3  United States Attorney is forbidden by policy from consenting to such a plea.  Jones, 119 F. Supp. at 290.

4  Thus, the United States Attorney's refusal to consent does not dictate whether the Court accepts Fleet's

5  proffered *nolo contendere* plea.

6       In this case there are not only civil implications to a guilty plea, the United States Government is

7  involved in the civil cases, as a plaintiff and as a counter-defendant.  The Government's own conduct and

8  financial interests are directly in issue.  As such, it should not be surprising that the Government here will

9  object to a plea of *nolo contendere*.  The Government would not want to give up the tactical advantage in

10  the civil cases that can be gained by convincing the court not to accept a plea of *nolo contendere*.  Because

11  the Government has a direct financial interest in the court's decision on this request, its objection should

12  not be a significant factor in the court's consideration of Fleet's request.

13       The Department of Justice has not approved a *nolo contendere* plea since 2002, in the Olympic

14  Pipeline Case.  (Greenberg Decl., ¶ 2.)  The Government's opposition is a matter of knee-jerk application

15  of a policy that is over 50 years old, and which has been rejected by courts for the same period of time in

16  the appropriate.  Ironically, if the Government were to give due consideration to the facts here, it would

17  find that this case meets its standard of the unique, but appropriate case.  Quite simply, if the facts and

18  circumstances of this case do not meet the standards for a *nolo contendere* plea, it is difficult to imagine

19  when the rule will ever be applied.

20      **E.**    **CONSERVATION OF JUDICIAL RESOURCES.**

21       Courts also consider whether a denial of a *nolo contendere* plea would result in a "very long

22  complicated trial" or "undue burden or expense to the Government in trying the case."  U.S. v. Faucette,

23  223 F. Supp. 199, 202 (D.C.N.Y. 1963).  "Where all the defendants in a complex criminal case request

24  permission to plead *nolo*, the overwhelming judicial economy of avoiding a trial will often dictate that the

25  requests be granted."  Yonkers, 697 F. Supp. at 784.  Allowing Defendant to enter a *nolo contendere* plea

26  could conserve judicial resources and spare the need for a long, complicated, and expensive trial.

27  Moreover, in this case, the crew members could be released to return home months sooner.  The crew has

28  been detained in hotel rooms at full wages for over eight months, all at the expense of Fleet and the ship

owner.  Despite being detained as "material witnesses" the government is not paying the full cost of its investigation.  Fleet is essentially paying for the investigation of itself.  The crew very much wants to return home as soon as possible.  However, because Fleet was charged as an after-thought, the crew will be detained even longer while Fleet's counsel works to prepare for trial and/or Rule 15 depositions.

Until Fleet receives and then reviews all the discovery, expert disclosures, 404(b) evidence, and electronic evidence the Rule 15 depositions of the crew cannot go forward.  While Cota was prepared to move forward in July with the depositions, the indictment of Fleet July 22, 2008, caused the depositions to be taken off-calendar.  The acceptance of a *nolo contendere* plea would remove the need for any further delay of the depositions and/or the trial of Captain Cota.

## IV. <u>CONCLUSION</u>

For the foregoing reasons, Fleet respectfully requests that this Court grant its motion for leave to enter a *nolo contendere* plea to the charges in the Indictment.


DATED:  September _____, 2008                    /s/ John Cox_____
                                                MARC R. GREENBERG
                                                JOSEPH A. WALSH II
                                                JOHN COX
                                                KEESAL, YOUNG & LOGAN
                                                Attorneys for Defendant
                                                FLEET MANAGEMENT LTD.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

KYL_SF466103