1 | JOSEPH A. WALSH II, CASB No. 143694
MARC R. GREENBERG, CASB No. 123115
2 | JOHN COX, CASB No. 197687
KEESAL, YOUNG & LOGAN
3 | A Professional Corporation
400 Oceangate, P.O. Box 1730
4 | Long Beach, California 90801-1730
Telephone:    (562) 436-2000
5 | Facsimile:    (562) 436-7416

6 | Attorneys for Defendant FLEET MANAGEMENT LTD.

7 | UNITED STATES DISTRICT COURT

8 | NORTHERN DISTRICT OF CALIFORNIA

9

10

11 | UNITED STATES OF AMERICA,                )  Case No. CR 08-0160-1 SI
                                            )
12 |                          Plaintiff(s),  )  **DEFENDANT FLEET MANAGEMENT**
                                            )  **LTD.'S REQUEST FOR JUDICIAL**
13 |                vs.                       )  **NOTICE**
                                            )  Date:   September 22, 2008
14 | JOHN J. COTA, et al.,                    )  Time:   11:00 A.M.
                                            )  Ctrm:: 4
15 |                          Defendant(s).  )  Judicial Officer:  Honorable Susan Illston
                                            )
16 |                                         )
                                            )
17 | _____)

18 |          Pursuant to Rule 201 of the Federal Rules of Evidence, Defendant FLEET

19 | MANAGEMENT LTD. ("Defendant") hereby requests this Court take judicial notice of the civil

20 | complaints filed in Federal and State court in the related civil matters:

21

| | Case Name |
|---|---|
| 1 | United States v. M/V COSCO BUSAN et al; C-07-6045-SC |
| 2 | Chelsea LLC, et al. v. Regal Stone Ltd., et al.; C-07-05800-SC |
| 3 | City of San Francisco, et al. v. Regal Stone, et al.; CGC07-0469876 |
| 4 | Tarantino v. Hanjin Shipping Co. Ltd., et al.; CGC 07-0469379 |
| 5 | Continental Ins. V. John Joseph Cota, et al.; C-08-2052-SC |

KYL_SF466029

DEFENDANT FLEET MANAGEMENT LTD.'S REQUEST FOR JUDICIAL NOTICE

| | Case Name |
|---|---|
| 6 | State of California v. Regal Stone, et al.; C-08-2268-SC |

DATED: September 4, 2008

/s/ John Cox
JOSEPH A. WALSH II
MARC R. GREENBERG
JOHN COX
KEESAL, YOUNG & LOGAN
Attorneys for Defendant
FLEET MANAGEMENT LTD.

- 2 -

KYL_SF466029

DEFENDANT FLEET MANAGEMENT LTD.'S REQUEST FOR JUDICIAL NOTICE

1  JEFFREY S. BUCHOLTZ
   Acting Assistant Attorney General
2  R. MICHAEL UNDERHILL
   Attorney in Charge, West Coast Office
3  Torts Branch, Civil Division
   U.S. Department of Justice
4  7-5395 Federal Bldg., Box 36028
   450 Golden Gate Avenue
5  San Francisco, California  94102-3463
   Telephone: (415) 436-6648
6  mike.underhill@usdoj.gov

7  RONALD J. TENPAS
   Assistant Attorney General
8  Environment and Natural Resources Division
   United States Department of Justice
9  Washington D.C. 20530
   BRADLEY R. O'BRIEN
10 Environmental Enforcement Section
   United States Department of Justice
11 301 Howard Street, Suite 1050
   San Francisco, California 94105
12 Telephone: (415) 744-6484; Facsimile: (415) 744-6476
   brad.o'brien@usdoj.gov
13
   Attorneys for Plaintiff
14 United States of America

15              UNITED STATES DISTRICT COURT

16            NORTHERN DISTRICT OF CALIFORNIA

17 UNITED STATES OF AMERICA,         )   Civil No. C07-6045 SC
                                     )
18         Plaintiff,                )   IN ADMIRALTY
                                     )
19         v.                        )
                                     )       FIRST AMENDED
20 M/V COSCO BUSAN, LR/IMO Ship No.  )   VERIFIED COMPLAINT OF
   9231743, her engines, apparel, electronics, tackle, )   THE UNITED STATES
21 boats, appurtenances, etc., in rem, REGAL STONE )
   LIMITED, FLEET MANAGEMENT LTD., and )
22 JOHN COTA, in personam,           )
                                     )
23         Defendants.               )
                                     )
24 _____)

25

26

27

28 FIRST AMENDED VERIFIED COMPLAINT – C07-6045 SC                                1

Plaintiff, the United States of America, alleges upon information and belief as follows:

## NATURE OF THE ACTION

1.     This is a case of admiralty and maritime jurisdiction, as hereinafter more fully appears, and within Rule 9(h) of the Federal Rules of Civil Procedure, and, further, is an action brought, *inter alia*, under the National Marine Sanctuaries Act ("NMSA"), 16 U.S.C. §§ 1431, *et seq.*, the Oil Pollution Act of 1990 ("OPA"), 33 U.S.C. §§ 2701, *et seq.*, and the Park System Resource Protection Act ("PSRPA"), 16 U.S.C. § 19jj, *et seq.*, against Defendants M/V COSCO BUSAN, *in rem*, and REGAL STONE LIMITED ("REGAL STONE"), FLEET MANAGEMENT LTD. ("FLEET MANAGEMENT"), and JOHN COTA, ("COTA"), *in personam*.

2.     The United States expressly reserves the right further to amend this First Amended Complaint to, *inter alia*, add additional parties and assert additional claims against such additional parties and the present Defendants herein.

## JURISDICTION AND VENUE

3.     The United States is authorized to bring this suit and the Court has jurisdiction pursuant to, *inter alia*, 28 U.S.C. § 1345, 16 U.S.C. §§ 1437 and 1443, 33 U.S.C. §§ 1321 and 2717, and 16 U.S.C. § 19jj-2.

4.     Venue is properly in this Court pursuant to, *inter alia*, 28 U.S.C. § 1391 and 1395, 16 U.S.C. § 1443, 33 U.S.C. § 2717, and 16 U.S.C. § 19jj-2.

## DEFENDANTS

5.     At all times material herein, defendant M/V COSCO BUSAN, LR/IMO Ship No. 9231743, her engines, apparel, electronics, tackle, boats, appurtenances, *etc.*, *in rem* (hereafter the "Vessel"), was flagged in Hong Kong is now or during the pendency of this action will be within the navigable waters of this District and within the jurisdiction of this Court.

6.     At all times material herein, defendant REGAL STONE, a foreign corporation or entity, presently believed to be headquartered in Hong Kong, had a place of business and/or was doing business within this district and within the jurisdiction of this Court, including, but not limited

1   to, through operation of the Vessel at the time of, and with respect to, the matters sued upon herein.

2          7.      At all times material herein, REGAL STONE owned the Vessel.

3          8.      At all times material herein, REGAL STONE operated the Vessel.

4          9.      At all times material herein, REGAL STONE managed the Vessel.

5          10.     At all times material herein, REGAL STONE chartered the Vessel.

6          11.     At all times material herein, REGAL STONE controlled the Vessel.

7          12.     At all times material herein, defendant FLEET MANAGEMENT, a foreign

8   corporation or entity, presently believed to be headquartered in the Hong Kong, had a place of

9   business and/or was doing business within this district and within the jurisdiction of this Court,

10  including, but not limited to, through operation of the Vessel at the time of, and with respect to, the

11  matters sued upon herein.

12         13.     At all times material herein, FLEET MANAGEMENT owned the Vessel.

13         14.     At all times material herein, FLEET MANAGEMENT operated the Vessel.

14         15.     At all times material herein, FLEET MANAGEMENT managed the Vessel.

15         16.     At all times material herein, FLEET MANAGEMENT chartered the Vessel.

16         17.     At all times material herein, FLEET MANAGEMENT controlled the Vessel.

17         18.     At all times material herein, defendant COTA was a resident of the State of

18  California and/or had a place of business and/or was doing business within this district and within

19  the jurisdiction of this Court.

20         19.     At all times material herein, defendant COTA was a licensed maritime pilot and,

21  *inter alia,* was licensed to pilot vessels such as the M/V COSCO BUSAN on the waters of San

22  Francisco Bay.

23                         **GENERAL ALLEGATIONS**

24         20.     On the morning of November 7, 2007, defendant COTA boarded the Vessel at its

25  berth at the Port of Oakland, California, in preparation for piloting the Vessel outbound from

26  Oakland, through the waters of San Francisco Bay, across the bar outside the Golden Gate, and

27

28  FIRST AMENDED VERIFIED COMPLAINT – C07-6045 SC                                           3

1    thereafter to the pilot station offshore San Francisco, at which point COTA was to disembark the

2    Vessel and transfer to a pilot boat. The Vessel thereafter was to continue directly on its voyage to

3    a foreign port of call, believed to be South Korea.

4        21.    On the morning of November 7, 2007, defendant COTA, the Vessel, and her crew

5    departed the Vessel's berth in Oakland and proceeded outbound through the waters of San Francisco

6    Bay.

7        22.    At the time the foregoing voyage commenced, and at all relevant times herein,

8    defendant COTA was on the bridge of the Vessel and serving in the capacity as pilot of the Vessel.

9        23.    At the time the foregoing voyage commenced, and at all relevant times herein,

10    the Vessel's Master and various crew of the Vessel were on the bridge of the Vessel.

11        24.    At or about 0830 hours on November 7, 2007, while on navigable waters of the

12    United States, the Vessel allided with the base and/or fendering system of the "Delta Tower", one

13    of the support towers of the western span of the San Francisco-Oakland Bay Bridge (the "Bay

14    Bridge").

15        25.    The foregoing allision with the Bay Bridge resulted, *inter alia*, in a rupture of the

16    Vessel's tanks, thereby allowing a portion of the Vessel's bunkers to be discharged into navigable

17    waters of the United States and onto adjoining shorelines, including, but not limited to, navigable

18    waters and adjoining shorelines of San Francisco Bay, including its appurtenant waters and

19    tributaries; the Pacific Ocean, including, but not limited to, the Gulf of the Farallones National

20    Marine Sanctuary and the Monterey Bay National Marine Sanctuary; and the navigable waters and

21    adjoining shorelines of units of the National Park System, including, but not limited to, the Golden

22    Gate National Recreation Area, Point Reyes National Seashore, San Francisco Maritime National

23    Historic Park, Rosie the Riveter/World War II Home Front National Historic Park, and other

24    resources subject to the protections of the PSRPA. The foregoing allision and subsequent discharge

25    of bunkers is hereafter referred to as the "COSCO BUSAN Incident".

26        26.    As a direct and proximate result of the COSCO BUSAN Incident, the United States

27

28    FIRST AMENDED VERIFIED COMPLAINT – C07-6045 SC                                    4

1  has expended and/or sustained, *inter alia*, response costs and damages within the meaning of the
2  NMSA, OPA, and PSRPA and, further, will continue to expend and/or sustain such response costs
3  and damages.

4        27.    The COSCO BUSAN Incident was proximately caused, *inter alia*, by the acts,
5  omissions, strict liability, fault, negligence, and breach of federal safety and operating regulations
6  by the *in rem* and *in personam* Defendants and, as applicable, their agents, servants, employees,
7  crew, and others for whom Defendants were responsible, all within the privity and knowledge of the
8  Defendants.

9        28.    The amount of damages sustained as a result of the COSCO BUSAN Incident
10 presently is not known and shall be established according to proof at the time of trial.

11              **AS AND FOR A FIRST CAUSE OF ACTION AGAINST**
12                            **ALL DEFENDANTS**
13                    **(NATIONAL MARINE SANCTUARIES ACT)**

14        29.    Plaintiff, United States of America, refers to and incorporates by reference as though
15 fully set forth herein each and every foregoing paragraph of this First Amended Complaint.

16        30.    Pursuant to the NMSA, any person who destroys and/or causes the loss of and/or
17 injures National Marine Sanctuaries and their resources are strictly liable for, *inter alia*, all damages,
18 response costs, and interest thereon. 16 U.S.C. §§ 1436-37.

19        31.    Pursuant to the NMSA, vessels used to destroy and/or cause the loss of and/or
20 injure National Marine Sanctuaries and their resources are strictly liable *in rem* and are subject to
21 a maritime lien for all response costs, damages, and/or disbursements specified in the NMSA.  16
22 U.S.C. § 1437(d)(3).

23        32.    Pursuant to the NMSA, vessels used to destroy and/or cause the loss of and/or
24 injure National Marine Sanctuaries and their resources are subject to forfeiture to the United States.
25 16 U.S.C. § 1437(e)(1).

26        33.    As a direct and proximate result of the actions set forth in the United States'
27

28 FIRST AMENDED VERIFIED COMPLAINT – C07-6045 SC                                    5

1   Complaint, Defendants are liable to the United States, without limitation, by virtue of the NMSA,

2   16 U.S.C. §§ 1437 and 1443, for all response costs and damages.

3   <center>AS AND FOR A SECOND CAUSE OF ACTION AGAINST</center>

4   <center>REGAL STONE, AND FLEET MANAGEMENT</center>

5   <center>(OIL POLLUTION ACT OF 1990)</center>

6       34.    Plaintiff, United States of America, refers to and incorporates by reference as though

7   fully set forth herein each and every foregoing paragraph of this First Amended Complaint.

8       35.    Defendant REGAL STONE, *inter alia*, is a "responsible party" within the meaning

9   of OPA.

10       36.    Defendant FLEET MANAGEMENT, *inter alia*, is a "responsible party" within the

11   meaning of OPA.

12       37.    Pursuant to OPA, 33 U.S.C. § 2706(b), the federal government designates officials

13   to act as trustees for natural resources.

14       38.    "Natural resources," as that term is defined in OPA, 33 U.S.C. § 2701(20), held in

15   trust by Federal trustees, have been injured, destroyed, or lost as the result of the Defendants'

16   discharge of oil into navigable waters, within the meaning of 33 U.S.C. § 2702(b)(2).

17       39.    Pursuant to OPA, 33 U.S.C. § 2702(a) and (b), each responsible party for a vessel

18   from which oil is discharged, or which poses the substantial threat of discharge, into or upon the

19   navigable waters or adjoining shorelines or the exclusive economic zone of the United States, is

20   strictly liable for all response costs, damages, and/or disbursements specified in the Act, including,

21   but not limited to, damages for injuries to natural resources.

22       40.    Under the circumstances herein, Defendants REGAL STONE and FLEET

23   MANAGEMENT are liable to the United States of America, without limitation, for all the aforesaid

24   response costs, damages, and/or disbursements sustained by the United States of America as a result

25   of the COSCO BUSAN Incident.

26   //

27

## AS AND FOR A THIRD CAUSE OF ACTION AGAINST
## REGAL STONE, AND FLEET MANAGEMENT
## (OIL POLLUTION ACT OF 1990)

41.    Plaintiff, United States of America, refers to and incorporates by reference as though fully set forth herein each and every foregoing paragraph of this First Amended Complaint.

42.    Pursuant to OPA, 33 U.S.C. §§ 2712(f) and 2715, the National Pollution Funds Center ("Fund"), on behalf of the Oil Spill Liability Trust Fund, shall be subrogated to all rights, claims and causes of action of claimants to whom it has paid compensation.

43.    As a result of the COSCO BUSAN Incident, the Fund may incur costs, damages and/or disbursements by reason of claims for removal costs and damages brought against it under OPA, 33 U.S.C. § 2713.

44.    Pursuant to OPA, Defendants REGAL STONE and FLEET MANAGEMENT are liable to the United States of America, without limitation, for all such costs, damages, and/or disbursements which may be sustained by the Fund.

## AS AND FOR A FOURTH CAUSE OF ACTION AGAINST
## REGAL STONE AND FLEET MANAGEMENT
## (OIL POLLUTION ACT OF 1990)

45.    Plaintiff, United States of America, refers to and incorporates by reference as though fully set forth herein each and every foregoing paragraph of this First Amended Complaint.

46.    Pursuant to OPA, 33 U.S.C. § 2717(f)(2), the United States is entitled to, and hereby seeks, a declaratory judgment that is binding in any subsequent action or actions against Defendants REGAL STONE and FLEET MANAGEMENT that said Defendants are liable for removal costs and damages in any such subsequent action or actions.

//
//
//

FIRST AMENDED VERIFIED COMPLAINT – C07-6045 SC                                    7

1    **AND AS FOR A FIFTH CAUSE OF ACTION AGAINST**

2    **ALL DEFENDANTS**

3    **(PARK SYSTEM RESOURCE PROTECTION ACT)**

4        47.    Plaintiff, United States of America, refers to and incorporates by reference as though

5    fully set forth herein each and every foregoing paragraph of this First Amended Complaint.

6        48.    Pursuant to the PSRPA, 16 U.S.C. § 19jj-1(a), any person who destroys, causes the

7    loss of, or injures any park system resource is strictly liable to the United States for response costs

8    and damages resulting from such destruction, loss, or injury.

9        49.    Pursuant to the PSRPA, 16 U.S.C. § 19jj-1(b), any vessel used to destroy and/or

10   cause the loss of and/or injure any park system resource or any marine or aquatic park resource shall

11   be liable *in rem* to the United States for response costs and damages resulting from such destruction,

12   loss, or injury to the same extent as a person is liable under § 19jj-1(a). .

13       50.    As a direct and proximate result of the COSCO BUSAN Incident, Defendants are

14   liable to the United States, without limitation, by virtue of the PSRPA for all response costs and

15   damages specified therein.

16   **AS AND FOR A SIXTH CAUSE OF ACTION**

17   **AGAINST REGAL STONE AND FLEET MANAGEMENT**

18   **(FEDERAL WATER POLLUTION CONTROL ACT, 33 U.S.C. § 1321(b)(7)).**

19       51.    Plaintiff, United States of America, refers to and incorporates by reference as though

20   fully set forth herein each and every foregoing paragraph of this Complaint. .

21       52.    Pursuant to 33 U.S.C § 1321(b)(7), REGAL STONE and FLEET MANAGEMENT

22   are subject to a judicially assessed civil penalty. .

23       53.    Pursuant to 33 U.S.C § 1321(b)(7), REGAL STONE and FLEET MANAGEMENT

24   are liable to the United States for a judicially assessed civil penalty in an amount to be determined

25   at trial.

26   //

27

28   FIRST AMENDED VERIFIED COMPLAINT – C07-6045 SC           8

WHEREFORE, the United States of America prays as follows:

1.    That United States of America be granted judgment against all Defendants pursuant to the First Amended Verified Complaint of the United States herein;

2.    That if Defendants REGAL STONE and FLEET MANAGEMENT cannot be found within this District, then, pursuant to Supplemental Admiralty Rule B of the Federal Rules of Civil Procedure, that all of any such absent Defendants' property of any description, whatsoever, including other vessels or real property, located within this District be attached for up to the amounts sued for herein, and condemned and sold to pay the amounts due plaintiff herein;

3.    That actual notice of the commencement of this suit, in a manner approved by the Court, be given to the custodian, master or other ranking officer of the Vessel, as may be applicable, and to any person, firm or corporation which has recorded a notice of claim of any undischarged lien upon the said Vessel;

4.    That, pursuant to Rule C(3) of the Supplemental Rules for Certain Admiralty and Maritime Claims this Honorable Court enter an order authorizing a warrant for the arrest of the Vessel, her engines, tackle, appurtenances, etc.;

5.    That a warrant issue for the arrest of the Vessel, her engines, tackle, appurtenances, etc.;

6.    That judgment of condemnation and sale be entered against the Vessel, her engines, tackle, appurtenances, etc.;

7.    That plaintiff United States of America be declared the holder of a valid preferred maritime lien on the Vessel, *in rem*;

8.    That the Vessel be sold and the proceeds of the Vessel be applied first to any judgments, costs, and expenses of the United States with respect to the Verified Complaint of the United States herein;

9.    In the alternative, that the Vessel, as defined in the NMSA, 16 U.S.C. § 1437(e), be forfeited to the United States;

FIRST AMENDED VERIFIED COMPLAINT – C07-6045 SC                                          9

1    10.    For such other relief as the Court deems just and proper in the premises.

2   Dated: March 14, 2008.                JEFFREY S. BUCHOLTZ
                                          Acting Assistant Attorney General
3

4                                         /s/ R. Michael Underhill
                                          R. MICHAEL UNDERHILL
5                                         Attorney In Charge, West Coast Office
                                          Torts Branch, Civil Division
6                                         U.S. Department of Justice

7                                         RONALD J. TENPAS
                                          Assistant Attorney General
8                                         Environment and Natural Resources Division

9

10                                        /s/ Bradley R. O'Brien
                                          BRADLEY R. O'BRIEN
11                                        Environmental Enforcement Section

12                                        Attorneys for Plaintiff United States of America

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28  FIRST AMENDED VERIFIED COMPLAINT – C07-6045 SC                                    10

1

<u>VERIFICATION</u>

2       R. Michael Underhill says:

3       I am one of the attorneys for plaintiff, United States of America, herein, and make this

4    verification by authority for and on its behalf; I have read the foregoing First Amended Complaint,

5    know the contents thereof, and from information officially furnished to me believe the same to be

6    true.

7       I verify under penalty of perjury, in accordance with 28 U.S.C. §1746, that the foregoing is

8    true and correct.

9       Dated: March 14, 2008.

10

11

12

13                                  /s/ R. Michael Underhill

14                                  R. MICHAEL UNDERHILL

15

16

17

18

19

20

21

22

23

24

25

26

27

28   FIRST AMENDED VERIFIED COMPLAINT – C07-6045 SC                                      11

2

## INTRODUCTION

1.      November 7, 2007 was like any other fall day in the San Francisco Bay Area: cold, overcast and foggy. Vessels were navigating their way through the San Francisco Bay to the Pacific Ocean. Crab fishermen, among others, were waiting for news of the season to officially open.

2.      Heading north out to the ocean bound for Asia, one container ship — the COSCO BUSAN — failed to heed normal precautions and hit the fender of tower W4 of the San Francisco Bay Bridge. The impact of the crash tore a huge gash in the side of the vessel and resulted in the spillage of an estimated 58,000 gallons of fuel oil into the fragile San Francisco Bay ecosystem.

3.      This man-made disaster will for years have a profound impact on not only the wildlife of Northern California, but has also immediately impacted the livelihood of thousands and thousands of individuals and small businesses, such as commercial fishers, and crabbers, as well as recreational charter operations. On November 12, 2007, the Governor of the State of California "halted" all commercial fishing in and around the San Francisco Bay Area.

4.      Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on its own behalf and as representative of a Class. Plaintiffs and members of the Class will have incurred significant damages and economic losses and will continue to incur such expenses and losses in the future.

## PARTIES

5.      Individual and Representative Plaintiff Chelsea, LLC. Plaintiff Chelsea is a member of the class. Plaintiff is a 60-foot "crab" vessel that prior to the spill caught crab in the San Francisco Bay Area.

6.      Individual and Plaintiff Mark Russo resides in Monterey, California, Plaintiff Russo is the owner of the vessel *Freeland* and has owned the vessel on or about November 7, 2007 and continues to own said vessel. The vessel is a duly licensed California Commercial Crab Fishing Vessel.



William M. Audet (waudet@audetlaw.com)
Michael McShane (mmcshane@audetlaw.com)
Adel A. Nadji (anadji@audetlaw.com)
AUDET & PARTNERS, LLP
221 Main Street, Suite 1460
San Francisco CA 94105
Telephone: 415.982.1776
Facsimile: 415.568.2556

*Attorneys for Plaintiffs and
the Class Members*

**UNITED STATES DISTRICT COURT FOR**

**THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| Chelsea, LLC, Mark Russo, and Allen Loretz, individually and on bchalf of all others similarly situated, | Case No. C–07–5800-SC |
| Plaintiffs, | AT LAW AND IN ADMIRALTY |
| v. | **VERIFIED SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF** |
| Regal Stone, Ltd., Hanjin Shipping, Co., Ltd., Synergy Maritime, Ltd., Fleet Management Ltd., and John Cota, *In Personam*; M/V Cosco Busan, their engines, tackle, equipment, appurtenances, freights, and cargo *In Rem*, | **Jury Trial Demanded** |
| Defendants. | |

Audet & Partners, LLP
www.audetlaw.com

VERIFIED SECOND AMENDED CLASS ACTION COMPLAINT

7.    Individual and Plaintiff Allen Loretz is a hired captain and crewmember aboard the vessel *Freeland*. Plaintiff Loretz was the captain and crewmember on or about November 7, 2007 and continues to serve as captain. The vessel is a duly licensed California Commercial Crab Fishing Vessel.

8.    Plaintiffs bring this action on behalf of themselves and on behalf of a class of over 500 fishermen, vessel owners, charterers and operators (the exact number of which is not presently known) who were to participate in, or depend upon, the 2007-2008 California Fisheries for commercial purposes.

9.    Defendant vessel, COSCO BUSAN, their engines, tackle, equipment, appurtenances, cargo, all freights, and any bonds as issued and other earnings (the "Vessel" or "COSCO BUSAN") is now, or will be during the pendency of this action, within the district and jurisdiction of this court.

10.    Defendant Regal Stone, Ltd. ("Regal Stone"), upon information and belief, is a Hong Kong based company that claims ownership of the COSCO BUSAN.

11.    Defendant Hanjin Shipping Co., Ltd. ("Hanjin") is a large Korean-based shipping company that leases or charters the COSCO BUSAN from Defendant Regal Stone, Ltd. or other owners.

12.    Defendant Synergy Maritime, Ltd. ("Synergy") upon information and belief is a manager, owner and the employer of the crew of the vessel COSCO BUSAN.

13.    Defendant Fleet Management Limited ("Fleet Management") upon information and belief is the managing operator or sub-manager of the COSCO BUSAN.

14.    Defendant John Cota ("Cota"), on information and belief, was piloting the COSCO BUSAN at the time of the allision and discharge of the 58,000 gallons of bunker fuel.

## JURISDICTION AND VENUE

15.    This is an admiralty or maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure and is within this Court's admiralty and maritime jurisdiction under 28 U.S.C. § 1333 and Article III § 2 of the United States Constitution. Certain causes of action that arise under the laws of California are within this Court's supplemental jurisdiction 28

1    U.S.C. § 1367.  Further, this Court has jurisdiction over this action because this is a class action

2    lawsuit in which over $5,000,000 is at issue and there are more than one hundred putative class

3    members.  Further this Court has jurisdiction under the Extension of Admiralty Act.

4         16.    Venue in this Court is proper pursuant to 28 U.S.C. § 1391 in that substantial part

5    of the events or omissions giving rise to the claims asserted herein occurred in this District.  The

6    vessel COSCO BUSAN, upon information and belief, is or will be within this District during the

7    pendency of this action.

8                                          **FACTS**

9         17.    On November 7, 2007, at approximately 7:30AM, the COSCO BUSAN, a

10   freighter ship bound for Asia, left the Port of Oakland.

11        18.    Less than thirty minutes later, the COSCO BUSAN crashed into a support piling

12   of the Oakland Bay Bridge.

13        19.    The crash resulted in a huge breach in the ship's hull, where the fuel tanks of the

14   ship are located.  The hole on the port side was reportedly at least 70 feet long, 12 feet wide, and

15   3 feet deep.

16        20.    Unfortunately, instead of immediately notifying the authorities about the

17   magnitude of the problem, the ship's captain initially "estimated" less than "150" gallons of fuel

18   spillage. In reality, the 150 gallons turned into over 58,000 gallons of toxic "bunker oil."

19        21.    As the day wore on, the oil "dispersed" into San Francisco Bay and also into the

20   Pacific Ocean.  The ship's pilot has recently reported that the ship's onboard radar malfunctioned

21   and the ship's master may have provided confusing instructions to the captain.

22        22.    The non-economic damage to the San Francisco Bay's fragile ecosystem is

23   beyond dollars and cents.  Moreover, because of the negligence of the Defendants, and/or

24   unseaworthiness of the COSCO BUSAN, commercial crabbers and other commercial fishers

25   postponed the short season and as such have and will continue to lose millions of dollars.

26        23.    As of November 13, 2007, the crab season was cancelled and all commercial

27   fishing halted with public safety and health concerns regarding Dungeness crab, and potentially

28   other seafood species.

24.     Recently uncovered evidence revealed that that despite company policy to use two independent means for position fixing and for the posting of additional "lookouts" during poor visibility conditions, at least one of the two radars on board malfunctioned or otherwise needed servicing in Long Beach before the COSCO BUSAN arrived in the San Francisco-Oakland area, and one of the two lookouts left the bow of the ship for a smoke and something to eat prior to the allision (and while the ship was navigating through the foggy waters of the San Francisco Bay).

25.     Further evidence revealed that upon leaving the berth of Port of Oakland, the Chief Officer noted that the COSCO BUSAN was moving "faster and faster," eventually reaching the speed of approximately 15 to 16.5 knots despite the fact that he, as a lookout, was unable to see navigational buoys in the shipping channel. In fact, the Chief Officer stated that the ship would not be moving in the foggy conditions had the ship been in Chinese port. In his opinion, the ship was moving "too fast" and in "too much fog."

26.     An "internal audit" conducted subsequently to the Bay Bridge allision revealed a number of egregious deficiencies, including but not limited to: that the speed log was not operational; navigational areas were not segregated; sole lookout was allowed without any evidence of risk assessment and deck logbook entry; manning and un-manning of ship stations were not being logged; there were no contingency plans marked on the navigation chart nor were they mentioned of contingency plans in the passage plan; navigating officers did no complete the bridge team management training; and, navigational warnings were not properly filed.

27.     On that foggy day, Defendants knew of the extremely high risk of catastrophic injury inherent in the navigation of the COSCO BUSAN. Notwithstanding, Defendants took no action to prevent or otherwise protect Plaintiffs and Class, and demonstrated a callous and reckless disregard for human life, health and safety by departing the Port of Oakland. Defendants acted with such indifference to the consequences of their misconduct, and with such recklessness as to be willful, malicious and oppressive and in disregard of the rights of Plaintiffs thereby meriting an award of punitive or exemplary damages against Defendants.

28.     This lawsuit seeks to economically compensate the victims of the spill.

## CLASS ACTION ALLEGATIONS

29.    Plaintiffs bring this action on their own behalf and as representatives of a class consisting of: "All commercial fishing operations, including but not limited to crab fishermen, herring fishermen, salmon fishermen, bottom trawl fishermen, shellfish producers, seafood processors, vendors, truckers, unloaders and other distributors of seafood products, and recreational charter vessel operations and marinas, who have been injured, or otherwise financially harmed, as a result of the COSCO BUSAN Oil Spill of November 7, 2007"."

30.    The Class is so numerous that joinder of all members is impracticable.

31.    There are questions of law and fact common to the Class including, but not limited to:

a.    Whether Defendants negligently and/or fraudulently acted to cause the spill;

b.    Whether Defendants conducted adequate supervision to determine whether the spill could be prevented;

c.    Whether Defendants engaged in unconscionable, deceptive, and/or unreasonable business practices and conduct;

d.    Whether Defendants knowingly, intentionally, or negligently concealed, suppressed, or omitted material information concerning the safety of their ship from the public;

e.    Whether the Class has suffered injury by virtue of the Defendants' negligence, recklessness, carelessness, and/or unconscionable and/or deceptive business practices and conduct; and

f.    Whether Defendants are strictly liable to the Class, by virtue of State and Federal Law.

g.    Whether the COSCO BUSAN was unseaworthy and such unseaworthiness was a proximate cause of the November 7, 2007 Oil Spill.

32.    These and other questions of law and/or fact are common to the Class and predominate over any questions affecting only individual Class members.

33.    The claims of the named Plaintiffs are typical of the claims of the respective Class they seek to represent.

34.     In the case of the proposed Court-supervised "Clean-Up" Program, the representative Plaintiffs and the Class as a whole will benefit from such relief.

35.     Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class they seek to represent.

36.     Plaintiffs have retained the undersigned counsel competent and experienced in complex class actions to represent them and the members of the proposed Class.  Accordingly, the interests of the Class will adequately be protected and advanced.  In addition, there is no conflict of interest among Plaintiffs and the members of the proposed Class.

37.     Class certification is appropriate because Defendants have acted on grounds generally applicable to the Class, making appropriate injunctive and/or declaratory relief.

38.     Class certification is also appropriate pursuant to Fed. R. Civ. P. 23(b)(3) because, as set forth above, common issues of law and fact predominate over any individual issues and certification of the claims as class claims is superior to other available methods for the fair and efficient adjudication of these claims.  In addition, there would be enormous economies to the courts and parties in litigating these common issues on a class-wide basis rather in individual trials.  Plaintiffs foresee no difficulties in the management of this action as a class action.

## JOINT AND SEVERAL LIABILITY

39.     On information and belief, Plaintiffs contend that at all material times hereto, the owners, operators, managers and charterers of the COSCO BUSAN were operating the vessel while it was within the navigable waters of San Francisco Bay pursuant to a joint venture agreement with The San Francisco Bar Pilots Association and its members, including Captain John Cota.  That such joint operating agreement creates joint and several liability for all damages arising from the oil spill from the COSCO BUSAN on November 7, 2007.

VERIFIED SECOND AMENDED CLASS ACTION COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CLASS CLAIMS

### FIRST CAUSE OF ACTION

**[Mandatory "Clean Up" Program]**

**[Against COSCO BUSAN, Regal Stone, Hanjin, Synergy, and Fleet Management]**

40.     Plaintiffs hereby restates and realleges each and every allegation set forth above with the same force and effect as if set forth herein and repeated at length.

41.     As a direct result of Defendants' actions and omissions, Plaintiffs and Class have been injured. The Bay Area spill requires immediate "clean up" of the toxins. Defendants are responsible for the spill.

42.     Accordingly, Defendants should be required to establish a fund and emergency "clean-up" program.

### SECOND CAUSE OF ACTION

**[Strict Liability]**

**[Against All Defendants]**

43.     Plaintiffs hereby restates and realleges each and every allegation set forth above with the same force and effect as if set forth herein.

44.     At all times herein, Defendants were the owners, charterers, custodians, and/or operators of the COSCO BUSAN which caused the incident described herein.

45.     At all times relevant to this action, Defendants had supervision, custody, navigation and control of the COSCO BUSAN from which the harmful oil spill occurred.

46.     At all times herein, Defendants were under a continuing duty to protect Plaintiffs and proposed class from the harm occasioned by the COSCO BUSAN within its custody, navigation and control.

47.     The oil spill herein was occasioned by its ruin, vice, unseaworthiness or defect.

48.     Defendants knew or, in the exercise of reasonable care, should have known of the ruin, vice, unseaworthiness or defect which caused the oil spill.

49.     The injuries sustained by Plaintiffs as a result of the oil spill was the direct and proximate result of the strict liability of the Defendants.

1    50.    Due to the Defendants strict liability, Plaintiffs and Class members are entitled to

2    recover actual damages.

3    51.    The acts and omissions of Defendants, and each of them, were done with malice,

4    fraud, and/or oppression as herein above set forth.

5    ### THIRD CAUSE OF ACTION

6    ### [Negligence]

7    ### [Against All Defendants]

8    52.    Plaintiffs hereby restate and reallege each and every allegation set forth above

9    with the same force and effect as if set forth herein.

10    53.    The Defendants owed a duty to Plaintiffs and the Class to exercise reasonable and

11    ordinary care.

12    54.    The Defendants breached their duty to Plaintiffs and the Class.

13    55.    The Defendants in the exercise of reasonable care should have known that the

14    ship would or could hit the bridge.

15    56.    As direct and proximate result of the Defendants' negligence, Plaintiffs and the

16    Class have sustained damages.

17    WHEREFORE, Plaintiffs on behalf of themselves and all others similarly

18    situated, demands judgment against the Defendants for compensatory damages for

19    himself/herself and each member of the Class, for establishment of a common fund, plus

20    attorneys' fees, interests and costs.

21    ### FOURTH CAUSE OF ACTION

22    ### [Violation of the Unfair Competition Act, Cal. Bus. & Prof. Code § 17200, *et seq.*]

23    ### [Against All Defendants]

24    57.    Plaintiffs hereby restate and reallege each and every allegation set forth above

25    with the same force and effect as if set forth herein.

26    58.    As described herein, Defendants' conduct constitutes unfair competition within

27    the meaning of the Unfair Competition Act, Cal. Bus. & Prof. Code § 17200, *et seq.* (the "Act"),

28

1    insofar as the Act prohibits "any unlawful, unfair or fraudulent business act or practice" or

2    "unfair, deceptive, untrue or misleading advertising."

3        59.    Defendants have engaged and continue to engage in unfair competition in

4    violation of the Act.

5        60.    Defendants' conduct constitutes unlawful business acts or practices under the Act

6    insofar as it violates, *inter alia,* Business and Professions Code §§ 17500 *et seq.* and California

7    Civil Code §§ 1750 *et seq.*

8        61.    Defendants' conduct constitutes "fraudulent" business practices within the

9    meaning of the Act in that members of the public have been harmed.

10       62.    Defendants' conduct amounts to "unfair" business practices insofar as the Act

11   forbids all wrongful business activities in any context in which they appear.  Moreover, as

12   described herein, Defendants' practices offend established public policies, and are immoral,

13   unethical, oppressive, and unscrupulous.  The impact of the Defendants' practices is in no way

14   mitigated by any justifications, reasons or motives.  The Defendants' conduct has no utility when

15   compared to the harm done to Plaintiffs and other members of the Class.

16       63.    Defendants conduct constituted a violation several statutes, ordinances, or

17   regulations including but limited to the Lempert-Keene-Seastrand Oil Spill Prevention and

18   Response Act ("Lempert-Keene Act"), Government Code Section 8670, *et seq.* as well as the

19   Porter-Cologne Water Quality Control Act ("Porter-Cologne Act"), Cal. Water Code Section

20   13000, *et seq.*, and, Cal. Fish & Game Code Section 5650, *et seq.*

21       64.    As a direct and proximate result of the Defendants' unfair methods of competition

22   and unfair and deceptive acts or practices, Plaintiffs and the Class have sustained damages.

23       65.    As a proximate result of their unfair methods of competition and unfair or

24   deceptive acts or practices, the Defendants have been unjustly enriched and should be required to

25   make restitution to Plaintiffs and the Class pursuant to Bus. & Prof. Code §§ 17203 and 17204.

26       66.    The acts and omissions of Defendants, and each of them, were done with malice,

27   fraud, and/or oppression as herein above set forth.

28

## FIFTH CAUSE OF ACTION

### [Strict Liability Under Lempert-Keene-Seastrand
### Oil Spill Prevention and Response Act, Government Code Section 8670, *et seq.*]
### [Against COSCO BUSAN, Regal Stone, Hanjin, Synergy, and Fleet Management]

67.    Plaintiffs hereby restate and reallege each and every allegation set forth above with the same force and effect as if set forth herein.

68.    The Lempert-Keene Act provides that "[a]ny responsible party, as defined in Section 8670.3, shall be absolutely liable without regard to fault for any damages incurred by any injured party which arise out of, or are caused by, the discharge or leaking of oil into or onto marine waters." Cal. Gov. Code Section 8670.56.5 (a).

69.    The San Francisco Bay and surrounding ocean areas are "marine waters," as defined in Section 8670.03 (i).

70.    The "Responsible parties" include "the owner or transporter of oil or a person or entity accepting responsibility for the oil;" and "the owner, operator, or lessee of, or person who charters by demise, any vessel ... or a person or entity accepting responsibility for the vessel ...." Cal. Gov. Code Section 8670.3 (w).

71.    As the owner, operator, lessee, or charterer by demise of the vessel and owner or transporter of the oil of the discharged oil, Defendants Regal Stone Ltd., Hanjin Shipping Co., Ltd., Fleet Management Ltd., Synergy Maritime, Ltd., and COSCO BUSAN are responsible parties that are absolutely liable under the Lempert-Keene Act.

72.    The bunker fuel that was discharged from the vessel is "oil" within the meaning of the Act, which defines "oil" as "any kind of petroleum, liquid hydrocarbon, or petroleum products or any faction or residues therefrom, including ... bunker fuel ...." Cal. Gov. Code Section 8670.3 (n).

73.    On November 7, 2007, defendants discharged or leaked bunker fuel into the San Francisco Bay, and are therefore absolutely liable without regard to fault for all damages that plaintiffs sustained or will sustain.

74.    The Lempert-Keene Act entitles a plaintiff to recover a broad variety of damages, including, without Limitation, the costs of investigation, response, containment, removal and treatment, damages for injury to, or economic losses resulting from destruction of or injury to real or personal property, lost faxes, royalties, rents, or net profit shares caused by the injury, destruction, loss, or impairment of as of real property, and personal property. Cal. Gov. Code Section 8670.56.5 (h).

75.    The contamination legally caused by the discharge of bunker fuel by the COSCO BUSAN into or upon the San Francisco Bay injured, destroyed, caused to be lost, and/or impaired the use of natural resources on which Plaintiffs and the class depend for their livelihood, including but not limited to, the local populations of Dungeness crab and herring.

76.    The injury, destruction, loss, and/or impairment of usability of these natural resources has caused Plaintiffs and the class to lose profits, and will cause future losses of profits by Plaintiffs and the class and/or impairment of their earning capacities.

77.    The likely long-lasting effects of the contamination of the discharge of bunker fuel into the San Francisco Bay by the Ship on the marine life on which Plaintiffs' and the class' livelihoods depend, especially but not limited to, the Dungeness crab and herring fish, requires that Plaintiffs and the class continue future monitoring and testing activities in order to ensure that such marine life is not contaminated and is safe and fit for human consumption.

78.    Plaintiffs on behalf of themselves and all others similarly situated, demands judgment against the Defendants for compensatory damages for himself/herself and each member of the Class, for establishment of a common fund, plus attorneys' fees, interest, costs, and additional relief as set forth below.

79.    The acts and omissions of Defendants, and each of them, were done with malice, fraud, and/or oppression as herein above set forth.

## SIXTH CAUSE OF ACTION

### [Negligence Per Se]

### [Against All Defendants]

80.    Plaintiffs incorporates by reference all preceding paragraphs as if fully set forth

1    herein and further alleges as follows:

2         81.    At all times herein mentioned, Defendants negligently, wantonly, carelessly

3    and/or recklessly hired, retained, supervised, trained, and/or entrusted the COSCO BUSAN to

4    one another, for the purpose of transporting cargo aboard a container ship filled with bunker fuel

5    through the San Francisco Bay.  Thereafter, the Defendants, and each of them, controlled,

6    navigated, and/or managed the COSCO BUSAN with the knowledge, consent, permission,

7    and/or within the scope of authority conferred by Defendants.

8         82.    Defendants violated several statutes, ordinances, or regulations including but

9    limited to the Lempert-Keene Act, Government Code Section 8670, *et seq.* as well as the Porter-

10   Cologne Act, Cal. Water Code Section 13000, *et seq.*, and, Cal. Fish & Game Code Section

11   5650, *et seq.*

12        83.    As a direct and legal cause of the Defendants wrongful acts and omissions herein

13   above set forth, Plaintiffs and Class have suffered and will suffer economic harm, injury, and

14   losses.

15        84.    Plaintiffs' harm resulted from the occurrence of the nature that the Lempert-

16   Keene Act and Porter-Cologne Act were designed to prevent.

17        85.    Plaintiffs are members of the class of persons for whose protection the Lempert-

18   Keene Act and Porter-Cologne Act were adopted.

19        86.    The acts and omissions of Defendants, and each of them, were done with malice,

20   fraud, and/or oppression as herein above set forth.

21

22   **SEVENTH CAUSE OF ACTION**

23   **[Public Nuisance]**

24   **[Against COSCO BUSAN, Regal Stone, Hanjin, Synergy, and Fleet Management]**

25        87.    Plaintiffs incorporates by reference all preceding paragraphs as if fully set forth

26   herein and further alleges as follows:

27        88.    Defendants have created a condition that affects a substantial number of

28   individuals similarly situated to the Plaintiffs; and a condition which would reasonably annoy

1  and disturb an ordinary person. The particular conduct constituting a nuisance is the discharge of

2  approximately 58,000 gallons of fuel in the San Francisco Bay.

3       89.    The seriousness and gravity of the harm outweighs the social utility of

4  Defendants' conduct.

5       90.    Plaintiffs and Class suffered harm and injury to their economic livelihood, which

6  they did not consent to and which is different from the type of harm which is suffered by the

7  general public.

8       91.    The above acts and omissions also created a public nuisance vis-a-vis the

9  Plaintiffs and the Class, interfering with the property rights of Plaintiffs and the Class, and rights

10  incidental to those property rights.

11       92.    The acts and omissions of the Defendants described herein were also in violation

12  of various California state laws including but not limited to the Lempert-Keene Act, Government

13  Code Section 8670, *et seq.*, and  the Porter-Cologne Act, Water Code Sections 13000, *et seq.*,

14  and Cal. Fish & Game Code Section 5650, *et seq.*

15       93.    Defendants' violations of these statutes directly and proximately caused, and will

16  cause, injury to Plaintiffs and the Class of a type which the statutes are intended to prevent.

17  Plaintiffs and the Class are of the class of persons for whose protection these statutes were

18  enacted.

19       94.    As a direct and legal cause of the Defendants wrongful acts and/or omissions

20  herein above set forth, Plaintiffs and the Class have suffered and will suffer economic harm,

21  injury, and losses as herein above set forth.

22       95.    In  maintaining the nuisance, Defendants arc acting with full knowledge of the

23  consequences and damage being caused, and the acts and omissions of Defendants, and each of

24  them, were done with malice, fraud, and/or oppression as herein above set forth.

25  <center>**PRAYER FOR RELIEF**</center>

26       **WHEREFORE,** Plaintiffs request that this Court enter a judgment against the

27  Defendants and in favor of the Plaintiffs and the Class and award the following relief:

28

Audet & Partners, LLP
www.audetlaw.com

<center>VERIFIED SECOND AMENDED CLASS ACTION COMPLAINT</center>

1   A.  That this action be certified as a class action on behalf of the proposed Class

2 described herein and that counsel of record be appointed to represent the Class;

3   B.  That a comprehensive Court-supervised "Clean-Up" Program be established;

4   C.  For general damages in an amount to be proven at the time of trial;

5   D.  For special damages in an amount to be proven at the time of trial;

6   E.  For pre-judgment and post-judgment interest on the above general and special

7 damages;

8   F.  For restitution and disgorgement of all profits;

9   G.  For compensatory and other damages, as the Court may determine;

10   H.  For any damages or penalties pursuant to the Lempert-Keene Act, and any other

11 applicable law;

12   J.  Costs, including experts' fees and attorneys' fees and expenses, and the costs of

13 prosecuting this action; and

14   K.  That the Defendant Vessel be arrested, including all appurtenances,  and cargo

15 aboard that the plaintiffs have judgment against them, in amounts to be proven at trial, with

16 additional interest, attorneys' fees, costs, and applicable federal and state penalties to be proven

17 at trial;

18   L.  That the plaintiffs' claims be determined to be valid maritime claims against the

19 Defendant Vessel, with priority over all other interests, claims or liens, as provided by law;

20   M.  That the Defendant Vessel be condemned and sold to pay the judgment of the

21 plaintiffs and a lien be created under federal law;

22   N.  That the plaintiffs have judgment against all *in personam* Defendants for

23 compensatory and exemplary damages, in an amount to be proven at trial, plus interest,

24 attorneys' fees, and costs; and

25   O.  For such other relief as this court deems just and equitable under the

26 circumstances.

27 //

28

VERIFIED SECOND AMENDED CLASS ACTION COMPLAINT

1

## PUNITIVE DAMAGES

2    P.    For exemplary and punitive damages, to the extent permissible by law and in an

3 amount to be proven at the time of trial, and sufficient to punish Defendants or to deter them and

4 other from repeating the injurious conduct alleged herein or similar conduct. Defendants knew

5 of the extremely high risk of catastrophic injury inherent in the control, navigation, and

6 management of the COSCO BUSAN. Notwithstanding, Defendants took no action to prevent or

7 otherwise protect Plaintiffs and Class, and demonstrated a callous and reckless disregard for

8 human life, health and safety. Defendants acted with such indifference to the consequences of

9 their misconduct, and with such recklessness as to be willful, malicious and oppressive and in

10 disregard of the rights of Plaintiffs thereby meriting an award of punitive or exemplary damages

11 against Defendants and in favor of Plaintiffs for the purpose of deterring them from such future

12 misconduct and to make a public example of their egregious, wrongful and despicable acts.

13 Plaintiffs are not presently aware of the true net worth of Defendants and therefore cannot

14 ascertain an amount which would properly punish them by way of punitive damages, and

15 Plaintiffs pray leave to amend this complaint to insert the same herein when Defendants' true net

16 worth is finally ascertained so that a jury may hear all the evidence and render a full, fair and

17 complete verdict condemning their outrageous misconduct.

18

## DEMAND FOR JURY TRIAL

19    Plaintiffs, on behalf of themselves and all others similarly situated, hereby demands a

20 jury trial as to all claims triable in this action.

21

22 Dated: July 29, 2008                        AUDET & PARTNERS, LLP

23                                              */s/ William M. Audet*

24                                              William M. Audet
                                                Michael McShane
25                                              Adel A. Nadji
                                                221 Main Street, Suite 1460
26                                              San Francisco CA 94105
                                                Telephone: 415.982.1776
27                                              Facsimile: 415.568.2556

28                                              *On Behalf of Plaintiffs and*
                                                *the Class*

VERIFIED SECOND AMENDED CLASS ACTION COMPLAINT

1 | Anthony M. Urie (Cal. State Bar #92363)
  | Law Offices of Anthony M. Urie
2 | 18025 17th Ave NW
  | Shoreline, WA, 98177
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Audet & Partners, LLP
www.audetlaw.com

17

VERIFIED SECOND AMENDED CLASS ACTION COMPLAINT

1

## **VERIFICATION**

2

3        I am the attorney of record for Plaintiffs and class in this action, and make this

4  verification pursuant to Admir. L.R. 2-1;  I have read the forgoing complaint, know the contents

5  thereof, and from information officially furnished to me believe the same to be true.

6        I verify under penalty of perjury, in accordance with 28 U.S.C. §1746, that the forgoing is

7  true and correct.

8        Dated:  July 29, 2008

9

10                             */s/ William M. Audet*
                                 William M. Audet

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**PROOF OF SERVICE**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA**

I am employed in the County of San Francisco, State of California; my business address is 221 Main Street, Suite 1460, San Francisco, California 94105. I am over the age of 18 and not a party to the within action. On this date I served the following documents:

**VERIFIED SECOND AMENDED COMPLAINT**

I hereby certify that on July 29, 2008, I electronically the above documents with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to the following attorneys of record listed on the Electronic Mail Notice List.

True and complete copies of the above documents were also served on the following counsel and individuals by U.S. Mail:

John D. Giffin
Keesal, Young & Logan
Suite 1500
Four Embarcadero Center
San Francisco, CA 94111

*Counsel for Regal Stone, LTD; Fleet Management Limited; and COSCO BUSAN, in rem*

David P. Shack
K&L Gates
10100 Santa Monica Blvd., 7th Floor
Los Angeles, CA 90067

*Counsel for John Cota*

Walter G. Coppenrath, Jr.
George Jones
Coppenrath & Associates
400 Oceangate, Ste 700
Long Beach, CA 90802

*Counsel for John Cota*

Eric P. Wise
Alecksandrs E. Drumals
FLYNN, DELICK & WISE LLP
One World Trade Center, Suite 1800
Long Beach, CA 90831

*Counsel for Hanjin Shipping Company, Ltd.*

[X] Federal: I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Executed on this 29th day of July, 2008 at San Francisco, California.

Adrienne C. Brennan

– 1 –

PROOF OF SERVICE

3

1   DENNIS J. HERRERA, State Bar #139669
    City Attorney
2   THERESE M. STEWART, State Bar #104930
    Chief Deputy City Attorney
3   DONALD P. MARGOLIS, State Bar # 116588
    THOMAS S. LAKRITZ, State Bar# 161234
4   Deputy City Attorneys
    City Hall, Room 234
5   1 Dr. Carlton B. Goodlett Place
    San Francisco, California 94102-4682
6   Telephone:    (415) 554-6547
    Facsimile:    (415) 554-4747
7   E-Mail:    tom.lakritz@sfgov.org

8   Attorneys for Plaintiffs
    CITY AND COUNTY OF SAN FRANCISCO AND
9   PEOPLE OF THE STATE OF CALIFORNIA

10

11  (Additional Counsel
    Listed On Following Page)

12



**F I L E D**
Superior Court of California
County of San Francisco

**FEB 0 8 2008**

GORDON, PARK-LI, Clerk.
BY: _Carolyn Balistrieri_
                Deputy Clerk

13              SUPERIOR COURT OF THE STATE OF CALIFORNIA

14                      COUNTY OF SAN FRANCISCO

15                        UNLIMITED JURISDICTION

16

17  CITY AND COUNTY OF SAN          Case No. CGC-07-469876   *Sig by Fax*
    FRANCISCO, CITY OF OAKLAND,
18  CITY OF RICHMOND, AND PEOPLE    FIRST AMENDED COMPLAINT FOR
    OF THE STATE OF CALIFORNIA,     DAMAGES, CIVIL PENALTIES, AND
19                                  INJUNCTIVE RELIEF FOR:
            Plaintiffs,
20                                  1. VIOLATION OF LEMPERT-
        vs.                         KEENE-SEASTRAND OIL SPILL
21                                  PREVENTION AND RESPONSE ACT
    REGAL STONE, LTD.; FLEET
22  MANAGEMENT LTD.; HANJIN         2. NEGLIGENCE
    SHIPPING CO., LTD.; SYNERGY
23  MANAGEMENT SERVICES;            3. NEGLIGENCE PER SE
    SYNERGY MARINE LIMITED; JOHN
24  J. COTA, AN INDIVIDUAL, AND     4. NUISANCE
    DOES ONE THROUGH 100,
25                                  5. TRESPASS
            Defendants.
26                                  6. UNJUST ENRICHMENT

27                                  7. UNFAIR BUSINESS PRACTICES

28

---

FIRST AMENDED COMPLAINT; S/C 469-876                    n:\govern\li2007\080680\00465226.doc



1   (Additional Counsel):

2   JOHN RUSSO, State Bar #129729
    City Attorney
3   BARBARA PARKER, State Bar #069722
    Assistant City Attorney
4   DORYANNA MORENO, State Bar #140976
5   Supervising Deputy City Attorney
    One Frank H. Ogawa Plaza, 6th Floor
6   Oakland, CA 94612
    Telephone:      (510) 238-3492
7   Facsimile:      (510) 238-6500

8   Attorneys For Plaintiff
9   CITY OF OAKLAND

10

11  LOUISE H. RENNE, State Bar #36508
    City Attorney
12  K. SCOTT DICKEY, State Bar #184251
    Chief Deputy City Attorney
13  RICHMOND CITY ATTORNEY'S OFFICE
14  1401 Marina Way South, Suite C
    Richmond, California 94804
15  Telephone:      (510) 620-6509
    Facsimile:      (510) 620-6518
16  E-Mail:         scott_dickey@ci.richmond.ca.us

17  Attorneys for Plaintiff
18  CITY OF RICHMOND

19

20

21

22

23

24

25

26

27

28

i

**INTRODUCTION**

1.     On the morning of November 7, 2007, the M/V Cosco Busan, a 65,131-ton, 900-foot long container ship, departed the Port of Oakland and headed for the Pacific Ocean, bound for South Korea. The 131-foot wide ship was required to pass through a 2,200-foot opening between two tower bases supporting the western span of the San Francisco-Oakland Bay Bridge. The ship failed to navigate successfully through this almost one-half mile wide gap. Instead, at about 8:30 a.m., the ship hit the base of the "D," or "Delta" Tower, tearing a gash in the port side of the ship's hull, ripping open fuel tanks on the ship and releasing about 58,000 gallons of heavy bunker fuel into the San Francisco Bay.

2.     The release of the fuel fouled the Bay waters, killing or injuring at least 2,200 birds, as well as marine mammals, fish, invertebrates and other marine organisms, damaging property along the San Francisco waterfront controlled, managed, maintained, and regulated by San Francisco, harming the livelihoods of the fishermen who depend on crab and other sea life in and about the Bay, impairing the public's enjoyment of the recreational opportunities afforded by the Bay, and compelling several public entities, including San Francisco, Oakland, and Richmond, and their taxpayers, to expend substantial sums of money for the deployment of personnel for investigation, remediation, and monitoring of environmental conditions.

3.     In this action, the City and County of San Francisco, and the Cities of Oakland and Richmond (collectively, "the Cities") seek compensation for all of their costs of investigating and responding to this catastrophic and wholly avoidable oil spill, including, without limitation, the costs incurred to assess the extent of the damage, remedy damages caused by the spill, and monitor conditions for continuing impacts of the spill. The Cities also seek to recover for the loss of recreational opportunities caused by the spill. The Cities also request injunctive relief to require defendants to develop and implement a plan to assess, remediate, and monitor for as long as is necessary, all harm to property, marine life, and recreational interests caused by defendants' catastrophic blunder. The San Francisco City Attorney in addition seeks civil penalties on behalf of

1

1  the People of the State of California for defendants' violation of a host of laws designed to protect

2  the delicate marine environment in and about the Bay.

3      4.  In addition, the City and County of San Francisco seeks to recover the costs it

4  incurred to mobilize and train volunteers.

5  <div align="center">**VENUE**</div>

6      5.  Venue is proper in this Court, because the spill, discharge, and violation of laws

7  occurred, in part, in the City and County of San Francisco, and because defendants at all relevant

8  times have done business in the City and County of San Francisco.  (Gov. Code, § 8670.59.)

9  <div align="center">**PARTIES**</div>

10      6.  Plaintiff **CITY AND COUNTY OF SAN FRANCISCO** ("San Francisco," or "the

11  City") is a municipal corporation duly organized and existing under the laws of the State of

12  California.  Under the Burton Act, Stats. 1968, ch. 1333, San Francisco, acting by and through the

13  Port of San Francisco and other City departments or agencies, has at all relevant times had complete

14  authority to use, operate, maintain, manage, regulate, improve, and control the Port and facilities

15  along approximately 7.5 miles of the eastern and northern waterfront of San Francisco, adjacent to

16  the San Francisco Bay.

17      7.  Plaintiff **CITY OF OAKLAND** ("Oakland") is a municipal corporation duly

18  organized and existing under the laws of the State of California.

19      8.  Plaintiff **CITY OF RICHMOND** ("Richmond") is a municipal corporation duly

20  organized and existing under the laws of the State of California.

21      9.  Plaintiff **THE PEOPLE OF THE STATE OF CALIFORNIA** ("the People")

22  appear by and through Dennis J. Herrera, San Francisco City Attorney, who asserts the seventh

23  cause of action for penalties under Business and Professions Code section 17200, as authorized by

24  Business and Professions Code section 17204.  The City has a population in excess of 750,000 as

25  determined by the Demographic Research Unit of the State of California's Department of Finance.

26      10.  Plaintiffs are informed and believe and on that basis allege that defendant **REGAL**

27  **STONE, LTD.** is, and at all relevant times was, the owner, operator or time-charterer of the Cosco

28

<div align="center">2</div>

1 | Busan, and that this defendant has at all relevant times done business in the State of California by

2 | allowing its operation in California waters.

3 |     11.    Plaintiffs are informed and believe and on that basis allege that defendant **FLEET**

4 | **MANAGEMENT LTD.**, which may be otherwise known as Fleet Ship Management, Inc.

5 | (hereafter, "Fleet Management Ltd."), is, and at all relevant times was, the operator, or sub-

6 | manager, of the Cosco Busan, and that this defendant has at all relevant times done business in the

7 | State of California by operating the ship in California waters.

8 |     12.    Plaintiffs are informed and believe and on that basis allege that defendant **HANJIN**

9 | **SHIPPING CO., LTD.** is, and at all relevant times was, the owner of the spilled bunker fuel,

10 | and/or the owner, operator, or charterer of the ship, and that this defendant has at all relevant times

11 | done business in the State of California.

12 |     13.    Plaintiffs are informed and believe and on that basis allege that defendant

13 | **SYNERGY MANAGEMENT SERVICES** is, and at all relevant times was, an agent of defendant

14 | Regal Stone, Ltd., and therefore that this defendant has at all relevant times done business in the

15 | State of California, and at all relevant times acted within the course and scope of its agency.

16 |     14.    Plaintiffs are informed and believe and on that basis allege that defendant

17 | **SYNERGY MARINE LIMITED** is, and at all relevant times was, an agent of defendant Regal

18 | Stone, Ltd., and that this defendant has at all relevant times done business in the State of California,

19 | and at all relevant times acted within the course and scope of its agency.

20 |     15.    Plaintiffs are informed and believe and on that basis allege that defendant **JOHN J.**

21 | **COTA** is an individual residing in Sonoma County, California, and was piloting the ship at the time

22 | of the incident.

23 |     16.    Each of the above-named defendants is liable for the torts, breaches, and other

24 | wrongs of the others, and was acting within the course and scope of its or his employment or

25 | agency.

26 |     17.    The true names or capacities, whether individual, corporate, associate, or otherwise,

27 | of DOE 1 through DOE 100 are unknown to plaintiffs, who therefore sue such defendants by such

28 | fictitious names, and who will amend this complaint to show their true names and capacities when

1    ascertained. Plaintiffs are is informed and believe and thereon allege that each of the defendants

2    designated as a DOE is responsible in some manner for the wrongs herein referred to and thereby

3    proximately caused injuries and damages as alleged herein.

4                                          FACTS

5         18.    Plaintiffs are informed and believe, and on that basis allege, the following facts: The

6    M/V Cosco Busan is a 65,131-ton container ship, longer than 900 feet, constructed in or about

7    2001. On November 7, 2007, the ship departed the Port of Oakland, bound for South Korea. It was

8    required to follow a routine route through the San Francisco Bay toward the Golden Gate. That

9    route included passing beneath the San Francisco-Oakland Bay Bridge. The ship's pilot intended to

10   steer between two bases supporting towers on the west span of the bridge. The spans were 2,200

11   feet apart. The ship was only 131 feet wide. The pilot of the ship – defendant John J. Cota – failed

12   to clear the "Delta" tower west of Yerba Buena Island and, as a result, the ship collided with the

13.  fender of the tower base.

14        19.    Plaintiffs are further informed and believe, and on that basis allege, the following

15   facts: The ship's collision with the tower base fender created a deep gash in the hull, tearing open

16   tanks carrying bunker fuel. Approximately 58,000 gallons of bunker fuel poured out of the ship

17   into the Bay waters.

18        20.    The bunker fuel, a heavy, viscous and toxic substance, killed thousands of sea birds,

19   fouled beaches and wildlife habitats, threatened the livelihood of fishermen who depend on their

20   catch of crabs and other sea life, and impaired boating, swimming, recreational fishing, walking or

21   jogging and other such opportunities for members of the public to use and enjoy the fouled beaches,

22   piers, wharves, and other facilities.

23        21.    As an actual and legal result of the spill, the public was prevented from enjoying the

24   use of several beaches and lakes, and municipal facilities, including wharves, piers, and lakes,

25   because of the risk of exposure to hazardous materials, bodily injury and property damage.

26        22.    The opening of the crab season, and all other fishing, were postponed, because of the

27   human health risks presented by consumption of sea animals taken from or through the

28   contaminated waters.

                                              4



23. Plaintiff San Francisco has sustained, and will continue to sustain, economic damage. This damage includes, without limitation, the costs and expenses associated with:

   a. Establishing an incident command post at Treasure Island to organize, on an ongoing basis, activities in response to the spill ("response activities"), assessment of damage, and monitoring;

   b. Committing time, labor, and materials to identifying, assessing and cleaning up San Francisco property damaged by the oil spill, containing the oil slick caused by the spill, monitoring for continuing damage and otherwise minimizing and mitigating further damage;

   c. Engaging fishermen and their vessels in the effort to clean up oil and attempt to save afflicted sea life, in the immediate aftermath of the oil spill;

   d. Recruiting, training and supervising volunteers to perform cleanup activities and tasks to mitigate and minimize environmental damage;

   e. Paying San Francisco employees for their time responding to the oil spill, which temporarily precluded these employees' performance of regular job duties;

   f. Paying employees of the Port of San Francisco who were unable to occupy Port offices in the immediate aftermath of the spill in order to perform their regular job duties; and

   g. Impressing San Francisco employees into performing duties on an overtime basis to respond on an urgent basis to the crisis created by the oil spill.

24. Plaintiff San Francisco has sustained, and will continue to sustain, additional economic damage. This damage includes, without limitation, the loss of:

   a. Anticipated rents, berthing, dockage and other fees, tax revenues and profit shares from fishing activities;

   b. Anticipated income from canceled commuter ferry trips and pleasure excursions, including those to Alcatraz and Angel Islands;

5



c. Anticipated parking ticket revenues that could not be collected because of the deployment of San Francisco parking control officers to non revenue-producing duties; and

d. Anticipated tax revenues associated with impacts to tourism and business interruption of tenants and lessees of the Port of San Francisco.

25. Plaintiff Oakland has sustained, and will continue to sustain, economic damage. This damage includes, without limitation, the costs and expenses associated with committing time, labor, and materials to determining whether any Oakland property was damaged by the oil spill, otherwise responding to the oil spill, monitoring for continuing damage, and otherwise minimizing and mitigating further damage.

26. Plaintiff Richmond has sustained, and will continue to sustain, economic damage. This damage includes, without limitation, the costs and expenses associated with committing time, labor, and materials to determining whether any Richmond property was damaged by the oil spill, otherwise responding to the oil spill, which included public information efforts, emergency response and management, and otherwise minimizing and mitigating further damage.

27. Plaintiff San Francisco and the People of the State of California also have sustained damage through loss of the use and enjoyment of recreational and other opportunities affected, impacted, or threatened by the spill, including, without limitation, the use of public beaches, wharves, piers, pedestrian and bicycle paths, marinas, and seawalls. This damage includes, without limitation, losses arising from:

a. Prevention of the use of San Francisco marinas and harbors by recreational boaters;

b. Prevention of the use of City owned or managed Aquatic Park facilities, public beaches, pedestrian and bicycle paths, and other San Francisco marine environments by pedestrians and bicyclists, swimmers, bathers, and waders, including cancellation of the planned swim from Alcatraz to Aquatic Park;

c. Cancellation of the planned triathlon at Treasure Island; and

d. Prevention of recreational and subsistence fishing off of San Francisco piers and wharves.

6

n:\govern\li2007\080680\00465226.doc

28.    Plaintiff Oakland also has sustained damage through loss of the use and enjoyment of recreational and other opportunities afforded by the natural resources damaged or threatened by the spill, including, without limitation, the use of public beaches, wharves, piers, pedestrian and bicycle paths, marinas, and seawalls.  This damage includes, without limitation, losses arising from:

    a.   Prevention of the use of Oakland marinas and harbors by recreational boaters; and

    b.   Prevention of the use of public beaches, pedestrian and bicycle paths, and other Oakland marine environments, including Lake Merritt, by pedestrians and bicyclists, swimmers, bathers, and waders.

29.    Plaintiff Richmond also has sustained damage through loss of the use and enjoyment of recreational and other opportunities afforded by the natural resources damaged or threatened by the spill, including, without limitation, the use of public beaches, waterfront parks, wharves, piers, pedestrian and bicycle paths, marinas, and seawalls.  This damage includes, without limitation, losses arising from:

    a.   Prevention of the use of Richmond marinas and harbors by recreational boaters; and

    b.   Prevention of the use of public beaches, pedestrian and bicycle paths, and other Richmond marine environments by pedestrians and bicyclists, swimmers, bathers, and waders.

**FIRST CAUSE OF ACTION**
**(Damages And Civil Penalties Under Lempert-Keene-Seastrand**
**Oil Spill Prevention and Response Act)**
**(By All Plaintiffs Against All Defendants)**

30.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 29 of this First Amended Complaint.

31.    The Lempert-Keene-Seastrand Oil Spill Prevention and Response Act, Government Code sections 8670.1, *et seq.* ("the Act") provides that "[a]ny responsible party, as defined in Section 8670.3 [of the Government Code], shall be absolutely liable without regard to fault for any damages incurred by any injured party which arise out of, or are caused by, the discharge or leaking of oil into or onto marine waters." (Gov. Code, § 8670.56.5, subd. (a).)

FIRST AMENDED COMPLAINT; S/C 469-876

n:\govern\li2007\080680\00465226.doc

 

32.    "Responsible parties" include "the owner or transporter of oil or a person or entity accepting responsibility for the oil;" and "the owner, operator, or lessee of, or person who charters by demise, any vessel ... or a person or entity accepting responsibility for the vessel ...." (Gov. Code, § 8670.3, subd. (w).)

33.    As the owner, operator, lessee, or charterer by demise of the vessel and owner or transporter of the oil of the discharged oil, defendant Regal Stone Ltd. is a responsible party that is absolutely liable under the Act.

34.    As the owner, operator, lessee, or charterer by demise of the vessel and owner or transporter of the discharged oil, defendant Hanjin Shipping Co., Ltd. is a responsible party that is absolutely liable under the Act.

35.    As the owner, operator, lessee, or charterer by demise of the vessel, defendant Fleet Management Ltd. is a responsible party that is absolutely liable under the Act.

36.    As the owner, operator, lessee, or charterer by demise of the vessel, defendant Synergy Management Services is a responsible party that is absolutely liable under the Act.

37.    As the owner, operator, lessee, or charterer by demise of the vessel, defendant Synergy Marine Limited is a responsible party that is absolutely liable under the Act.

38.    As the transporter of the oil and the person accepting responsibility for the oil and for the vessel, defendant John J. Cota is a responsible party who is absolutely liable under the Act.

39.    The bunker fuel that was discharged from the vessel is "oil" within the meaning of the Act, which defines "oil" as "any kind of petroleum, liquid hydrocarbon, or petroleum products or any faction or residues therefrom, including ... bunker fuel ...." (Gov. Code, § 8670.3, subd. (n).)

40.    The San Francisco Bay waters are "marine waters" within the meaning of the Act, because the Bay is "subject to tidal influence." (Gov. Code, § 8670.3, subd. (i).)

41.    On November 7, 2007, defendants discharged or leaked bunker fuel into the San Francisco Bay, and are therefore absolutely liable without regard to fault for all damages that plaintiffs sustained or will sustain.

FIRST AMENDED COMPLAINT; S/C 469-876                                    n:\govern\li2007\080680\00465226.doc




42.  The Act entitles a plaintiff to recover a broad variety of damages, including, without limitation, the costs of investigation, response, containment, removal and treatment; damages for injury to, or economic losses resulting from destruction of or injury to real or personal property; lost taxes, royalties, rents, or net profit shares caused by the injury; destruction, loss, or impairment of use of real property, and personal property.  (Gov. Code, § 8670.56.5, subd. (h).)

43.  In addition to those damages, alleged above, in any action brought by a county or city, the Act entitles such an entity to recover damages for loss of use and enjoyment of natural resources, public beaches, and other public resources or facilities.  (Gov. Code, § 8670.56.5, subd. (h)(7).)

44.  The civil remedies provided in the Act are "separate and in addition to, and do not supersede or limit, any and all other remedies, civil or criminal."  (Gov. Code, § 8670.61.)

45.  Plaintiffs sustained a variety of forms of damage recoverable under the Act, in excess of the jurisdictional limit of this Court, including, without limitation, each of the forms of damage alleged in paragraphs 23 through 29, above.

46.  The Act further provides that "[a]ny person who intentionally or negligently does any of the following acts shall be subject to a civil penalty of not less than twenty-five thousand dollars ($25,000) or more than five hundred thousand dollars ($500,000) for each violation, and each day or partial day that a violation occurs is a separate violation:  … Discharges or spills oil into marine waters, unless the discharge is authorized by the United States, the state, or other agency with appropriate jurisdiction.  (Gov. Code, § 8670.66, subd. (a)(3).)

47.  The Act further provides that … [e]xcept as provided in subdivision (a), any person who intentionally or negligently violates any provision of [the Act] … or any permit, rule, regulation, standard, or requirement issued or adopted pursuant to those provisions, shall be liable for a civil penalty not to exceed two hundred and fifty thousand dollars ($250,000) for each violation of a separate provision, or, for continuing violations, for each day that violation continues."  (Gov. Code, § 8670.66, subd. (b).)

48.  Plaintiffs are informed and believe that defendants committed a violation of the Act, within the meaning of sections 8670.66, subdivisions (a) and (b), by discharging or spilling bunker

9

 

1    fuel into the waters of the Bay, which are marine waters.  Each day or partial day that the oil has

2    remained and will remain in marine waters constitutes an additional violation.

3         49.    Defendants are therefore liable for civil penalties under Government Code section

4    8670.66, in an amount according to proof.

5                          **SECOND CAUSE OF ACTION**
                          **(Damages For Negligence)**
6                      **(By All Plaintiffs Against All Defendants)**

7         50.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 49 of this First

8    Amended Complaint.

9         51.    Defendants owed a duty of reasonable and ordinary care to plaintiffs, which required

10   them to operate the ship in a safe manner so as to avoid the injuries alleged herein.

11        52.    Defendants breached their duty of care to plaintiffs in numerous respects.  Examples

12   of their breach include, but are not limited to, the following acts or omissions of defendant Cota:

13        a.   Attempting to sail the ship in the Bay in foggy conditions that limited visibility to no

14             greater than 1/10 of a mile;

15        b.   Proceeding on a course in the Bay with insufficient information about the level of

16             visibility;

17        c.   Proceeding at a speed that was excessive for the circumstances;

18        d.   Failing to use all available resources to maximize safety and minimize the risk of an

19             incident, including a tugboat, the Vessel Traffic Service of the Coast Guard, and the

20             ship's lookout;

21        e.   Failing to be fully acquainted with and able to operate the ship's navigation system;

22             and

23        f.   Failing, upon being informed by the Coast Guard that the vessel was on a course that

24             would result in a collision with the bridge, to heed that warning and to stop or

25             reverse course until the location and course of the vessel could be ascertained with

26             certainty.

27

28

                                              10



53.    Because defendant John J. Cota was at all relevant times acting within the course and scope of his employment or agency for each of the other defendants, each such other defendant is liable for the acts and omissions of defendant Cota on the basis of respondeat superior.

### THIRD CAUSE OF ACTION
#### (Damages For Negligence Per Se)
#### (By All Plaintiffs Against All Defendants)

54.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 53 of this First Amended Complaint.

55.    Defendants violated several statutes, ordinances, or regulations, including, without limitation, the following statutes and implementing and related regulations and ordinances:

   a.  Government Code, § 8670.25;

   b.  Government Code, § 8670.25.5;

   c.  Government Code, § 8670.27;

   d.  Government Code, § 8670.56.5;

   e.  Government Code, § 8670.62;

   f.  Government Code, § 8670.64;

   g.  Government Code, § 8670.66;

   h.  Government Code, § 8670.67.5;

   i.  Fish & Game Code, § 5650;

   j.  Fish & Game Code, § 12015;

   k.  Harbors & Navigation Code, § 133;

   l.  Water Code, § 13350, subd. (a)(3); and

   m.  Water Code, § 13271, subds. (a) & (c).

56.    Defendants' violation of statutes, ordinances, or regulations actually and legally caused injury and other harm to plaintiffs, as alleged herein.

57.    Plaintiffs' harm resulted from an occurrence of the nature that these statutes, ordinances, or regulations were designed to prevent.

58.    Plaintiffs are members of the class of persons for whose protection the statutes, ordinances, or regulations were adopted.

11

## FOURTH CAUSE OF ACTION
### (Damages For And Abatement of Nuisance)
### (By All Plaintiffs Against All Defendants)

59.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 58 of this First Amended Complaint.

60.    Defendants' conduct as alleged herein constituted a use of the San Francisco Bay in such a manner as to constitute a private and public nuisance.  The particular conduct constituting a nuisance is the discharge of approximately 58,000 gallons of bunker fuel into the Bay environment.

61.    Defendants' creation of the nuisance was the result of unsafe, negligent, unnecessary, unreasonable, and injurious methods of operation of their business.

62.    Defendants' conduct constitutes a private nuisance within the meaning of Section 3479 of the Civil Code, and a public nuisance within the meaning of section 3490 *et seq.* of the Civil Code.

63.    The conduct of which the Cities complain is especially injurious to the Cities.

64.    Despite abundant notice and demands, defendants have failed and refused, and continue to fail and refuse, to completely investigate, assess, monitor, and abate the nuisance.

65.    Defendants have threatened to and will, unless restrained by this Court, continue to maintain the nuisance and continue the acts complained of, and each and every act has been, and will be, without the consent, against the will, and in violation of plaintiffs' rights.

66.    As an actual and proximate result of the nuisance created by defendants, plaintiffs have been, and will be, damaged in an amount to be determined, in excess of the jurisdictional limit of this Court.

67.    Unless defendants are restrained by order of this Court, it will be necessary for plaintiffs to commence many successive actions against defendants to secure compensation for damages sustained, thus requiring a multiplicity of suits, and the general public will be daily threatened with harm to their health, safety, and recreational interests.

68.    Plaintiffs have no plain, speedy, or adequate remedy at law, and injunctive relief requiring immediate abatement of the nuisance is expressly authorized by Sections 526 and 731 of the Code of Civil Procedure.  Plaintiffs are entitled to an injunction requiring defendants to devise

12

 

1  and implement a plan to investigate, assess, contain, remediate, and monitor on an ongoing basis, all

2  harm to San Francisco waterfront property, marine life, and recreational opportunities at and about

3  the waterfront abutting the Bay, and the beaches along the Bay and Pacific Ocean.

4     69.    In maintaining the nuisance, defendants are acting with full knowledge of the

5  consequences and damage being caused, and their conduct is willful, oppressive and malicious;

6  accordingly, the City is entitled to punitive damages against defendants.

7                    **FIFTH CAUSE OF ACTION**
                           **(Trespass)**
8             **(By All Plaintiffs Against All Defendants)**

9     70.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 69 of this First

10  Amended Complaint.

11    71.    Plaintiff San Francisco has complete authority to use, conduct, operate, maintain,

12  manage, regulate, improve and control the San Francisco Port, including without limitation property

13·  conveyed to San Francisco in trust pursuant to the Burton Act and other property held in fee by the

14  City, and its facilities harmed or threatened by defendants' conduct, including piers, wharves,

15  pedestrian paths, seawalls, riprap, and marinas and harbors and their associated landside facilities

16  ("the property").

17    72.    Beginning on November 7, 2007, and continuing to the present time, defendants,

18  without San Francisco's consent, trespassed on the property by causing the bunker fuel spill to

19  occur, failing to prevent the migration of the spilled fuel, and failing to remove the spilled product

20  from the marine environment, despite abundant notification of its obligation and opportunity to

21  perform.

22    73.    As an actual and legal result of the trespass, San Francisco has been and continues to

23  be damaged in an amount to be determined, in excess of the jurisdictional limit of this Court.

24                    **SIXTH CAUSE OF ACTION**
                        **(Unjust Enrichment)**
25             **(By San Francisco Against All Defendants)**

26    74.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 73 of this First

27  Amended Complaint.

28

13

 

75.     The volunteers whom San Francisco recruited, trained and supervised performed hundreds or thousands of hours of service, including, without limitation, retrieving, treating and saving oiled birds and other marine life, cleaning up fouled beaches and other coastal property.

76.     The volunteer service constituted a benefit to defendants, who were obligated by law to perform the work that the volunteers performed.

77.     Defendants have unjustly retained and been enriched by the benefit of the volunteers' service, at the expense of San Francisco.

78.     Defendants must disgorge to plaintiffs their unjustly retained benefit.

<div align="center">

**SEVENTH CAUSE OF ACTION**
**(Unfair Business Practices Act, Bus. & Profs. Code, § 17200)**
**(By The People Against All Defendants)**

</div>

79.     The People reallege and incorporate by reference paragraphs 1 through 78 of this First Amended Complaint.

80.     Section 17200 of the Business and Professions Code provides that unfair competition shall mean and include any "unlawful, unfair, or fraudulent business act or practices and unfair, deceptive, untrue or misleading advertising."

81.     Each of the defendants' acts alleged herein was unlawful, unfair, and fraudulent, within the meaning, and in violation, of section 17200.

82.     Violations of statutes, ordinances, or regulations constitute unlawful acts within the meaning of section 17200.  Such provisions that defendants violated include, without limitation, the statutes, ordinances and regulations alleged in paragraph 55, above.

<div align="center">

**PRAYER FOR RELIEF**

</div>

Wherefore, plaintiffs pray for judgment against defendants as follows:

1.     For damages in excess of the jurisdictional limit of this Court, in an amount to be determined at trial, including, without limitation, all damages necessary to compensate for the economic interests and real property damages and for the loss of use and enjoyment of recreational opportunities alleged herein;

2.     For an injunction requiring defendants to abate the nuisance and devise and implement a plan to investigate, assess, monitor, contain and remediate, on an ongoing basis, all

<div align="center">14</div>



1  harm to San Francisco waterfront property, marine life, and recreational interests at and about the

2  waterfront abutting the Bay, and the beaches along the Bay and Pacific Ocean.

3      3.    For an order requiring defendants to disgorge to plaintiffs the value of all unjustly

4  retained benefits flowing from the commitment of volunteers' remediation activities in response to

5  the spill;

6      4.    For civil penalties under Government Code section 8670.66, Business and

7  Professions Code section 17206, and any other applicable law;

8      5.    For an award of reasonable costs and attorney's fees under Government Code section

9  8670.56.5, subdivision (f); Code of Civil Procedure section 1033.5; and any other applicable law;

10     5.    For punitive damages; and

11     6.    For trial by jury of all issues so triable.

12  Dated:  February 8, 2008

| | DENNIS J. HERRERA<br>City Attorney<br>THERESE M. STEWART<br>Chief Deputy City Attorney<br>DONALD P. MARGOLIS<br>THOMAS S. LAKRITZ<br>Deputy City Attorneys<br><br>By _Thomas S. Lakritz_____<br>    THOMAS S. LAKRITZ<br>    Deputy City Attorney<br><br>Attorneys for Plaintiffs CITY AND COUNTY<br>OF SAN FRANCISCO AND THE PEOPLE OF<br>THE STATE OF CALIFORNIA |
| LOUISE H. RENNE<br>City Attorney<br>K. SCOTT DICKEY<br>Chief Deputy City Attorney<br><br>By_____<br>    K. SCOTT DICKEY<br>    Chief Deputy City Attorney<br><br>Attorneys for Plaintiff CITY OF<br>RICHMOND | JOHN RUSSO<br>City Attorney<br>BARBARA PARKER<br>Assistant City Attorney<br>DORYANNA MORENO<br>Supervising Deputy City Attorney<br><br>By_____<br>    DORYANNA MORENO<br>    Supervising Deputy City Attorney<br><br>Attorneys for Plaintiff CITY OF OAKLAND |

15



1   harm to San Francisco waterfront property, marine life, and recreational interests at and about the

2   waterfront abutting the Bay, and the beaches along the Bay and Pacific Ocean.

3          3.    For an order requiring defendants to disgorge to plaintiffs the value of all unjustly

4   retained benefits flowing from the commitment of volunteers' remediation activities in response to

5   the spill;

6          4.    For civil penalties under Government Code section 8670.66, Business and

7   Professions Code section 17206, and any other applicable law;

8          5.    For an award of reasonable costs and attorney's fees under Government Code section

9   8670.56.5, subdivision (f); Code of Civil Procedure section 1033.5; and any other applicable law;

10         5.    For punitive damages; and

11         6.    For trial by jury of all issues so triable.

12  Dated:  February 8, 2008

| | |
|---|---|
| 13 | DENNIS J. HERRERA<br>City Attorney<br>THERESE M. STEWART<br>Chief Deputy City Attorney<br>DONALD P. MARGOLIS<br>THOMAS S. LAKRITZ<br>Deputy City Attorneys<br><br>By _____<br>    THOMAS S. LAKRITZ<br>    Deputy City Attorney<br><br>Attorneys for Plaintiffs CITY AND COUNTY<br>OF SAN FRANCISCO AND THE PEOPLE OF<br>THE STATE OF CALIFORNIA |
| LOUISE H. RENNE<br>City Attorney<br>K. SCOTT DICKEY<br>Chief Deputy City Attorney<br><br>By _____<br>    K. SCOTT DICKEY<br>    Chief Deputy City Attorney<br><br>Attorneys for Plaintiff CITY OF<br>RICHMOND | JOHN RUSSO<br>City Attorney<br>BARBARA PARKER<br>Assistant City Attorney<br>DORYANNA MORENO<br>Supervising Deputy City Attorney<br><br>By _____<br>    DORYANNA MORENO<br>    Supervising Deputy City Attorney<br><br>Attorneys for Plaintiff CITY OF OAKLAND |

15

2008-02-08 14:52 OaklandCity Attorney    (510) 238-6500 >>    415 554 4747 P 2/2

1   harm to San Francisco waterfront property, marine life, and recreational interests at and about the

2   waterfront abutting the Bay, and the beaches along the Bay and Pacific Ocean.

3       3.    For an order requiring defendants to disgorge to plaintiffs the value of all unjustly

4   retained benefits flowing from the commitment of volunteers' remediation activities in response to

5   the spill;

6       4.    For civil penalties under Government Code section 8670.66, Business and

7   Professions Code section 17206, and any other applicable law;

8       5.    For an award of reasonable costs and attorney's fees under Government Code section

9   8670.56.5, subdivision (f); Code of Civil Procedure section 1033.5; and any other applicable law;

10      5.    For punitive damages; and

11      6.    For trial by jury of all issues so triable.

12  Dated: February 8, 2008

| | |
|---|---|
| 13 14 15 16 17 18 19 20 21 | DENNIS J. HERRERA<br>City Attorney<br>THERESE M. STEWART<br>Chief Deputy City Attorney<br>DONALD P. MARGOLIS<br>THOMAS S. LAKRITZ<br>Deputy City Attorneys<br><br>By _____<br>    THOMAS S. LAKRITZ<br>    Deputy City Attorney<br><br>Attorneys for Plaintiffs CITY AND COUNTY<br>OF SAN FRANCISCO AND THE PEOPLE OF<br>THE STATE OF CALIFORNIA |
| 22 23 24 25 26 27 28 — LOUISE H. RENNE<br>City Attorney<br>K. SCOTT DICKEY<br>Chief Deputy City Attorney<br><br>By _____<br>    K. SCOTT DICKEY<br>    Chief Deputy City Attorney<br><br>Attorneys for Plaintiff CITY OF<br>RICHMOND | JOHN RUSSO<br>City Attorney<br>BARBARA PARKER<br>Assistant City Attorney<br>DORYANNA MORENO<br>Supervising Deputy City Attorney<br><br>By _____<br>    DORYANNA MORENO<br>    Supervising Deputy City Attorney<br><br>Attorneys for Plaintiff CITY OF OAKLAND |

15

1  JOSEPH A. WALSH II, CASB No. 143694
   MARC R. GREENBERG, CASB No. 123115
2  JOHN COX, CASB No. 197687
   KEESAL, YOUNG & LOGAN
3  A Professional Corporation
   400 Oceangate, P.O. Box 1730
4  Long Beach, California 90801-1730
   Telephone:   (562) 436-2000
5  Facsimile:   (562) 436-7416

6  Attorneys for Defendant FLEET MANAGEMENT LTD.

7              UNITED STATES DISTRICT COURT

8            NORTHERN DISTRICT OF CALIFORNIA

9

10
   UNITED STATES OF AMERICA,          )  Case No. CR 08-0160-1 SI
11                                     )
                       Plaintiff(s),   )  **DEFENDANT FLEET MANAGEMENT**
12                                     )  **LTD.'S REQUEST FOR JUDICIAL**
            vs.                        )  **NOTICE**
13                                     )  Date:  September 22, 2008
   JOHN J. COTA, et al.,               )  Time:  11:00 A.M.
14                                     )  Ctrm:: 4
                       Defendant(s).   )  Judicial Officer:  Honorable Susan Illston
15                                     )
                                       )
16            .                        )
                                       )
17  ─────────────────────────────────  )

18

19       **PART 2 OF EXHIBITS TO REQUEST FOR JUDICIAL NOTICE**

20

21

22

23

24

25

26

27

28

                          - 1 -                    KYL_SF466029

DEFENDANT FLEET MANAGEMENT LTD.'S REQUEST FOR JUDICIAL NOTICE

4

1    FRANK M. PITRE (SBN 100077)
     NANCY L. FINEMAN (SBN 124870)
2    STUART G. GROSS (SBN 251019)
     NIKI B. OKCU (SBN 229345)
3    COTCHETT, PITRE & McCARTHY
     San Francisco Airport Office Center
4    840 Malcolm Road, Suite 200
     Burlingame, CA 94010
5    Telephone: (650) 697-6000

6    *Attorneys for Plaintiffs*

7

8       **IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9        **IN AND FOR THE COUNTY OF SAN FRANCISCO**

10

11    JOHN TARANTINO; STEVEN F.    )   CASE NO. CGC-07-469379
12    FITZ, dba FITZ-BUSKIRK, INC.;    )
     JOHN ATKINSON; SEAN M.       )   **CLASS ACTION**
13    HODGES; ERNIE KOEPF; SAU      )   **FIRST AMENDED COMPLAINT**
     A. PHANG; KIU A. PHANG SIN;   )   **FOR DAMAGES BASED UPON:**
14    and others similarly situated,      )
                              )   1.   **VIOLATION OF THE**
15                               )      **LEMPERT-KEENE-**
                              )      **SEASTRAND OIL SPILL**
16          **Plaintiffs,**         )      **PREVENTION AND**
                              )      **RESPONSE ACT**
17      v.                       )      **[Gov't Code §§ 8670, *et seq.*];**
                              )
18    HANJIN SHIPPING CO., LTD.;      )   2.   **STRICT LIABILITY - ULTRA**
     REGAL STONE, LTD.; FLEET       )      **HAZARDOUS ACTIVITY;**
19    MANAGEMENT, LTD.; JOHN J.     )
     COTA; and DOES 2-100,         )
20                               )   3.   **NEGLIGENCE;**
          **Defendants.**       )
21    _____ )   4.   **PUBLIC NUISANCE**
                                      **[Civ. Code §§ 3479 *et seq*];**
22
                                   5.   **PRIVATE NUISANCE**
23                                    **[Civ. Code §§ 3479 *et seq*]; and**

24                                 6.   **ENVIRONMENTAL**
                                   **MONITORING.**
25

26                                    **JURY TRIAL DEMANDED**

27

28

---

**FIRST AMENDED CLASS ACTION COMPLAINT**
Case No. CGC-07-469379

---

F I L E D
Superior Court of California
County of San Francisco

FEB 0 1 2008

GORDON PARK-LI, Clerk
BY: _____
M.A. MORAN, Deputy Clerk

# TABLE OF CONTENTS

                                                                    **Page**

I.    INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   PARTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    A.   The Plaintiffs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    B.   The Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    C.   The DOE Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    D.   Agency, Employment And Joint Venture . . . . . . . . . . . . . . 9

III.  JURISDICTION AND VENUE . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

IV.  CLASS ACTION ALLEGATIONS . . . . . . . . . . . . . . . . . . . . . . . . . 9

V.   FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    A.   Timeline Of The Collision And Spill . . . . . . . . . . . . . . . . 12

    B.   Construction, Ownership, Management, Operation,
          And Control Of the Ship . . . . . . . . . . . . . . . . . . . . . . . . . . 15

          1.   Construction Of the Ship . . . . . . . . . . . . . . . . . . . . 15

          2.   Ownership, Leasing, Management, Operation, Charter,
              And Control Of the Ship . . . . . . . . . . . . . . . . . . . . . 16

    C.   Bunker Fuel – The Contaminant Involved . . . . . . . . . . . . 17

          1.   Toxicity Of Bunker Fuel . . . . . . . . . . . . . . . . . . . . . 17

          2.   Consequences of Bunker Fuel Spills . . . . . . . . . . . . 18

    D.   Extent Of Damages To Plaintiffs And The Class . . . . . . . 20

          1.   The San Francisco Bay Area Dungeness Crab Fishery . . . . 20

              a.   Development Of The Fishery . . . . . . . . . . . . . 20

              b.   San Francisco Dungeness Crab Season . . . . . . 22

              c.   Immediate Effects Of The Oil Spill On The
                   Dungeness Crab Fishery . . . . . . . . . . . . . . . . . 23

          2.   The San Francisco Bay Area Flat Fish Fishery . . . . . . . . . 27

          3.   Other Fisheries Of The San Francisco Bay . . . . . . . . . . . . 27

VI.   CAUSES OF ACTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

      FIRST CAUSE OF ACTION
      (Strict Liability - Lempert-Keene-Seastrand Oil Spill
      Prevention Act, Gov't Code §§ 8670 *et seq.*) . . . . . . . . . . . . . . . . . 28

      SECOND CAUSE OF ACTION
      (Strict Liability - Ultra Hazardous Activity) . . . . . . . . . . . . . . . 30

      THIRD CAUSE OF ACTION
      (Negligence) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

      FOURTH CAUSE OF ACTION
      (Negligent Entrustment) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

      FIFTH CAUSE OF ACTION
      (Public Nuisance - Civ. Code §§ 3479 *et seq.*) . . . . . . . . . . . . . . 33

      SIXTH CAUSE OF ACTION
      (Private Nuisance - Civ. Code §§ 3479 *et seq.*) . . . . . . . . . . . . . . 34

      SEVENTH CAUSE OF ACTION
      (Declaratory Relief And Request for Monitoring
      of Contamination) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

PRAYER FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

JURY DEMAND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

## I. <u>INTRODUCTION</u>

1.    This action is the byproduct of reckless indifference, inattention, and mismanagement among those responsible for the control of a 68 thousand ton container ship called the COSCO BUSAN (hereinafter "the Ship"), which smashed into the Delta Tower of the Bay Bridge at 8:37 a.m. on November 7, 2007. The collision tore a horizontal gash in the side of the Ship 100 feet long, 12 feet wide, and 3 feet deep, shown in the photo below which appeared in the San Francisco Chronicle. Approximately 58,000 gallons of highly toxic bunker fuel poured into the San Francisco Bay, befouling for years one of the most beautiful and productive bodies of water in the world (hereinafter "the Spill").





2.      The polluting of the San Francisco Bay and its marine life was a
direct and foreseeable consequence of a combination of wrongful acts and
omissions by those who owned, operated, maintained, managed, chartered, leased
and/or exercised control over the Ship and/or the bunker fuel transported therein
at the time of the Spill; hereinafter identified as Defendants HANJIN SHIPPING
CO., LTD. (hereinafter "HANJIN"); REGAL STONE, LTD. (hereinafter
"REGAL"); JOHN COTA (hereinafter "COTA"); FLEET MANAGEMENT
LTD. (hereinafter "FLEET"); and/or Does 2-50.

3.      On the day of the accident, Defendant COTA was the pilot
navigating the Ship through the San Francisco Bay.  COTA was navigating with
the assistance of Captain Mao Cai Sun, and a crew comprised of agents,
employees, servants and/or joint venturers of the Defendants HANJIN, REGAL,
FLEET, and/or Does 2-50.

4.      Defendant COTA, who had a history of accidents, piloted the
enormous Ship out of the Bay and through the towers of the Bay Bridge despite:
(1) the presence dense fog; (2) concerns regarding the accuracy of navigational
equipment; and (3) no functional ability to communicate with the Ship's Captain
and crew.  Predictably, the 131-foot wide Ship veered off course and broadsided
the Delta Tower.

5.      The reaction of the Ship's crew, Captain Mao and Defendant COTA
to the bridge collision and Spill displayed a conscious indifference for the
environmental consequences.  Instead of urgently assessing the true extent of
highly toxic bunker fuel which had spewed from the ruptured side of the Ship into
the Bay, the Ship's crew reported, without any reliable basis, that only 140
gallons had spilled.  The United States Coast Guard relied on the grossly
inadequate assessment for the purpose of mounting a response, and did not learn
that the true amount was 400 times greater for another eight hours.
Incomprehensibly, Captain Mao also waited approximately one hour before

1    contacting private spill-containment operators, allowing the bunker fuel to spread

2    from the gash unabated.

3         6.    The magnitude of this calamity has triggered consequences of

4    immediate and long-term proportion to the environmental health of the Bay and

5    its marine life.  Plaintiffs herein have suffered profound economic losses to their

6    livelihood as a direct, legal and foreseeable result of public health concerns over

7    the short and long-term safety of crab and other seafood for human consumption

8    and the damage caused to the productivity of the Bay.

9    **II.**    **PARTIES**

10        **A.**    **The Plaintiffs**

11         7.    **JOHN TARANTINO:**  Plaintiff JOHN TARANTINO (hereinafter

12    "TARANTINO") is, and at all relevant times herein was, an individual residing in

13    the City of Corte Madera, County of Marin, California.  TARANTINO has earned

14    a living as a commercial fisherman in the San Francisco Bay Area for 35 years.

15    For much of that time, TARANTINO served as the owner and skipper of the

16    fishing vessel "The Crown Royal," berthed at the Wharf in San Francisco, where

17    he is actively engaged in fishing for crab, as well as various vertebrate fish.

18    TARANTINO receives more than 25% of his earnings from the fishing of these

19    species during the applicable seasons for each.  Plaintiff TARANTINO has

20    suffered economic injury, harm and/or damages to his livelihood as a commercial

21    fisherman as a direct, legal and foreseeable consequence of the wrongful acts

22    and/or omissions of Defendants, and each of them, more particularly set forth

23    herein.

24         8.    **STEVEN F. FITZ:**  Plaintiff STEVEN F. FITZ (hereinafter "FITZ")

25    is, and at all relevant times herein was, an individual residing in El Granada,

26    County of San Mateo, California.  FITZ has earned a living as a commercial

27    fisherman for over 35 years, the last 27 of which he has spent in the San

28    Francisco Bay Area.  Since 1989 Fitz has served as the owner and skipper of the

1  fishing vessel "Mr. Morgan" depicted in the photo below, berthed in Pilar Point
2  Harbor in Half Moon Bay where he is actively engaged in fishing for crab, as well
3  as "flat fish," including species more commonly known as Petrale, English sole,
4  Skate, and Sand Dabs, under the name Fitz-Buskirk, Inc.  FITZ receives more
5  than 25% of his earnings from the fishing of these species during the applicable
6  seasons for each.  Plaintiff FITZ, dba Fitz-Buskirk, Inc., has suffered economic
7  injury, harm and/or damages to his livelihood as a commercial fisherman as a
8  direct, legal and foreseeable consequence of the wrongful acts and/or omissions
9  of Defendants, and each of them, more particularly set forth herein.



24      9.      JOHN ATKINSON:  Plaintiff JOHN ATKINSON (hereinafter
25  "ATKINSON") is, and at all relevant times herein was, an individual residing in
26  the City of Corte Madera, County of Marin, California.  ATKINSON has earned a
27  living as a commercial fisherman in the San Francisco Bay Area for over 17
28  years.  Since 1990, ATKINSON has served as the owner and skipper of the

FIRST AMENDED CLASS ACTION COMPLAINT
Case No. CGC-07-469379                                                                   4

1  fishing vessel "New Rayann," berthed in Sausalito. ATKINSON is actively
2  engaged in fishing for crab and other fishing activities. ATKINSON receives
3  more than 25% of his earnings from the fishing of crab during the applicable
4  season. Plaintiff ATKINSON has suffered economic injury, harm and/or
5  damages to his livelihood as a commercial fisherman as a direct, legal and
6  foreseeable consequence of the wrongful acts and/or omissions of Defendants,
7  and each of them, more particularly set forth herein.

8      10.    SEAN M. HODGES:  Plaintiff SEAN M. HODGES (hereinafter
9  "HODGES") is, and at all relevant times herein was, an individual residing in
10  Novato, County of Marin, California. HODGES has earned a living as a
11  commercial fisherman in the San Francisco Bay Area for over 15 years. Since
12  1996, HODGES has served as the owner and skipper of the fishing vessel "Hog
13  Heaven," berthed in Sausalito. HODGES is actively engaged in fishing for crab
14  and other fishing activities. HODGES receives more than 25% of his earnings
15  from the fishing of crab during the applicable season. Plaintiff HODGES has
16  suffered economic injury, harm and/or damages to his livelihood as a commercial
17  fisherman as a direct, legal and foreseeable consequence of the wrongful acts
18  and/or omissions of Defendants, and each of them, more particularly set forth
19  herein.

20      11.    ERNIE KOEPF:  Plaintiff ERNIE KOEPF (hereinafter "KOEPF")
21  is, and at all relevant times herein was, an individual residing in Oakland, County
22  of Alameda, California. KOEPF has earned a living as a commercial fisherman in
23  the San Francisco Bay Area for over 36 years. KOEPF is the owner and skipper
24  of the fishing vessels "F/V Ursula B" and the "F/V Betty Jane," which are both
25  berthed at Fisherman's Wharf in San Francisco. KOEPF is actively engaged in
26  fishing for herring and salmon and receives more than 25% of his earnings from
27  the fishing of these species during the applicable season for each.   Plaintiff
28  KOEPF has suffered economic injury, harm and/or damages to his livelihood as a

1    commercial fisherman as a direct, legal and foreseeable consequence of the

2    wrongful acts and/or omissions of Defendants, and each of them, more

3    particularly set forth herein.  Throughout his career as a Bay Area commercial

4    fisherman, KOEPF has been a leader in the community.   KOEPF is currently

5    serving as: Chair of the Director's Herring Advisory Council; President of the

6    California Herring Fishermen's Association; Director of the Pacific Coast

7    Federation of Fishermen's Associations, California Herring Association;

8    Member of the California Advisory Council on Salmon and Steelhead Trout; and

9    Project Supervisor/Development of Fishing Families Outreach.

10        12.    SAU A. PHANG:  Plaintiff SAU A. PHANG (hereinafter

11   "PHANG") is, and at all relevant times herein was, an individual residing in the

12   City and County of San Francisco.  PHANG has earned a living as a commercial

13   fishermen, with his partner and wife Kiu A. Phang Sin, in the San Francisco Bay

14   Area for over 20 years.  Since approximately 2002, PHANG has served as the

15   owner and skipper of the fishing vessel "Car Vella," berthed in Oyster Point.

16   PHANG is actively engaged in fishing for rock fish and receives more than 25%

17   of his earnings from the fishing of rock fish during the applicable seasons.

18   Plaintiff PHANG has suffered economic injury, harm and/or damages to his

19   livelihood as a commercial fisherman as a direct, legal and foreseeable

20   consequence of the wrongful acts and/or omissions of Defendants, and each of

21   them, more particularly set forth herein.

22        13.    KIU A. PHANG SIN:  Plaintiff KIU A. PHANG SIN (hereinafter

23   "SIN") is, and at all relevant times herein was, an individual residing in the City

24   and County of San Francisco.   SIN has earned a living as a commercial

25   fisherman, with her partner and husband Sau A. Phang, in the San Francisco Bay

26   Area for over 20 years.  Since approximately 2000, SIN has served as the owner

27   and skipper of the fishing vessel "Hop Sang III," berthed in Oyster Point.  SIN is

28   actively engaged in fishing for rock fish and receives more than 25% of her

1    earnings from the fishing of rock fish during the applicable seasons.  Plaintiff SIN

2    has suffered economic injury, harm and/or damages to her livelihood as a

3    commercial fisherman as a direct, legal and foreseeable consequence of the

4    wrongful acts and/or omissions of Defendants, and each of them, more

5    particularly set forth herein.

6    **B.**    **The Defendants**

7    14.    **HANJIN:**  Plaintiffs are informed and believe, and thereupon allege,

8    that HANJIN is the owner, operator, lessee, and/or charterer by demise of the

9    Ship and/or the bunker fuel transported therein at the time of the Spill.  HANJIN

10   is, and at all times herein mentioned was, a corporation, association, partnership,

11   joint venture, and/or sole proprietorship organized and existing under the laws of

12   Republic of Korea and/or headquartered at Hanjin Shipping Building, 25-11,

13   Yoido-Dong, Youngdeungpo-Gu, Seoul Korea.  HANJIN is part of the Hanjin

14   Group, a South Korean conglomerate, which includes, in addition to HANJIN,

15   Hanjin Logistics and Korean Air (KAL).  Holding a majority interest in the

16   Senator Lines, Hanjin-Senator is the seventh largest container transportation and

17   shipping company in the world, and is Korea's largest carrier, operating some 60

18   liner and tramper services transporting on 200 containerships, bulk carriers and

19   LNG carriers, more than 100 tons of cargo all over the world, including

20   California and/or the San Francisco Bay Area.

21   15.    **REGAL:**  Plaintiffs are informed and believe, and thereupon allege,

22   that REGAL is the owner, operator, lessee, and/or charterer by demise of the Ship

23   and/or the bunker fuel transported therein at the time of the Spill.  REGAL is, and

24   at all times herein mentioned was, a corporation, association, partnership, joint

25   venture, and/or sole proprietorship organized and existing under the laws of Hong

26   Kong, China and/or is based in Hong Kong, China and transacts business

27   throughout the world, including California and/or the San Francisco Bay Area.

28



16.    FLEET:  Plaintiffs are informed and believe, and thereupon allege, that FLEET is the owner, operator, lessee, and/or charterer by demise of the Ship and/or the bunker fuel transported therein at the time of the Spill.  FLEET is, and at all times herein mentioned was, a corporation, association, partnership, joint venture, and/or sole proprietorship organized and existing under the laws of the Hong Kong, China and/or is based in Hong Kong, China and transacts business throughout the world, including California and/or the San Francisco Bay Area.

17.    COTA: Plaintiffs are informed and believe, and thereupon allege, that COTA was piloting the Ship at the time of the collision and discharge of 58,000 gallons of bunker fuel into the San Francisco Bay.  COTA is a 59 year old individual residing in Petaluma, California.  COTA has been a local pilot for more than 25 years.

18.    In the past 14 years COTA has had several "incidents" requiring an investigation by the State Board of Pilot Commissioners.  On several occasions, the Commissioners have "counseled" COTA regarding his piloting activities on the Bay.  For example, in July 2006 COTA was reprimanded after it was determined that he had allowed the bulk freighter Pioneer to move out of the channel and run aground when it was approaching a dock at Antioch four months earlier.  The report on the incident stated: "Capt. COTA had not realized that the vessel was going off track and did nothing to prevent it."  COTA was also involved in an incident in the San Francisco Bay in 2003 involving a Navy aircraft carrier, for which he received a "letter of concern."

C.    The DOE Defendants

19.    The true names and capacities, whether individual, corporate, associate or otherwise of the Defendants DOES 2 through 100 are unknown to Plaintiffs who therefore sue said Defendants by such fictitious names pursuant to Code of Civ. Proc. § 474.  Plaintiffs further allege that each said fictitious Defendant is in some manner responsible for the acts and occurrences hereinafter

1  set forth.  Plaintiffs will amend this Complaint to show the true names and
2  capacities of these DOES Defendants when the same are ascertained, as well as
3  the manner in which each fictitious Defendant is responsible.

      **D.**     <u>**Agency, Employment And Joint Venture**</u>

      20.    At all relevant times, each of the Defendants was an agent,
6  employee, servant, partner, alter ego, and/or joint venturer of each of its/his/her
7  co-Defendants in the operation, management and control of the Ship and was at
8  all times proceeding, during, and following the Spill, acting within the course and
9  scope of said agency, employment, service, partnership, conspiracy, alter ego
10  status, and/or joint venture

11  **III.**   <u>**JURISDICTION AND VENUE**</u>

12        21.    This Court has jurisdiction over this action pursuant to Code of Civil
13  Procedure Section 410.10.  Plaintiffs seek damages and injunctive relief on behalf
14  of themselves and all others similarly situated under the statutory and common
15  laws of the State of California.

16        22.    Venue is proper in this Court because the principal acts, occurrences,
17  and injuries alleged herein giving rise to this action occurred within the County,
18  the Defendants transact business within the County, and/or Plaintiffs
19  TARANTINO, KOEPF, PHANG, and SIN are residents of the County.

20        23.    This Court has jurisdiction over the Defendants because they transact
21  business in California, and the principal acts, occurrences, and injuries alleged
22  herein giving rise to this action occurred in California.

23        24.    Plaintiffs' class action complaint only asserts causes of action under
24  the statutory and common law of the State of California.

25  **IV.**  <u>**CLASS ACTION ALLEGATIONS**</u>

26        25.    Plaintiffs bring this action on their own behalf and as representatives
27  of a class consisting of:

28

1    "all commercial fishing operations, including crab, herring, flat

2    fish, salmon, rock fish, and other fish, which are commercially

3    fished in and around the San Francisco Bay and surrounding

4    ocean areas."

5    26.    The class is so broad and numerous that joinder of all members is

6    impracticable.  Although its exact number is unknown, it is estimated that there

7    are more than 1000 class members.

8    27.    Plaintiffs are members of the class, and their claims are typical of the

9    claims of all members.

10    28.    Plaintiffs will fairly and adequately protect the interests of all of the

11    class, and the interests of each are coincident and not antagonistic with those of

12    the remainder of the class.

13    29.    Plaintiffs are represented by counsel experienced with class action

14    and complex litigation and in the prosecution of violations of law arising out of

15    large scale environmental pollution.

16    30.    There are common questions of law and fact common to the class in

17    relation to their claims against Defendants, including, but not limited to:

18             (a)    Whether the Defendants are strictly liable for the economic

19                    damages caused to Plaintiffs and the class which are the direct

20                    and legal result of the discharge of 58,000 gallons of bunker

21                    fuel from the Ship under the Lempert-Keene-Seastrand Oil

22                    Spill Prevention and Response Act, Gov't Code §§ 8670, *et*

23                    *seq.*;

24             (b)    Whether the transport of 58,000 gallons of highly toxic bunker

25                    fuel through the San Francisco Bay constitutes an ultra-

26                    hazardous activity, and thus whether Defendants are strictly

27                    liable for any harm flowing from such activity;

28

FIRST AMENDED CLASS ACTION COMPLAINT
Case No. CGC-07-469379                                                           10

(c)     Whether Defendants were negligent, reckless, willful, wanton or malicious in their conduct which resulted in the discharge of 58,000 gallons of bunker fuel into and upon the San Francisco Bay;

(d)     Whether Defendants have created a public and/or private nuisance by causing or contributing to the discharge of 58,000 gallons of highly toxic bunker fuel into and upon the San Francisco Bay and surrounding ocean areas;

(e)     Whether such violations of law are the direct and proximate cause of the economic injuries suffered by the Plaintiffs and the class;

(f)     Whether the wrongful acts and/or omissions of Defendants warrant creation of a monetary fund for future monitoring, testing, evaluation and assessment of the safety and/or fitness of seafood caught for human consumption from the San Francisco Bay and surrounding ocean areas; and

(g)     Whether injunctive or other equitable relief for the benefit of the class is appropriate.

31.    These and other common questions of law and fact predominate over questions affecting only individual members.

32.    A class action is superior to other methods of adjudication for a fair and efficient administration of this controversy. Prosecution of these claims within the procedural device of a class action will reduce the possibility of repetitious litigation and conflicting results, while producing redress for claims too small to support the expense of individual, complex litigation.

33.    Individual adjudications of class member claims, which would as a practical matter be dispositive of the interests of other members not parties to the action, might substantially impair or impede the ability of the absent members to

1  protect their interests, particularly in regard to claims against defendants for

2  punitive damages.

3    34.    Individual adjudications of class member claims would also create

4  the possibility of conflicting results, particularly on issues related to the

5  apportionment of fault and responsibility amongst the Defendants, and thus be

6  detrimental to the interests of the Defendants.

7  V.    **FACTS**

8    A.    **Timeline Of The Collision And Spill**

9    35.    On or about October 23, 2007, the Ship initiated its voyage from

10 Shanghai, China to Busan, South Korea; and thereafter to Long Beach,

11 California, arriving in Long Beach on November 3, 2007.  The Ship subsequently

12 sailed from Long Beach to Oakland, California, arriving in Oakland on the

13 afternoon of November 6, 2007.

14   36.    On the morning of November 7, 2007, the Ship left Oakland to

15 return to Buson, South Korea, carrying 2,500 20-foot containers for the China

16 Ocean Shipping Company (COSCO), one of the world's biggest shipping

17 agencies headquartered in Shanghai, China.

18   37.    As COTA, Captain Mao, and the Ship's crew attempted to navigate

19 the Ship out of Oakland Harbor through the San Francisco Bay and into the

20 openocean, the Ship collided with the Delta Tower of the Bay Bridge, tearing a

21 large gash in its fuel tanks and discharging approximately 58,000 gallons of toxic

22 bunker fuel into and upon the Bay.  This was the *first ever collision between a*

23 *vessel and a Bay Bridge tower* in the bridge's seventy-year history.

24   38.    The sequence of events culminating in the collision and Spill played

25 out over a fifteen-hour period on November 7, 2007 is set forth below (all times

26 are approximate):

27

28

1      (a)   6:00 a.m. – COTA boarded the Ship at berth 55, Oakland
2              Inner Harbor. COTA at first decided the fog was too thick and
3              waited for it to lift.

4      (b)   7:30 a.m. – COTA notified the Coast Guard Vessel Traffic
5              Service that the fog had sufficiently lifted and he intended to
6              sail. COTA told Vessel Traffic Service he intended to use the
7              Delta-Echo span of the Bay Bridge. The Ship was assisted by
8              the tug Revolution.

9      (c)   7:30 to 8:20 a.m. – The Ship's radar allegedly failed as the
10             Ship was passing Yerba Buena Island in the fog. Defendant
11             COTA was then allegedly forced to rely on an "electronic
12             chart" and its interpretation by Captain Mao as to the center of
13             the 2,210-foot Delta-Echo span through which the 131-foot
14             Ship was to pass. During the interchange between Defendant
15             COTA and the Ship's Captain, an incorrect heading was
16             allegedly supplied directing the Ship *at Delta Tower*, instead
17             of the center of the Delta-Echo span.

18     (d)   8:20 - 8:27 a.m. – The Coast Guard Vessel Traffic Service
19             advised Defendant COTA that the Ship was off course. In an
20             effort by Defendant COTA and/or the Ship's Captain and crew
21             to quickly readjust course, the Ship smashed into the fender of
22             Delta Tower tearing a horizontal gash near the front of the
23             Ship measuring 100 feet long, 12 feet wide and 3 feet deep.

24     (e)   8:30 a.m. – Defendant COTA reported to Vessel Traffic
25             Service that the Ship had hit Delta Tower. The collision had
26             ruptured two of the Ship's fuel tanks, and the bunker fuel
27             contained therein poured out into the Bay. Neither Captain
28

Mao nor Defendant COTA requested the services of private spill-containment operators for another hour.

(f)   8:52 a.m. – Personnel on a pilot boat sent from Pier 9 in San Francisco noticed that "a substantial flow of oil" was coming from the Ship.

(g)   9:03 a.m. – The Coast Guard dispatched its first vessel to the scene.

(h)   9:30 a.m. – Captain Mao finally contacted a private spill-containment operator for assistance cleaning up the discharged bunker fuel.

(i)   9:46 a.m. – The Marine Spill Response Corp. ("MSRC"), private spill-containment operator, dispatches its first vessel to the scene.

(j)   11:00 a.m. – Five MSRC skimming boats designed to contain and mop oil arrived on the scene.

(k)   12:15 p.m. – The Coast Guard reports the oil spill at 140 gallons based on information provided by the Defendants. The Ship is moved to anchorage south of the Bay Bridge, trailing an oil slick.

(l)   4 p.m. – Oil booms were set up at Aquatic Park and Fisherman's Wharf in San Francisco.

(m)   4:49 p.m. – Contrary to earlier assessments provided by the Defendants, the Coast Guard realizes the spill was approximately 58,000 gallons.

(n)   8:58 p.m. – The Coast Guard notifies the public of the true extent of spill.

39.    The graphic below, which appeared in the San Francisco Chronicle, shows in stark contrast the correct course, as opposed to the actual course of the Ship on the morning of November 7th.

## Off course

This diagram shows the heading of the Cosco Busan at 235 degrees when the ship was contacted by the Coast Guard Vessel Traffic Service. The correct course from the Oakland Bar Channel to the channel between the D and E towers of the Bay Bridge is 310 degrees. The pilot turned the ship right to 280 degrees when he hit the D tower.



Sources: Chronicle reporting; ESRI, TeleAtlas                    The Chronicle

B.    **Construction, Ownership, Management, Operation, And Control Of the Ship**

1.    **Construction Of the Ship**

40.    The Ship, built in 2001 by Hyundai Heavy Industries Ltd. Co. is a cargo ship, shown below in a picture which appeared in the San Francisco Chronicle. Unlike modern tanker ships and other recently built cargo ships, the Ship's fuel tanks are arrayed along the sides of the ship behind a single hull, commonly called "winged" tanks. In 2006, the International Maritime Organization, a United Nations agency, banned winged fuel tanks along the hull

5



1 | Samuel H. Ruby, SBN 191091
E-mail: samuel.ruby@bullivant.com
2 | Kevin K. Ho, SBN 233408
E-mail: kevin.ho@bullivant.com
3 | BULLIVANT HOUSER BAILEY PC
601 California Street, Suite 1800
4 | San Francisco, California 94108
Telephone: 415.352.2700
5 | Facsimile: 415.352.2701

6 | Steven M. Crane, SBN 108930
E-mail: scrane@bcrslaw.com
7 | BERKES CRANE ROBINSON & SEAL LLP
515 South Figueroa Street, Suite 1500
8 | Los Angeles, CA 90071
Telephone: (213) 955-1150
9 | Facsimile: (213) 955-1155

10 | *Attorneys for Plaintiff The Continental Insurance Company*

11

12 | UNITED STATES DISTRICT COURT

13 | NORTHERN DISTRICT OF CALIFORNIA

14 | SAN FRANCISCO DIVISION

15

16 | THE CONTINENTAL INSURANCE COMPANY,

17 | Plaintiff,

18 | vs.

19 | JOHN JOSEPH COTA; REGAL STONE LIMITED; FLEET MANAGEMENT
20 | LIMITED and the *M/V COSCO BUSAN (aka HANJIN VENEZIA)*, LR/IMO Ship No.
21 | 9231743 her engines, apparel, electronics, tackle, boats, appurtenances, etc., *in rem*,

22 | Defendants.

23

Case No.: 3:08-cv-2052-SC as related to: 07-cv-5800-SC, 07-cv-6045-SC, and 07-cv-5926-SC

**FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF, INDEMNITY AND REIMBURSEMENT**

24 | Plaintiff, The Continental Insurance Company, alleges the following:

25 | **SUBJECT MATTER JURISDICTION**

26 | 1.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1333

27 | (admiralty jurisdiction), in that, as set forth more fully below, the action concerns a maritime

28 | contract; specifically, a contract of marine insurance.

– 1 –

1      2.     This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332

2 (diversity jurisdiction), in that, as set forth more fully below, there is complete diversity of

3 citizenship between the plaintiff and the defendants, and the amount in controversy as to each

4 defendant exceeds $75,000.

5      3.     If, notwithstanding the foregoing allegations, any claim asserted herein is not

6 within the Court's admiralty or diversity jurisdiction, the Court nonetheless has subject matter

7 jurisdiction over the claim pursuant to 28 U.S.C. § 1367 (supplemental jurisdiction), in that, as

8 set forth more fully below, the claim is so related to the claims in the action within the Court's

9 admiralty or diversity jurisdiction that it forms a part of the same case or controversy.

10      4.     The Court also has jurisdiction under Fed. Rule of Civ. Proc 9(h) to apply

11 Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture.

12 <div align="center">**VENUE**</div>

13      5.     Venue is proper pursuant to 28 U.S.C. § 1391 in that, as set forth more fully

14 below, the substantial part of the events or omissions giving rise to this claim occurred in the

15 County of San Francisco.

16 <div align="center">**INTRADISTRICT ASSIGNMENT**</div>

17      6.     Pursuant to Local Rule 3-2(c-d), this action is assignable to the San Francisco

18 Division or the Oakland Division, because a substantial part of the events or omissions giving

19 rise to this claim occurred in the County of San Francisco.

20 <div align="center">**COMMON ALLEGATIONS**</div>

21      7.     The Continental Insurance Company ("Continental") is a citizen of Pennsylvania

22 and Illinois. Continental is a corporation organized and existing under the laws of

23 Pennsylvania. Continental's principal place of business is in Chicago, Illinois.

24      8.     Captain John Joseph Cota ("Cota") is a citizen of California. Cota is domiciled

25 in and is a resident of California.

26      9.     Cota was licensed by the United States Coast Guard and the State of California

27 as a pilot of maritime vessels.

28

<div align="center">– 2 –</div>

1       10.    Cota is a member of the San Francisco Bar Pilots Association ("the SF Bar

2  Pilots"), an association of persons who guide vessels entering or exiting the waters of San

3  Francisco Bay.

4       11.    Continental issued a policy of insurance, No. H856049 ("the Policy"), to the SF

5  Bar Pilots, the San Francisco Bar Pilots Benevolent Association, and their officers, employees,

6  and individual member pilots, including Cota.

7       12.    A true and correct copy of the Policy is attached hereto as ***Exhibit A***.

8       13.    Regal Stone Limited ("Regal Stone") is a citizen of a foreign nation

9  headquartered in Hong Kong, Special Administrative Region of the People's Republic of China.

10       14.    Fleet Management Limited ("Fleet Management") is a citizen of a foreign nation

11  headquartered in Hong Kong, Special Administrative Region of the People's Republic of China.

12       15.    At all material times herein, Regal Stone and Fleet Management was each an

13  owner, operator, or demise or bareboat charterer of the maritime vessel known as of November

14  7, 2007, as the *Cosco Busan*, "LR/IMO" ship number 9231743, flagged in Hong Kong and

15  which may currently be known as the *Hanjin Venezia*.

16       16.    On November 7, 2007, the *Cosco Busan*, her engines, apparel, electronics, tackle,

17  boats, appurtenances, etc., *in rem*, were within the navigable waters of this District and within

18  the jurisdiction of this Court.

19       17.    Prior to or about November 7, 2007, Regal Stone, Fleet Management and/or the

20  *Cosco Busan* hired Cota to pilot the *Cosco Busan* during its anticipated exit from the Port of

21  Oakland and departure from San Francisco Bay.

22       18.    California Harbors & Navigations Code § 1198(c) provides, in pertinent part:

23             Every vessel, owner, operator, or demise or bareboat charterer
                hiring a pilot with a state license for the Bays of San Francisco,
24            San Pablo, and Suisun shall either defend, indemnify, and hold
                harmless pilots pursuant to paragraph (1), or alternatively, notify
25            pilots of an intent to pay for trip insurance to paragraph (2). If a
                vessel or its owner, operator, or demise or bareboat charterer does
26            not provide written notice pursuant to paragraph (2) of an intent to
                exercise the trip insurance option, then the vessel and its owner,
27            operator, and demise or bareboat charterer will be deemed to have
                elected the obligation to defend, indemnify, and hold harmless
28            pilots pursuant to paragraph (1).

FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF, INDEMNITY AND REIMBURSEMENT

(1)    (A)***

(B)  A vessel subject to this paragraph and its owner,
operator, and demise or bareboat charterer shall defend,
indemnify, and hold harmless the pilot, any organization
of pilots to which the pilot belongs, and their officers and
employees, with respect to liability arising from any claim,
suit, or action, by whomsoever asserted, resulting in
whole, or in part, from any act, omission, or negligence of
the pilot, any organization of pilots to which the pilot
belongs, and their officers and employees....

(C)  *****

(D)  A pilot who is the prevailing party shall be awarded
attorneys' fees and costs incurred in any action to enforce
a right of indemnification provided pursuant to this
subdivision.

19.    Neither Regal Stone, Fleet Management, nor the *Cosco Busan* notified Cota or anyone else of an intent to pay for trip insurance to paragraph (2) of Harbors and Navigations Code § 1198(c).

20.    Consequently, Regal Stone, Fleet Management, and the *Cosco Busan* are deemed to have elected to defend, indemnify, and hold harmless Cota pursuant to paragraph (1) of Harbors and Navigations Code § 1198(c).

21.    On November 7, 2007, Cota did pilot the *Cosco Busan* during its exit from the Port of Oakland and intended departure from San Francisco Bay.

22.    While Cota was piloting the *Cosco Busan*, it allided with and struck the Delta span of the San Francisco-Oakland Bay Bridge.

**FIRST CAUSE OF ACTION**

**(Indemnity – As To Civil Defense Costs)**

**(Against Regal Stone, Fleet Management and *Cosco Busan*)**

23.    Continental incorporates by reference the allegations of paragraphs 1 to 22 above and realleges them as if set forth fully herein.

24.    In connection with the allision, several claims (subsequently developing into civil actions) were brought against Cota:  (a) *United States v. M/V Cosco Busan, et al.*, U.S.D.C. N.D. Cal. Case No.: 07-cv-06045; *Chelsea LLC et al. v. Regal Stone, Ltd., et. al.*, U.S.D.C. N.D.

— 4 —

1   Cal. Case No.: 07-cv-05800; and *Shogren Living Trust et al. v. Regal Stone, Ltd., et al.*

2   (U.S.D.C. N.D. Cal. Case No.: 07-cv-05926) (hereinafter, "the Civil Claims").

3        25.    Under Harbors and Navigations Code § 1198(c), Cota tendered his defense

4   against the Civil Claims to Regal Stone, Fleet Management, and the *Cosco Busan.*

5        26.    Initially, Regal Stone, Fleet Management, and the *Cosco Busan* declined to

6   defend Cota against the Civil Claims.

7        27.    Cota also tendered his defense of the Civil Claims to Continental.

8        28.    Under a reservation of rights, Continental accepted the tender and appointed civil

9   defense counsel for Cota at Continental's expense.

10       29.    While defending Cota against the Civil Claims, Continental requested that Regal

11  Stone, Fleet Management, and the *Cosco Busan* assume the defense and reimburse Continental

12  for defense costs incurred, pursuant to Harbors and Navigations Code § 1198.

13       30.    Only after several months did Regal Stone, Fleet Management, and the *Cosco*

14  *Busan* assume the defense of Cota against the Civil Claims.

15       31.    In the meantime, Continental paid of all of Cota's attorneys' fees, experts' fees,

16  and other costs relating to the defense of the Civil Claims, without application or recovery of

17  any deductible, in the total amount of at least $315,321.31.

18       32.    Having defended Cota and paid all of his defense costs in the Civil Claims,

19  Continental is completely subrogated to his legal rights, including his rights to defense and

20  indemnification by Regal Stone, Fleet Management and the *Cosco Busan* under Harbors and

21  Navigations Code § 1198(c).

22       33.    Additionally, or alternatively, Continental is directly entitled to equitable

23  indemnity or contribution from Regal Stone, Fleet Management and the *Cosco Busan.*

24       34.    By subrogation to Cota's indemnity rights, and/or by direct indemnity or

25  contribution rights, Continental is entitled to recover from Regal Stone, Fleet Management and

26  the *Cosco Busan* the costs incurred by Continental in defending Cota in connection with the

27  Civil Claims.

28

FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF, INDEMNITY AND REIMBURSEMENT

1    35.    Pursuant to Harbors & Navigations Code § 1198(c)(1)(D), Continental is also

2    entitled to recover attorneys' fees that is has and will continue to incur to enforce the obligations

3    of Regal Stone, Fleet Management and the *Cosco Busan*.

4        WHEREFORE, Continental prays for relief as set forth below.

5                        **SECOND CAUSE OF ACTION**

6                    **(Declaratory Relief – As To Coverage)**

7                            **(Against Cota)**

8    36.    Continental incorporates by reference the allegations of paragraphs 1 to 35 above

9    and realleges them as if set forth fully herein.

10   37.    In connection with the allision, the United States Department of Justice (United

11   States Attorney's Office) commenced a criminal investigation in which Cota was identified as a

12   "target" ("the Criminal Investigation").

13   38.    On March 17, 2008, the United States filed an indictment against Cota alleging

14   certain criminal charges (*United States v. John Joseph Cota*, U.S.D.C. N.D. Cal., Case No.: 08-

15   cr-160) ("the Original Indictment").

16   39.    On April 22, 2008, the United States filed a superseding indictment against Cota,

17   alleging the original charges and two new charges ("the Superseding Indictment").

18   40.    Attached hereto as ***Exhibit B*** is a true and correct copy of the Original

19   Indictment and a true and correct copy the Superseding Indictment.

20   41.    Cota contends that Continental was and is obligated to defend him (or indemnify

21   him against his costs of his defense) in connection with the Criminal Investigation, the Original

22   Indictment, and the Superseding Indictment.

23   42.    Continental denies it is or ever was obligated to defend Cota (or indemnify him

24   against his costs of his defense) in connection with the Criminal Investigation, the Original

25   Indictment, or the Superseding Indictment.

26   43.    There exists an actual and justiciable controversy between Continental and Cota.

27   44.    The controversy can be resolved by a judicial declaration of the parties' rights

28   and obligations under the Policy and the law.

– 6 –

FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF, INDEMNITY AND REIMBURSEMENT

WHEREFORE, Continental prays for relief as set forth below.

## THIRD CAUSE OF ACTION

### (Reimbursement – Of Criminal Defense Costs Paid)

### (Against Cota)

45.    Continental incorporates by reference the allegations of paragraphs 1 to 44 above and realleges them as if set forth fully herein.

46.    Since filing its original Complaint in this action, and without waiver of the Second Cause of Action set forth above, and subject to other reservations of rights, Continental has agreed to reimburse Cota and has reimbursed him for some criminal defense costs, in excess of $100,000.00.

47.    Pursuant to *Buss v. Superior Court*, 16 Cal. 4th 35 (1997), Continental reserved the right to seek reimbursement from Cota of such payments if it is determined that Continental had no duty to make them.

48.    As set forth above, Continental indeed has no duty (and has never had any duty) to defend Cota (or indemnify him against his costs of his defense) in connection with the Criminal Investigation, the Original Indictment, or the Superseding Indictment.

49.    Accordingly, Continental is entitled to reimbursement from Cota of the criminal defense costs that it has paid on his behalf.

WHEREFORE, Continental prays for the relief set forth below.

## FOURTH CAUSE OF ACTION

### (Declaratory Relief)

### (Against All Defendants)

50.    Continental incorporates by reference the allegations of paragraphs 1 to 49 above and realleges them as if set forth fully herein.

51.    In addition to tendering his defense of the Criminal Investigation, the Original Indictment, and the Superseding Indictment to Continental, Cota tendered his defense of one or more said matters to Regal Stone, Fleet Management, and/or the *Cosco Busan*.

-7-

1    52.    Cota contends that under Harbors & Navigations Code § 1198(c), if a vessel, its

2    owners, operators, and/or charterers elect not to purchase trip insurance, then they are obligated

3    to defend and indemnify the pilot not only against civil liability but also against criminal

4    liability.

5    53.    On that basis, Cota contends that Regal Stone, Fleet Management, and/or the

6    *Cosco Busan* are also obligated to defend Cota (or indemnify him against his costs of his

7    defense) in connection with the Criminal Investigation, the Original Indictment, and the

8    Superseding Indictment.

9    54.    Continental contends that if Cota is correct that Regal Stone, Fleet Management,

10    and the *Cosco Busan* have such obligations, and if Cota is also correct that Continental also has

11    such obligations, then the obligations of Regal Stone, Fleet Management and the *Cosco Busan*

12    are primary and Continental has no duty to contribute to Cota's criminal defense or

13    indemnification unless and until the duties of Regal Stone, Fleet Management, and the *Cosco*

14    *Busan* are somehow excused or exhausted.

15    55.    Continental is informed and believes and on that basis alleges that Regal Stone,

16    Fleet Management, and the *Cosco Busan* dispute Continental's contentions.

17    56.    There exists an actual and justiciable controversy between Continental and the

18    defendants.

19    57.    The controversy can be resolved by a judicial declaration of the parties' rights

20    and obligations under the Policy and the law.

21    WHEREFORE, Continental prays for relief as set forth below.

22    **FIFTH CAUSE OF ACTION**

23    **(Indemnity – As To Criminal Defense Costs)**

24    **(Against Regal Stone, Fleet Management and *Cosco Busan*)**

25    58.    Continental incorporates by reference the allegations of paragraphs 1 to 58 above

26    and realleges them as if set forth fully herein.

27

28

FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF, INDEMNITY AND REIMBURSEMENT

59.    To the extent of Continental's payments to Cota and/or his attorneys for Cota's criminal defense costs, Continental is subrogated to Cota's indemnity rights against any other parties.

60.    If Cota is correct that under Harbors & Navigations Code § 1198(c), Regal Stone, Fleet Management and the *Cosco Busan* are obligated to defend and indemnify him against criminal liability, then by virtue of Continental's subrogation to Cota's rights, Regal Stone, Fleet Management and the *Cosco Busan* are obligated to indemnify Continental for criminal defense costs that Continental has paid.

61.    Additionally, or alternatively, Continental is directly entitled to equitable indemnity or contribution from Regal Stone, Fleet Management and the *Cosco Busan*.

62.    Pursuant to Harbors & Navigations Code § 1198(c)(1)(D), Continental is also entitled to recover attorneys' fees that is has and will continue to incur to enforce the obligations of Regal Stone, Fleet Management and the *Cosco Busan*.

WHEREFORE, Continental prays for relief as set forth below.

## **PRAYER**

As relief for the causes of action set forth above, Continental prays:

1.    For a judicial declaration:

    (a)    that Continental has no duty (and has never had a duty) to defend or indemnify Cota in connection with the Criminal Investigation, the Original Indictment, or the Superseding Indictment;

    (b)    *or, in the alternative*, that Regal Stone, Fleet Management, and the *Cosco Busan* have been obligated to defend and indemnify Cota; that their obligations are primary as compared to Continental's; and that Continental shall have no duty to contribute to Cota's defense or indemnification unless and until the duties of Regal Stone, Fleet Management, and the *Cosco Busan* are excused or exhausted.

FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF, INDEMNITY AND REIMBURSEMENT

1    2.    For a money judgment against Regal Stone, Fleet Management, and the *Cosco*

2    *Busan* for at least $315,321.31, plus prejudgment interest, plus attorneys' fees pursuant to

3    Harbors & Navigations Code § 1198(c)(1)(D), and either:

4        (c)    A money judgment against Cota in the amount of criminal defense costs

5            paid on his behalf, to be proven at trial, plus prejudgment interest,

6        (d)    Or, in the alternative, that criminal defense costs paid on his behalf, to be

7            proven at trial, plus prejudgment interest, plus attorneys' fees pursuant to

8            Harbors & Navigations Code § 1198(c)(1)(D), be assessed against Regal

9            Stone, Fleet Management, and the *Cosco Busan* as part of the money

10           judgment against those defendants.

11   3.    For costs of suit; and

12   4.    For such other and further relief as the Court may deem just and proper.

13   DATED:  June 13, 2008

14                    BULLIVANT HOUSER BAILEY PC

15

16                    By _____

17                    Samuel H. Ruby
                      Kevin K. Ho

18                    Attorneys for Plaintiff
                      The Continental Insurance Company

19

20   10604522.2

21

22

23

24

25

26

27

28

– 10 –

FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF, INDEMNITY AND REIMBURSEMENT

**<u>EXHIBIT A</u>**

COPY

# POLICY OF INSURANCE

**POLICY NO.:**                    H 856049

**ASSURED:**                       San Francisco Bar Pilots, et al, as attached.

**INTEREST INSURED:**              Primary Trip Insurance and Pilot's Contingent Legal
                                   Liability

**AMOUNT INSURED HEREIN:**         $1,000,000 Combined Single Limit

**FROM:**                          January 1, 2007, 0001 hours, PST

**TO:**                            January 1, 2008, 0001 hours, PST

## Table of Contents

**Section A – General Conditions**

**Section B – Primary Trip Insurance**

**Section C - Pilot's Contingent Legal Liability Insurance**

# SECTION A

## <u>General Conditions Applicable to All Policy Sections</u>

| | |
|---|---|
| **ASSURED:** | San Francisco Bar Pilots, The San Francisco Bar Pilots Benevolent Association and their officers and employees and the individual Pilot performing the services insured hereunder. |
| **LOSS PAYEE:** | Assured, or order. |
| **COVERAGE:** | Section B – Primary Trip Insurance<br>Section C – Pilot's Contingent Legal Liability Insurance |
| **PERIOD:** | January 1, 2007, 0001 hours, Pacific Standard Time to<br>January 1, 2008, 0001 hours, Pacific Standard Time |
| **LIMIT OF LIABILITY<br>& SUM INSURED:** | $1,000,000 any one accident or occurrence, both sections combined. |
| **CONDITIONS:** | As per manuscript wordings (including Pollution Exclusion and Buyback clause) attached hereunder. |
| **PREMIUM:** | This policy is issued in consideration of a Minimum and Deposit Premium of $70,335 (payable quarterly) subject to premium adjustment at policy expiration at a rate of:<br><br>Section B - $129.35 per each trip, shift or engagement where the Owner/Operator elects to purchase coverage.<br><br>Section C - $9.49 per each trip, shift or engagement where the Owner/Operator elects not to purchase the coverage described in Section B hereunder. |
| **REPORTS:** | The Assured agrees to provide monthly reports to Marsh Risk and Insurance Services which provide the names of all vessels accepting or declining coverage under Section B. |

S:\dep\mari-Marine and Energy\SFBP\2007\Primary Trip and Legal Liability Policy (d).doc

# POLLUTION EXCLUSION AND BUYBACK CLAUSE

## <u>Applicable to All Policy Sections</u>

Such coverage as is afforded by this policy shall not apply to any claim arising out of the discharge, dispersal, release, or escape of smoke, vapors, soot, fumes, alkalis, toxic chemicals, liquids or gases, waste materials, oil or other petroleum substance or derivative (including any oil refuse or oil mixed wastes) or other irritants, contaminants or pollutants into or upon land, the atmosphere, or any watercourse or body of water.

This exclusion shall not apply, however, provided that the Assured establishes that all of the following conditions have been met:

(a) The occurrence was accidental and was neither expected nor intended by the Assured. An occurrence shall not be considered unintended or unexpected unless caused by some intervening event neither foreseeable nor intended by the Assured.

(b) The occurrence can be identified as commencing at a specific time and date during the term of this policy.

(c) The occurrence became known to the Assured within 7 days after its commencement.

(d) The occurrence was reported in writing to these underwriters within 90 days after having become know to the Assured.

(e) The occurrence did not result from the Assured's intentional and willful violation of any government statue, rule or regulation.

Nothing contained in this Endorsement shall operate to provide any coverage with respect to:

(1) loss of, damage to or loss of use of property directly or indirectly resulting from subsidence caused by sub-surface operations of the Assured;

(2) removal of, loss or damage to sub-surface oil, gas or any other substance;

(3) fines, penalties, punitive damages, exemplary damages, treble damages or any other damages resulting from the multiplication of compensatory damages;

(4) any site or location used in whole or in part for the waste, processing, treatment, storage, disposal or dumping of any waste materials or substances or the transportation of any waste materials or substances.

Notwithstanding any other provision of this policy or any underlying insurance, this policy of insurance is not evidence of financial responsibility under the Oil Pollution Act of 1990 or any

similar federal or state laws. Any showing or offering of this policy by the Assured as evidence of insurance shall not be taken as any indication that the Underwriters consent to act as guarantor or to be sued directly in any jurisdiction whatsoever. The Underwriters do not consent to be guarantors or to be sued directly.

**ALL OTHER TERMS AND CONDITIONS REMAINING UNCHANGED**

S:\dep\mari-Marine and Energy\SFBP\2007\Primary Trip and Legal Liability Policy (d).doc



# SECTION B

## Primary Trip Insurance

Subject to the terms and conditions set forth within this policy, Underwriters as shown below, hereinafter referred to as the Assurer, do insure the individual Pilot providing services, the San Francisco Bar Pilots, The San Francisco Bar Pilots Benevolent Association and their officers and employees hereinafter called the Assured, in the sum as stated above against the hereinafter described losses and liabilities arising out of, or relating to, directly or indirectly the acts, omissions or negligence of licensed pilots, officers or employees of San Francisco Bar Pilots in connection with the provision of pilotage service, provided that such losses and liabilities occur while a licensed pilot or authorized trainee from San Francisco Bar Pilots is piloting the vessel on whose behalf this policy has been procured.

The coverage provided by this policy attaches solely to the individual vessel movement for which trip insurance has been ordered pursuant either to the provisions of California Senate Bill No. 1109 or to private agreement between the Assured and the owners, master, operators, charterers or agents of the vessel. The period of the coverage hereunder is limited to the period the pilot is aboard the vessel or piloting services are provided.

The Assurer hereby undertakes to make good to the Assured or successors, all such loss and/or damage and/or expenses as the Assured shall have sustained and/or shall have become legally liable to pay on account of the consequences of acts, omissions or negligence of either licensed pilots of the San Francisco Bar Pilots and The San Francisco Bar Pilots Benevolent Association, or officers or employees of San Francisco Bar Pilots and The San Francisco Bar Pilots Benevolent Association: provided, however, that such insurance provides coverage only for that proportion of losses, damages and expenses sustained by the Assured, or other parties, which are proximately caused by the acts, omissions or negligence of the Assured and that no coverage is provided for losses, damages and expenses resulting from any other cause whatsoever.

1.  The Assured under this policy is protected and indemnified for losses and damages resulting from liabilities, risks, events, happenings and/or occurrences set forth within this policy including but not limited to:

    (a) For loss or damage that may be caused to the vessel being navigated by the pilot.

    (b) For loss or damage that may be caused to any vessel, or waterborne craft of any description, by the vessel being navigated by the pilot.

    (c) For loss or damage that may be caused to any wharves, piers, stages and similar structures, or any other property afloat or ashore, by the vessel being navigated by the pilot.

S:\dep\mari-Marine and Energy\SFBP\2007\Primary Trip and Legal Liability Policy (d).doc

(d)  For loss or damage, whether by collision or otherwise, which may be caused to any goods, merchandise, equipment or other thing of value whatsoever, whether on board any vessel or waterborne craft, or not, or to any vessel or waterborne craft, pier, jetty, or other movable or fixed thing whatsoever.

(e)  For loss of life or personal injury, whether by collision or otherwise, to any person other than employees of San Francisco Bar Pilots, wheresoever such person or persons may be.

(f)  For Pollution Liabilities as described in the attached Pollution Exclusion and buyback wording.

(g)  The provisions of California Senate Bill No. 1109 and the provisions of the agreements between San Francisco Bar Pilots and the owners, operators, charterers and agents of vessel on whose behalf piloting services are rendered have been made available to Assurer. It is the intent of the Assurer and the Assured that the Assured's legal liabilities that would otherwise be covered by the exculpatory and indemnification clauses set forth within California Senate Bill No. 1109 and within the pilot Contract and agreement as described above be insured by this policy, except as may be specifically excluded by the terms and conditions as shown below.

2.  Liability hereunder in respect to any one accident is limited to the amount of this policy; but the face value of this policy shall always remain at its original amount irrespective of any payments made or expenses incurred by the Assurer.

(a)  It is understood and agreed that any payment in respect of liability for any one accident or occurrence shall not act to reduce the policy limits hereunder in respect of liability for any subsequent accident or occurrence, it being understood the full policy limit shall remain in full force and effect for each separate accident or occurrence during the entire period this policy is in force.

(b)  However, it is also understood and agreed that the naming of any additional Assured(s) shall not serve to increase the policy limit in respect of any one accident or occurrence hereunder, notwithstanding the fact that liability may be asserted against more than one Assured, separately or combined.

(c)  It is also understood and agreed that liability for all loss, damage, cost, or expense, including all costs of investigation, defense, negotiation or settlement shall be included in the policy limit and shall not exceed $1,000,000 in respect of any one accident or occurrence.

3.  The Assured shall give prompt written notice of all claims to Marsh Risk & Insurance Services, One California Street, San Francisco, CA 94111. All losses under this policy shall become due and payable within ninety (90) days after the submission of satisfactory proof thereof, and shall be paid to the Assured, or order.

4.    The Assurer shall be subrogated to all rights which Assured may acquire against any third person, entity or vessel, by reason of any payments made to the Assured upon claims upon which the Assured is entitled to be indemnified under this policy, to the extent of such payment, and the Assured shall, upon the request of the Assurer, execute all documents necessary to secure to the Assurer such rights.

5.    If any dispute arises under this policy the parties hereto shall submit the same to arbitration, for which purpose one arbitrator is to be chosen by the Assurer and one by the Assured. The two so chosen, if unable to agree shall select a third as umpire and the award of any two shall be final as between the parties. The cost of arbitration, including arbitrator's fees, shall be assessed by the arbitrators.

6.    Notwithstanding anything to the contrary, contained in the policy, this insurance is warranted free from any claim for loss, damage or expenses caused by or resulting from capture, seizure, arrest, restraint or detainment or the consequence thereof or of any attempt, threat, or any taking of the vessel, by requisition or otherwise, whether in time of peace or war and whether lawful or otherwise, also from consequences of hostilities or warlike operation (whether there by a declaration of war or not), piracy, civil war, revolution, rebellion or insurrection, or civil strife arising therefrom.

7.    Notwithstanding anything contained in the policy, this insurance is warranted free from any claim for loss, damage or expense caused solely by strikers, locked-out workmen or persons taking part in labor disturbances or riots or civil commotions.

8.    Notwithstanding anything contained in the policy, any shift or engagement involving air drafts of less than ten feet under the Golden Gate Bridge and/or Bay Bridge must be reported to Underwriters in advance of binding coverage under this Section, and may be subject to additional premium.

# SECTION C

## Pilot's Contingent Legal Liability

Subject to the terms and conditions set forth within this policy, Underwriters as shown below, hereinafter called the Assurer, by this policy of insurance do insure:

> San Francisco Bar Pilots, The San Francisco Bar Pilots Benevolent Association and their officers and employees and the individual Pilot performing the services insured hereunder

hereinafter called the Assured, in the sum insured stated above for each and every accident or occurrence herein after designated, against the liabilities of the Assured as hereinafter described, and subject to the terms and conditions hereinafter set forth.

The coverage provided by this policy attaches solely to the individual vessel movement for which trip insurance (as detailed in Section B hereunder) has NOT been ordered pursuant either to the provisions of California Senate Bill No. 1109 or to private agreement between the Assured and the owners, master, operators, charterers or agents of the vessel. The period of the coverage hereunder is limited to the period the pilot is aboard the vessel or piloting services are provided in connection with such movement.

The Assurer hereby undertakes to make good to the Assured or successors, all such loss and/or damage and/or expenses (limited to the amount of this policy) as the Assured shall have become liable to pay on account of the liabilities, risks, events, happenings, and/or occurrences herein set forth.

1.   The Assured under this policy is protected and indemnified for legal liabilities arising out of, or relating to, directly or indirectly, losses and/or damages and/or expenses which result while members of the San Francisco Bar Pilots are engaged in the piloting of vessels, including but not limited to:

>    (a)   For loss or damage which may be caused to any other vessel, or waterborne craft of any description, by the vessel being navigated by the pilot.

>    (b)   For loss or damage which may be caused to any wharves, piers, stages and similar structures, or any other property afloat or ashore, by the vessel being navigated by the pilot.

>    (c)   For loss or damage which may be caused to the vessel being navigated by the pilot.

>    (d)   For loss or damage, whether by collision or otherwise, which may be caused to any goods, merchandise, equipment or other thing of value whatsoever, whether on board any vessel or waterborne craft, or not, or to any vessel or

waterborne craft, pier, jetty, or other movable or fixed thing whatsoever.

(e)  For loss of life or personal injury, whether by collision or otherwise, to any person other than employees of San Francisco Bar Pilots, wheresoever such person or persons may be.

(f)  For Pollution Liabilities as described in the attached Pollution Exclusion and Buyback wording.

(g)  The provisions of California Senate Bill No. 1109 and the provisions of the agreements between San Francisco Bar Pilots and the owners, operators, charterers and agents of vessel on whose behalf piloting services are rendered have been made available to Assurer.  It is the intent of the Assurer and the Assured that the Assured's legal liabilities that would otherwise be covered by the exculpatory and indemnification clauses set forth within California Senate Bill No. 1109 and within the pilot Contract and agreements as described above be insured by this policy, except as may be specifically excluded by the terms and conditions as shown below.

2.    In the event that one of the named Assureds incurs liability to any other of the named Assureds in this policy, the policy shall cover the named Assured against whom claim is or may be made in the same manner as if separate policies had been issued to each named Assured.

However, it is understood and agreed that the foregoing Paragraph No. 2 does not increase the Limit(s) of Liability covered by this insurance.

3.    For the purpose of this insurance, it is understood and agreed that in case property damaged by an act or occurrence covered by this policy is owned by the Assured, the fact of such ownership shall not invalidate any claims, but shall be treated as if the property in question belonged to a third party, and the Assured shall be indemnified to the same extent and under the same conditions as if such were the case.

This clause applies only in situations where pilots as described above are engaged in the piloting of vessels in the course of their employment.

4.    Each claim for loss or damage, including costs of defense and attorneys fees, shall be adjusted separately and from the amount of each such adjusted claim or the limit of liability, whichever is the lesser, the sum of $2,500 shall be deducted.

(a)  It is understood and agreed that any payment in respect of liability for any one accident or occurrence shall not act to reduce the policy limits hereunder in respect of liability for any subsequent accident or occurrence, it being understood the full policy limit shall remain in full force and effect for each separate accident or occurrence during the entire period this policy is in force.

S:\dcp\mari-Marine and Energy\SFBP\2007\Primary Trip and Legal Liability Policy (d).doc

(b) However, it is also understood and agreed that the naming of any additional Assured(s) shall not serve to increase the policy limit in respect of any one accident or occurrence hereunder, notwithstanding the fact that liability may be asserted against more than one Assured, separately or combined.

(c) It is also understood and agreed that liability for all loss, damage, cost, or expense, including all costs of investigation, defense, negotiation or settlement shall be included in the policy limit and shall not exceed $997,500 excess of $2,500 in respect of any one accident or occurrence.

5. Liability hereunder in respect of any one accident is limited to the amount of this policy; but the face value of this policy shall always remain at its original amount irrespective of any payments made or expenses incurred by the Assurer.

6. The Assured shall give prompt written notice of all claims to Marsh Risk & Insurance Services, One California Street, San Francisco, CA 94111. All losses under this policy shall become due and payable within ninety (90) days after the submission of satisfactory proof thereof, and shall be paid to the Assured, or order.

7. The Assurer shall be subrogated to all rights which Assured may acquire against any third person, entity or vessel, by reason of any payments made to the Assured upon claims upon which the Assured is entitled to be indemnified under this policy, to the extent of such payment, and the Assured shall, upon the request of the Assurer, execute all documents necessary to secure to the Assurer such rights.

8. It is understood and agreed that the Assurer will, at the written request of the Assured, defend on behalf of the Assured any claim hereunder or any suit or action at law that may possibly result in a claim hereunder, and that the costs of such defense, including attorneys' fees, are included as expenses and liabilities to which the limits of this policy apply. The Assured agrees to give its full cooperation in all matters relating to the defense of any such suit or action. Assured reserves the right to join and assist in such defense at their own expense. It is further understood and agreed with respect to claims within the Assured's retention that legal counsel shall be selected by the Assured.

9. It is warranted by the Assured that it shall not be party to any agreement under which it may agree to assume liability for losses covered by this policy. Failure to comply with this warranty shall render this policy null and void as to coverage for those liabilities so assumed.

10. If any dispute arises under this policy the parties hereto shall submit the same to arbitration, for which purpose one arbitrator is to be chosen by the Assurer and one by the Assured. The two so chosen, if unable to agree shall select a third as umpire and the award of any two shall be final as between the parties. The cost of arbitration, including arbitrator's fees, shall be assessed by the arbitrators.

11.   It is warranted by the Assured that all pilots are currently and continuously licensed to perform pilotage in the San Francisco Bay and its tributaries or are authorized trainees.

12.   This policy may be cancelled at any time at the request of the Assured or the Assurer by giving ninety (90) days notice in writing of such cancellation.

13.   Notwithstanding anything to the contrary, contained in the policy, this insurance is warranted free from any claim for loss, damage or expenses caused by or resulting from capture, seizure, arrest, restraint or detainment or the consequence thereof or of any attempt, threat, or any taking of the vessel, by requisition or otherwise, whether in time of peace or war and whether lawful or otherwise, also from consequences of hostilities or warlike operation (whether there by a declaration of war or not), piracy, civil war, revolution, rebellion or insurrection, or civil strife arising therefrom.

14.   Notwithstanding anything to the contrary contained in this policy, this insurance is warranted free of any claim for loss, damage or expense caused solely by strikers, locked-out workmen or persons taking part in labor disturbances or riots or civil commotion.

S:\dep\mari-Marine and Energy\SFBP\2007\Primary Trip and Legal Liability Policy (d).doc

## AIMU U.S. ECONOMIC AND TRADE SANCTIONS CLAUSE

Whenever coverage provided by this policy would be in violation of any U.S. economic or trade sanctions such as, but not limited to, those sanctions administered and enforced by the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC"), such coverage shall be null and void.

Similarly, any coverage relating to or referred to in any certificates or other evidences of insurance or any claim that would be in violation of U.S. economic or trade sanctions as described above shall also be null and void.

All other provisions of the Policy remain unchanged.

## EXTENDED RADIOACTIVE CONTAMINATION EXCLUSION CLAUSE WITH U.S.A. ENDORSEMENT

### (American Institute of Marine Underwriters – March 1, 2003)

This clause shall be paramount and shall override anything contained in this insurance inconsistent therewith.

1.  In no case shall this insurance cover loss damage liability or expense directly or indirectly caused by or contributed to by or arising from

    1.1  ionizing radiations from or contamination by radioactivity from any nuclear fuel or from any nuclear waste or from the combustion of nuclear fuel

    1.2  the radioactive, toxic, explosive or other hazardous or contaminating properties of any nuclear installation, reactor or other nuclear assembly or nuclear component thereof

    1.3  any weapon or device employing atomic or nuclear fission and/or fusion or other like reaction or radioactive force or matter.

    1.4  the radioactive, toxic, explosive or other hazardous or contaminating properties of any radioactive matter.  The exclusion in this sub-clause does not extend to radioactive isotopes, other than nuclear fuel, when such isotopes are being prepared, carried, stored, or used for commercial, agricultural, medical, scientific or other similar peaceful purposes.

## RADIOACTIVE CONTAMINATION EXCLUSION CLAUSE (U.S.A. ENDORSEMENT)

This insurance is subject to the Extended Radioactive Contamination Exclusion Clause (March 1, 2003) provided that

if fire is an insured peril

and

where the subject matter insured or, in the case of a reinsurance, the subject matter insured by the original insurance, is within the U.S.A., its islands, onshore territories or possessions

and

a fire arises directly or indirectly from one or more of the causes detailed in Sub-Clauses 1.1, 1.2, and 1.4 of the Extended Radioactive Contamination Exclusion Clause March 1, 2003 any loss or damage arising directly from that fire shall, subject to the provisions of this insurance (reinsurance), be covered, EXCLUDING however any loss damage liability or expense caused by nuclear reaction, nuclear radiation, or radioactive contamination arising directly or indirectly from that fire.

Nothing herein contained shall be held to vary, alter, waive or change any of the terms, limits or conditions of the Policy except as hereinbefore set forth.

## CHEMICAL, BIOLOGICAL, BIO-CHEMICAL, AND ELECTROMAGNETIC EXCLUSION CLAUSE

### (American Institute of Marine Underwriters – March 1, 2003)

This clause shall be paramount and shall override anything contained in this insurance inconsistent therewith.

In no case shall this insurance cover loss, damage, liability or expense directly or indirectly caused by or contributed to or arising from an actual or threatened act involving a chemical, biological, bio-chemical or electromagnetic weapon, device, agent or material when used in an intentionally hostile manner.

Nothing herein contained shall be held to vary, alter, waive or change any of the terms, limits or conditions of the Policy except as hereinbefore set forth.

## COVERAGE OF AND CAP ON LOSSES FOR CERTIFIED ACTS OF TERRORISM UNDER THE TERRORISM RISK INSURANCE ACT OF NOVEMBER 2002

In consideration of the premium allocation of $1,318.00 it is agreed as follows:

The policyholder has been previously notified of the availability of and the price for coverage of Certified Acts of Terrorism under the Federal Terrorism Risk Insurance Act of 2002. The Policyholder has opted to purchase such coverage under its policy.

This endorsement provides coverage for Certified Acts of Terrorism as follows:

"Certified Act of Terrorism" means an act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State and the Attorney General of the United States, to be an act of terrorism pursuant to the federal Terrorism Risk Insurance Act of 2002.

The federal Terrorism Risk Insurance Act of 2002 sets forth the following criteria for a Certified Act of Terrorism:

    a. The act resulted in aggregate losses in excess of $5 million; and

    b. The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals acting on behalf of any foreign person or foreign interest, as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

This Policy provides coverage for losses arising from Certified Acts of Terrorism subject to all other terms and conditions of this policy.

Under the federal Terrorism Risk Insurance Act of 2002, any losses caused by Certified Acts of Terrorism will be partially reimbursed by the United States under a formula established by federal law. Under this formula, the United States pays 90% of covered terrorism losses exceeding the statutorily established deductible paid by the insurance company providing the coverage.

With respect to any one or more Certified Acts of Terrorism, the Insurer will not pay any amounts for which the Insurer is not responsible under the terms of the federal Terrorism Risk Insurance Act of 2002 (including subsequent acts of Congress pursuant to the Act) due to the application of any clause in such law which results in a cap on the Insurer's liability for payments for terrorism losses.

All other provisions of the Policy remain unchanged.

Any provisions required by law to be printed in policies issued by a Subscriber thereto, shall be deemed to have been stated herein.

IN WITNESS WHEREOF, The Subscribers hereunder each severally, but not jointly, and not on the part of one for the other or any of the others have caused this policy to be signed by a duly authorized officer, attorney, or agent, this 1st day of January 2007.

| Subscriber | Amount Insured | Minimum & Deposit Premium | Authorized Signature |
|---|---|---|---|
| Continental Insurance Company – (Marine Office of America Corporation) | $1,000,000 | $70,335 | |

Commission: 17.5%

S:\dep\mari-Marine and Energy\SFBP\2007\Primary Trip and Legal Liability Policy (d).doc

# COPY



## ENDORSEMENT

Endorsement No.: 1 <span>San Francisco, January 10, 2006</span>

Endorsement to be attached to and made a part of Policy No.    **H 856049**

of                        **Continental Insurance Company**

issued to                    **San Francisco Bar Pilots**

on        **Primary Trip Insurance and Pilot's Contingent Legal Liability Insurance**

Premium Adjustment for the period January 1, 2005 – 2006

In accordance with policy provisions, the Assured advises that for the period January 1, 2005 – 2006 there were 2 trips, shifts, or engagements where the Owner/Operator elected to purchase Trip Insurance coverage and 8,533 trips, shifts, or engagements Owner/Operator elected not to purchase Trip Insurance coverage.  It is understood and agreed that additional premium is due as follows:

| | |
|---|---|
| Minimum and Deposit Premium = | $80,040.00 |
| 2 Trips @ $147.20 per Trip = | $294.40 |
| 8,533 Trips @ $10.80 per Trip = | $92,156.40 |
| Total Earned Premium = | $92,450.80 |
| Earned Premium = | $92,450.80 |
| Deposit Premium = | $80,040.00 |
| Additional Premium Due = | $12,410.80 |

**ENTERED**
Initial
Date

All other terms and conditions remain unchanged.

**Continental Insurance Company**
**(CNA Marine)**

_____

Authorized Signature

# ENDORSEMENT

Endorsement No.: **1**                                    **San Francisco, January 11, 2007**

Endorsement to be attached to and made a part of Policy No.    **H 856049**

of                                    **Continental Insurance Company**

issued to                                    **San Francisco Bar Pilots**

on        **Primary Trip Insurance and Pilot's Contingent Legal Liability Insurance**

Premium Adjustment for the period January 1, 2006 – 2007

In accordance with policy provisions, the Assured advises that for the period January 1, 2006 – 2007 there was 1 trip, shift, or engagement where the Owner/Operator elected to purchase Trip Insurance coverage and 9,591 trips, shifts, or engagements Owner/Operator elected not to purchase Trip Insurance coverage.  It is understood and agreed that additional premium is due as follows:

| | |
|---|---:|
| Minimum and Deposit Premium = | $76,038.00 |
| 1 Trip @ $139.84 per Trip = | $139.84 |
| 9,591 Trips @ $10.26 per Trip = | $98,403.66 |
| Total Earned Premium = | $98,543.50 |
| Earned Premium = | $98,543.50 |
| Deposit Premium = | $76,038.00 |
| Additional Premium Due = | $22,505.50 |

All other terms and conditions remain unchanged.

**Continental Insurance Company**
**(CNA Marine)**

Authorized Signature

ENTERED
Initial
Date

C:\Documents and Settings\e241081\Local Settings\Temporary Internet Files\OLK33\Primary Trip Policy Adjustment Endorsement (d).doc

**EXHIBIT B**

Case 3:08-cr-00160-SI   Document 133-2   Filed 09/04/2008   Page 52 of 71
Case 3:08-cv-02052-SC   Document 14   Filed 06/13/2008   Page 31 of 45
Case 3:08-cr-00160-JCS   Document 1   Filed 03/17/2008   Page 1 of 6

AO 257 (Rev. 6/78)

## DEFENDANT INFORMATION RELATIVE TO A CRIMINAL ACTION - IN U.S. DISTRICT COURT

BY: ☐ COMPLAINT  ☒ INFORMATION  ☐ INDICTMENT  ☐ SUPERSEDING

| OFFENSE CHARGED | |
|---|---|
| Count One: 33 U.S.C. §§ 1319(c)(1), 1321(b)(3) - (Clean Water Act - Negligent Discharge of a Pollutant); Count Two: 16 U.S.C. §§ 703 and 707(a) - (Migratory Bird Treaty Act) **E-filing** | ☐ Petty ☐ Minor ☒ Misdemeanor ☐ Felony |
| PENALTY: Count One: 1 year imprisonment, $100,000 fine, 1 year supervised release, $25 special assessment. Count Two: 6 months imprisonment, $15,000 fine, 1 year supervised release, $10 special assessment | |

Name of District Court, and/or Judge/Magistrate Location
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

DEFENDANT - U.S

▶ JOHN JOSEPH COTA

DISTRICT COURT NUMBER

**MAG**

### PROCEEDING

Name of Complainant Agency, or Person (& Title, if any)

U.S. COAST GUARD/ENVIRONMENTAL PROTECTION AGENCY

☐ person is awaiting trial in another Federal or State Court, give name of court

☐ this person/proceeding is transferred from another district per (circle one) FRCrp 20, 21, or 40. Show District

☐ this is a reprosecution of charges previously dismissed which were dismissed on motion of:
   ☐ U.S. ATTORNEY   ☐ DEFENSE
} SHOW DOCKET NO.

☐ this prosecution relates to a pending case involving this same defendant
} MAGISTRATE CASE NO.

☐ prior proceedings or appearance(s) before U.S. Magistrate regarding this defendant were recorded under

Name and Office of Person
Furnishing Information on this form   JOSEPH P. RUSSONIELLO
   ☒ U.S. Attorney   ☐ Other U.S. Agency

Name of Assistant U.S.
Attorney (if assigned)   STACEY GEIS/DAVID JOYCE

### DEFENDANT

**IS NOT IN CUSTODY**
1) ☒ Has not been arrested, pending outcome this proceeding. If not detained give date any prior summons was served on above charges ▶

2) ☐ Is a Fugitive

3) ☐ Is on Bail or Release from (show District)

**IS IN CUSTODY**
4) ☐ On this charge

5) ☐ On another conviction
} ☐ Federal ☐ State

6) ☐ Awaiting trial on other charges
   If answer to (6) is "Yes", show name of institution

Has detainer   ☐ Yes   If "Yes"
been filed?   ☐ No   give date filed

DATE OF   Month/Day/Year
ARREST ▶

Or... if Arresting Agency & Warrant were not

DATE TRANSFERRED   Month/Day/Year
TO U.S. CUSTODY ▶

☐ This report amends AO 257 previously submitted

### ADDITIONAL INFORMATION OR COMMENTS

PROCESS:
☐ SUMMONS   ☒ NO PROCESS*   ☐ WARRANT   Bail Amount:

If Summons, complete following:
☐ Arraignment   ☐ Initial Appearance
Defendant Address:

Comments:

* Where defendant previously apprehended on complaint, no new summons or warrant needed, since Magistrate has scheduled arraignment

Date/Time:   Before Judge:

Case 3:08-cr-00160-SI    Document 133-2    Filed 09/04/2008    Page 53 of 71
Case 3:08-cv-02052-SC    Document 14    Filed 06/13/2008    Page 32 of 45
Case 3:08-cr-00...-JCS    Document 1    Filed 03/17/2008    Page 2 of 6

1   JOSEPH P. RUSSONIELLO
    United States Attorney
2   BRIAN J. STRETCH (CASBN 163973)
    Chief, Criminal Division
3   STACEY P. GEIS (CASBN 181444)
    JONATHAN SCHMIDT (CASBN 230646)
4   Assistant United States Attorneys
    450 Golden Gate Ave., 11th Floor
5   San Francisco, CA 94102
    (415) 436-6776 (tel)
6   (415) 436-7234 (fax)
    Jonathan.Schmidt@usdoj.gov
7

8   RONALD J. TENPAS
    Assistant Attorney General
9   Environment and Natural Resources Division
    United States Department of Justice
10  DAVID B. JOYCE
    Trial Attorney
11  Environmental Crimes Section
    P.O. Box 23985
12  L'Enfant Plaza Station
    Washington, DC 20004
13  (202) 305-0321 (tel)
    (202) 305-0396 (fax)
14  David.Joyce@usdoj.gov

15
    Attorneys for Plaintiff
16  United States of America

17

18                  UNITED STATES DISTRICT COURT

19                 NORTHERN DISTRICT OF CALIFORNIA

20                     SAN FRANCISCO DIVISION

21

22  UNITED STATES OF AMERICA,        )   No. CR
                                     )
23      Plaintiff,                   )   VIOLATIONS:
                                     )
24  v.                               )   Title 33 U.S.C. §§ 1319(c)(1)(A),
                                     )   1321(b)(3) (Clean Water Act) (one
25  JOHN JOSEPH COTA,                )   count)(a Class A misdemeanor);
                                     )   Title 16 U.S.C. §§ 703, 707
26      Defendant.                   )   (Migratory Bird Treaty Act) (one count)
                                     )   (a Class B Misdemeanor)
27                                   )
                                     )
28  _____ )

# INFORMATION

The United States Attorney charges:

## INTRODUCTION

At all times relevant to this Information:

1. The *M/V Cosco Busan* was a 901 foot, 65,131 gross ton container ship registered in Hong Kong and bearing IMO number 9231743.

2. The Defendant, JOHN JOSEPH COTA, was a resident of Petaluma, California, and was a member of the San Francisco Bar Pilots. COTA was licensed both by the United States Coast Guard and the State of California as a Pilot. COTA had been employed as a Pilot in San Francisco Bay since 1981.

3. On November 7, 2007, the *M/V Cosco Busan* departed the Port of Oakland in heavy fog and struck the Delta span of the San Francisco Bay Bridge, which resulted in the discharge of approximately 58,000 gallons of heavy fuel oil and caused environmental damage, including the loss of migratory birds.

## LEGAL FRAMEWORK

### The Clean Water Act and the Oil Pollution Act

4. In the Federal Water Pollution Control Act (the "Clean Water Act"), as amended by the Oil Pollution Act, 33 U.S.C. § 1321(b)(1), Congress has declared that it is the policy of the United States that there should be no discharges of oil or hazardous substances into or upon the navigable waters of the United States or the adjoining shorelines.

5. The Clean Water Act makes it a crime for a person to negligently discharge oil into or upon the navigable waters or contiguous zone of the United States in such quantities as may be harmful. 33 U.S.C. §§ 1319(c)(1) and 1321(b)(3).

6. The Clean Water Act defines a "discharge" as any spilling, leaking, pumping, pouring, emitting, emptying or dumping. 33 U.S.C. § 1321(a)(2). The Clean Water Act defines "oil" as oil of any kind or in any form, including, but not limited to, petroleum, fuel oil, sludge and oil residue. 33 U.S.C. § 1321(a)(1).

2

Case 3:08-cr-00160-SI    Document 133-2    Filed 09/04/2008    Page 55 of 71
Case 3:08-cv-02052-JC    Document 14    Filed 06/13/2008    Page 34 of 45
Case 3:08-cr-00160-JCS    Document 1    Filed 03/17/2008    Page 4 of 6

1    7. Federal regulations promulgated under the Clean Water Act define a "harmful"

2  quantity of oil as including any discharges of oil that cause a film or sheen upon or

3  discoloration of the surface of the water or adjoining shorelines or cause a sludge or

4  emulsion to be deposited beneath the surface of the water or adjoining shorelines. 40

5  C.F.R. § 110.3

6    8. The Clean Water Act defines the "navigable waters" of the United States as the

7  waters of the United States and the territorial seas, which are defined to be water

8  extending three (3) miles seaward of the ordinary low tide mark. 33 U.S.C. §§ 1362(7)

9  and 1362(8). Navigable waters also includes internal waters, which are "the waters

10  shoreward of the territorial sea baseline." 33 C.F.R. §§ 2.24(a); 2.36. San Francisco Bay

11  is a navigable waterway of the United States.

12                              The Migratory Bird Treaty Act

13    9. The Migratory Bird Treaty Act ("MBTA") makes it unlawful for any person, at any

14  time, by any means or in any manner, to take or kill any migratory bird without a permit

15  or as otherwise provided by regulation. 16 U.S.C. §§ 703, 707(a).

16    10. The term "take" in the MBTA includes killing or wounding. 50 C.F.R. § 10.12.

17    11. The Brown Pelican (*Pelecanus occidentalis*), Marbled Murrelet, (*Brachyramphus*

18  *marmoratus*), and Western Grebe, (*Aechmophorus occidentalis*), among others, are listed

19  as migratory birds pursuant to the MBTA. 50 C.F.R. § 10.13.

20

21  ///

22

23  ///

24

25  ///

26

27  ///

28

Case 3:08-cr-00160-SI    Document 133-2    Filed 09/04/2008    Page 56 of 71
Case 3:08-cv-02052-SC    Document 14    Filed 06/13/2008    Page 35 of 45
Case 3:08-cr-00160-JCS    Document 1    Filed 03/17/2008    Page 5 of 6

1    **Count One -- 33 U.S.C. §§ 1319(c)(1), 1321(b)(3)**
2    **(Clean Water Act -- Negligent Discharge of a Pollutant)**

3

4    12.  Paragraphs 1-8 are realleged and incorporated by reference as though fully set

5    forth herein.

6    13.  On or about November 7, 2007, in San Francisco Bay, within the Northern

7    District of California, the defendant,

8                        JOHN JOSEPH COTA,

9    did negligently cause the discharge of oil in such quantities as may be harmful from a

10   vessel, the *M/V Cosco Busan*, into and upon the navigable waters of the United States,

11   without a permit.  Specifically, on or about November 7, 2007, Defendant Cota, while

12   piloting the *M/V Cosco Busan*, caused approximately 58,000 gallons of heavy fuel oil to

13   be discharged from the vessel into San Francisco Bay by acting in a negligent manner,

14   that included the following: (a) failing to pilot a collision free course; (b) failing to

15   adequately review with the Captain and crew of the *M/V Cosco Busan* prior to departure

16   the official navigational charts of the proposed course, the location of the San Francisco

17   Bay aids to navigation, and the operation of the vessel's navigational equipment; (c)

18   departing port in heavy fog and then failing to proceed at a safe speed during the voyage

19   despite limited visibility; (d) failing to use the vessel's radar while making the final

20   approach to the Bay Bridge; (e) failing to use positional fixes during the voyage; and (f)

21   failing to verify the vessel's position vis-à-vis other established and recognized aids to

22   navigation throughout the voyage.

23   All in violation of Title 33, United States Code, Sections 1319(c)(1)(A) and

24   1321(b)(3), a Class A misdemeanor.

25   ///

26   ///

27

28

                                4

Case 3:08-cr-00160-SI    Document 133-2    Filed 09/04/2008    Page 57 of 71
Case 3:08-cv-02052-SC    Document 14    Filed 06/13/2008    Page 36 of 45
Case 3:08-cr-00160-JCS    Document 1    Filed 03/17/2008    Page 6 of 6

1

**Count Two – 16 U.S.C. §§ 703 and 707(a)**
**(Migratory Bird Treaty Act)**

2

3    14.  Paragraphs 1-13 are realleged and incorporated by reference as though fully set

4    forth herein.

5    15.  On or about November 7, 2007, in San Francisco Bay, within the Northern

6    District of California, the defendant,

7                        JOHN JOSEPH COTA,

8    without being permitted to do so by regulation as required by law, did take migratory

9    birds, including at least one Brown Pelican, (*Pelecanus occidentalis*), Marbled Murrelet,

10   (*Brachyramphus marmoratus*), and Western Grebe, (*Aechmophorus occidentalis*).

11   All in violation of Title 16, United States Code, Sections 703 and 707(a), and Title 50,

12   Code of Federal Regulations, Sections 21.11, 20.71 and 20.72, a Class B misdemeanor.

13

14

15   JOSEPH P. RUSSONIELLO                    RONALD J. TENPAS
     United States Attorney                   Assistant Attorney General
16   BRIAN J. STRETCH                         Environment and Natural Resources
     Chief, Criminal Division                 Division
17                                            United States Department of Justice

18
     By:                                      By:
19   STACEY P. GEIS                           DAVID B. JOYCE
     Assistant United States Attorney         Trial Attorney
20                                            Environmental Crimes Section

21

22

23

24

25

26

27

28

5

Case 3:08-cr-00160-SI    Document 133-2    Filed 09/04/2008    Page 58 of 71
Case 3:08-cv-02052-SC    Document 14    Filed 06/13/2008    Page 37 of 45
Case 3:08-cr-00160-SI    Document 18    Filed 04/22/2008    Page 1 of 9

AO 257 (Rev. 6/78)

## DEFENDANT INFORMATION RELATIVE TO A CRIMINAL ACTION - IN U.S. DISTRICT COURT

BY: ☐ COMPLAINT   ☐ INFORMATION   ☒ INDICTMENT
☒ SUPERSEDING

| OFFENSE CHARGED |
| --- |

Count 1: 18 U.S.C. § 1001 (False Statements)
Count 2: 18 U.S.C. § 1001 (False Statements)
Count 3: 33 U.S.C. § 1319(c)(1), 1321(b)(3)
   (Clean Water Act - Negligent Discharge of a Pollutant)
Count 4: 16 U.S.C. §§ 703 and 707(a)
   (Migratory Bird Treaty Act)

☐ Petty
☐ Minor
☐ Misde-
   meanor
☒ Felony

PENALTY:  Count 1 & 2:  5 years imprisonment, $250,000 fine, 3 years supervised release, $100 special assessment; Count 3: 1 year imprisonment, $100,000 fine, 1 year supervised release, $25 special assessment; Count 4: 6 month imprisonment, $15,000 fine, 1 year supervised release, $10 special assessment.

Name of District Court, and/or Judge/Magistrate Location
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| DEFENDANT - U.S. |
| --- |

▶ JOHN JOSEPH COTA

DISTRICT COURT NUMBER
CR 08-0160 JCS

### DEFENDANT

| PROCEEDING |
| --- |

Name of Complainant Agency, or Person (& Title, if any)

U.S. COAST GUARD/EPA

☐ person is awaiting trial in another Federal or State Court, give name of court

☐ this person/proceeding is transferred from another district per (circle one) FRCrp 20, 21, or 40.  Show District

☐ this is a reprosecution of charges previously dismissed which were dismissed on motion of:
   ☐ U.S. ATTORNEY   ☐ DEFENSE

SHOW DOCKET NO.

☐ this prosecution relates to a pending case involving this same defendant

MAGISTRATE CASE NO.

☒ prior proceedings or appearance(s) before U.S. Magistrate regarding this defendant were recorded under

CR-08-0160 MAG

Name and Office of Person Furnishing Information on this form    JOSEPH P. RUSSONIELLO

☒ U.S. Attorney   ☐ Other U.S. Agency

Name of Assistant U.S. Attorney (if assigned)    J. SCHMIDT/STACEY GEIS

**IS NOT IN CUSTODY**
1) ☐ Has not been arrested, pending outcome this proceeding. If not detained give date any prior summons was served on above charges ▶
2) ☐ Is a Fugitive
3) ☒ Is on Bail or Release from (show District)
   NDCA

**IS IN CUSTODY**
4) ☐ On this charge
5) ☐ On another conviction
6) ☐ Awaiting trial on other charges
   If answer to (6) is "Yes", show name of institution

☐ Federal   ☐ State

Has detainer been filed?  ☐ Yes   If "Yes" give date filed
☐ No

DATE OF ARREST ▶    Month/Day/Year

Or... if Arresting Agency & Warrant were not

DATE TRANSFERRED TO U.S. CUSTODY ▶    Month/Day/Year

☐ This report amends AO 257 previously submitted

| ADDITIONAL INFORMATION OR COMMENTS |
| --- |

PROCESS:
☐ SUMMONS   ☒ NO PROCESS*   ☐ WARRANT       Bail Amount:

If Summons, complete following:
☐ Arraignment   ☐ Initial Appearance

Defendant Address:

*Where defendant previously apprehended on complaint, no new summons or warrant needed, since Magistrate has scheduled arraignment

Date/Time:                Before Judge:

Comments:

Case 3:08-cr-00160-SI    Document 133-2    Filed 09/04/2008    Page 59 of 71
Case 3:08-cv-0205?-SC    Document 14    Filed 06/13/2008    Page 38 of 45
Case 3:08-cr-00160-SI    Document 18    Filed 04/22/2008    Page 2 of 9

# United States District Court

## FOR THE
## NORTHERN DISTRICT OF CALIFORNIA

VENUE: San Francisco

---

### UNITED STATES OF AMERICA,

### v.

### JOHN JOSEPH COTA,

*[signature]*

### DEFENDANT.

---

SUPERSEDING INDICTMENT

Violations: Title 18, United States Code §
1001 (false statements) (two counts); Title 33
United States Code §§ 1319(c)(1)(A), 1321(b)
(3) (Clean Water Act) (one count)(a Class A
misdemeanor); Title 16 United States Code §§
703, 707 (Migratory Bird Treaty Act) (one
count) (a Class B Misdemeanor)

---

A true bill.

*[signature]*
Foreman

Filed in open court this ____ day of
APRIL 2008

*[signature]*
Clerk

Bail, $ NO PROCESS

*[signature]*

Case 3:08-cr-00160-SI    Document 133-2    Filed 09/04/2008    Page 60 of 71
Case 3:08-cv-02052-SC    Document 14    Filed 06/13/2008    Page 39 of 45
Case 3:08-cr-00160-SI    Document 18    Filed 04/22/2008    Page 3 of 9

FILED
08 APR 22 PH 3:39
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NO. DIST. OF CALIFORNIA

1    JOSEPH P. RUSSONIELLO
     United States Attorney
2    BRIAN J. STRETCH (CASBN 163973)
     Chief, Criminal Division
3    STACEY P. GEIS (CASBN 181444)
     JONATHAN SCHMIDT (CASBN 230646)
4    Assistant United States Attorneys
     450 Golden Gate Ave., 11th Floor
5    San Francisco, CA 94102
     (415) 436-7126 (tel)
6    (415) 436-7234 (fax)
     Stacey.Geis@usdoj.gov
7    Jonathan.Schmidt@usdoj.gov

8
9    RONALD J. TENPAS
     Assistant Attorney General
     Environment and Natural Resources Division
10   United States Department of Justice
     Richard A. Udell
11   Senior Trial Attorney
     Environmental Crimes Section
12   P.O. Box 23985
     L'Enfant Plaza Station
13   Washington, DC 20004
     (202) 305-0361 (tel)
14   (202) 514-8865 (fax)
     Richard.Udell@usdoj.gov
15
     Attorneys for Plaintiff
16   United States of America

17
18              UNITED STATES DISTRICT COURT

19            NORTHERN DISTRICT OF CALIFORNIA

                  SAN FRANCISCO DIVISION
20

21

22   UNITED STATES OF AMERICA,        )    No. CR 08 -00160-JCS
                                       )
23         Plaintiff,                  )    VIOLATIONS:
                                       )    Title 18 U.S.C. § 1001 (false statements)
24   v.                                )    (two counts);
                                       )    Title 33 U.S.C. §§ 1319(c)(1)(A),
25   JOHN JOSEPH COTA,                 )    1321(b)(3) (Clean Water Act) (one
                                       )    count)(a Class A misdemeanor);
26         Defendant.                  )    Title 16 U.S.C. §§ 703, 707
                                       )    (Migratory Bird Treaty Act) (one count)
27                                     )    (a Class B Misdemeanor)
                                       )
28   _____)

Case 3:08-cr-00160-SI    Document 133-2    Filed 09/04/2008    Page 61 of 71
Case 3:08-cv-02052-°C    Document 14    Filed 06/13/2008    Page 40 of 45
Case 3:08-cr-00160-SI    Document 18    Filed 04/22/2008    Page 4 of 9

# SUPERSEDING INDICTMENT

The Grand Jury charges:

## INTRODUCTION

At all times relevant to this Indictment:

1. The Defendant, JOHN JOSEPH COTA, was a resident of Petaluma, California, and a member of the San Francisco Bar Pilots Association. He held a federal first class pilot's license issued by the United States Coast Guard, and a state pilot's license issued by the Board of Pilot Commissioners for the Bays of San Francisco, San Pablo and Suisun. COTA had been employed as a Pilot in San Francisco Bay since 1981.

2. The *M/V Cosco Busan* was a 901 foot, 65,131 gross ton container ship registered in Hong Kong and bearing IMO number 9231743.

3. On November 7, 2007, the *M/V Cosco Busan,* with JOHN JOSEPH COTA as its pilot, departed the Port of Oakland in heavy fog and struck the Delta tower of the San Francisco Bay Bridge, which resulted in the discharge of more than 50,000 gallons of heavy fuel oil and caused environmental damage, including the loss of migratory birds.

## LEGAL FRAMEWORK

### Federal Requirements for Licensed Pilot's Annual Medical Exam

4. Title 46 U.S.C. § 7101 together with 46 C.F.R. §10.709 mandates that "every person holding a license or endorsement as a first class pilot shall have a thorough physical examination each year while holding a license or endorsement." 46 C.F.R. § 10.709(b). Further, an individual with a first class license or endorsement "may not operate under authority of that license or endorsement until a physical examination has been satisfactorily completed." 46 C.F.R. §10.709(d). The exam must be given by a licensed physician or physician assistant who completes a Coast Guard physical examination form or the equivalent. 46 C.F.R.§§ 10.205(d), 10.709(d).

### The Clean Water Act and the Oil Pollution Act

5. In the Federal Water Pollution Control Act (the "Clean Water Act"), as amended by the Oil Pollution Act, 33 U.S.C. § 1321(b)(1), Congress has declared that it is the

2

Case 3:08-cr-00160-SI    Document 133-2    Filed 09/04/2008    Page 62 of 71
Case 3:08-cv-02052-SC    Document 14    Filed 06/13/2008    Page 41 of 45
Case 3:08-cr-00160-SI    Document 18    Filed 04/22/2008    Page 5 of 9

1  policy of the United States that there should be no discharges of oil or hazardous

2  substances into or upon the navigable waters of the United States or the adjoining

3  shorelines.

4    6. The Clean Water Act makes it a crime for a person to negligently discharge oil into

5  or upon the navigable waters or contiguous zone of the United States in such quantities as

6  may be harmful. 33 U.S.C. §§ 1319(c)(1) and 1321(b)(3).

7    7. The Clean Water Act defines a "discharge" as any spilling, leaking, pumping,

8  pouring, emitting, emptying or dumping. 33 U.S.C. § 1321(a)(2). The Clean Water Act

9  defines "oil" as oil of any kind or in any form, including, but not limited to, petroleum,

10 fuel oil, sludge and oil residue. 33 U.S.C. § 1321(a)(1).

11   8. Federal regulations promulgated under the Clean Water Act define a "harmful"

12 quantity of oil as including any discharges of oil that cause a film or sheen upon or

13 discoloration of the surface of the water or adjoining shorelines or cause a sludge or

14 emulsion to be deposited beneath the surface of the water or adjoining shorelines. 40

15 C.F.R. § 110.3

16   9. The Clean Water Act defines the "navigable waters" of the United States as the

17 waters of the United States and the territorial seas, which are defined to be water

18 extending three (3) miles seaward of the ordinary low tide mark. 33 U.S.C. §§ 1362(7)

19 and 1362(8). Navigable waters also includes internal waters, which are "the waters

20 shoreward of the territorial sea baseline." 33 C.F.R. §§ 2.24(a); 2.36. San Francisco Bay

21 is a navigable waterway of the United States.

22                          The Migratory Bird Treaty Act

23   10. The Migratory Bird Treaty Act ("MBTA") makes it unlawful for any person, at

24 any time, by any means or in any manner, to take or kill any migratory bird without a

25 permit or as otherwise provided by regulation. 16 U.S.C. §§ 703, 707(a).

26   11. The term "take" in the MBTA includes killing or wounding. 50 C.F.R. § 10.12.

27   12. The Brown Pelican (*Pelecanus occidentalis*), Marbled Murrelet, (*Brachyramphus*

28 *marmoratus*), and Western Grebe, (*Aechmophorus occidentalis*), among others, are listed

Case 3:08-cr-00160-SI      Document 133-2      Filed 09/04/2008      Page 63 of 71
Case 3:08-cv-02052-SC      Document 14      Filed 06/13/2008      Page 42 of 45
Case 3:08-cr-00160-SI      Document 18      Filed 04/22/2008      Page 6 of 9

as migratory birds pursuant to the MBTA.  50 C.F.R. § 10.13.

<div align="center">

**Count One -- 18 U.S.C. §1001**
**(False Statements)**

</div>

13.  Paragraphs 1-4 are realleged and incorporated by reference as though fully set forth herein.

14.  On or about January 18, 2006, in the Northern District of California, the defendant,

<div align="center">

JOHN JOSEPH COTA,

</div>

knowingly and willfully made a materially false, fictitious, and fraudulent statement and representation in a matter within the jurisdiction of the executive branch of the Government of the United States, specifically on United States Coast Guard Form CG-719K – Merchant Mariner Physical Examination Report – in that he certified that all the information he provided was complete and true to the best of his knowledge, when in fact he knew that the information he provided was neither complete nor true; including the information provided in Sections VI and VII of the form regarding current medications, the dosage, possible side effects and medical conditions for which the medications are taken.

All in violation of Title 18, United States Code, Section 1001(a)(2).

//
//
//
//
//
//
///
//
//

<div align="center">

4

</div>

1

2

**Count Two — 18 U.S.C. §1001**
**(False Statements)**

3    15. Paragraphs 1-4 are realleged and incorporated by reference as though fully set

forth herein.

4

5    16. On or about January 19, 2007, in the Northern District of California, the defendant,

6                          JOHN JOSEPH COTA,

7    knowingly and willfully made a materially false, fictitious, and fraudulent statement and

representation in a matter within the jurisdiction of the executive branch of the

8    Government of the United States, specifically on United States Coast Guard Form CG-

9    719K – Merchant Mariner Physical Examination Report – in that he certified that all the

10   information he provided was complete and true to the best of his knowledge, when in fact

11   he knew that the information he provided was neither complete nor true; including the

12   information provided in Sections VI and VII of the form regarding current medications,

13   the dosage, possible side effects and medical conditions for which the medications were

14   taken.

15   All in violation of Title 18, United States Code, Section 1001(a)(2).

16   //

17   //

18   //

19   //

20   //

21   //

22   //

23   //

24   //

25   //

26   //

27

28

5

Case 3:08-cr-00160-SI    Document 133-2    Filed 09/04/2008    Page 65 of 71
Case 3:08-cv-02052-SC    Document 14    Filed 06/13/2008    Page 44 of 45
Case 3:08-cr-00160-SI    Document 18    Filed 04/22/2008    Page 8 of 9

## Count Three -- 33 U.S.C. §§ 1319(c)(1), 1321(b)(3)
### (Clean Water Act -- Negligent Discharge of a Pollutant)

17.  Paragraphs 1-10 are realleged and incorporated by reference as though fully set forth herein.

18.  On or about November 7, 2007, in San Francisco Bay, within the Northern District of California, the defendant,

### JOHN JOSEPH COTA,

did negligently discharge and cause the discharge of oil in such quantities as may be harmful from a vessel, the *M/V Cosco Busan*, into and upon the navigable waters of the United States, without a permit.  Specifically, on or about November 7, 2007, Defendant Cota, while piloting the *M/V Cosco Busan*, negligently caused more than 50,000 gallons of heavy fuel oil to be discharged from the vessel into San Francisco Bay by acting in a negligent manner, that included, the following: (a) failing to pilot a collision free course; (b) failing to adequately review with the Captain and crew of the *M/V Cosco Busan* prior to departure the official navigational charts of the proposed course, the location of the San Francisco Bay aids to navigation, and the operation of the vessel's navigational equipment; (c) departing port in heavy fog and then failing to proceed at a safe speed during the voyage despite limited visibility; (d) failing to use the vessel's radar while making the final approach to the Bay Bridge; (e) failing to use positional fixes during the voyage; and (f) failing to verify the vessel's position vis-à-vis other established and recognized aids to navigation throughout the voyage.

All in violation of Title 33, United States Code, Sections 1319(c)(1)(A) and 1321(b)(3), a Class A misdemeanor.

//

//

//

//

6

Case 3:08-cr-00160-SI    Document 133-2    Filed 09/04/2008    Page 66 of 71
Case 3:08-cv-02052-C    Document 14    Filed 06/13/2008    Page 45 of 45
Case 3:08-cr-00160-SI    Document 18    Filed 04/22/2008    Page 9 of 9

**Count Four – 16 U.S.C. §§ 703 and 707(a)**
**(Migratory Bird Treaty Act)**

19. Paragraphs 1-13 are realleged and incorporated by reference as though fully set forth herein.

20. On or about November 7, 2007, in San Francisco Bay, within the Northern District of California, the defendant,

**JOHN JOSEPH COTA,**

without being permitted to do so by regulation as required by law, did take migratory birds, including at least one Brown Pelican, (*Pelecanus occidentalis*), Marbled Murrelet, (*Brachyramphus marmoratus*), and Western Grebe, (*Aechmophorus occidentalis*).

All in violation of Title 16, United States Code, Sections 703 and 707(a), and Title 50, Code of Federal Regulations, Sections 21.11, 20.71 and 20.72, a Class B misdemeanor.

DATED:                                      A TRUE BILL.

                                            *[signature]*
                                            FOREPERSON

JOSEPH P. RUSSONIELLO
United States Attorney

*[signature]*

BRIAN J. STRETCH
Chief, Criminal Division

(Approved as to form: *[signature]*          )
                        AUSA Geis

RONALD J. TENPAS
Assistant Attorney General

*[signature]*
Richard A. Udell
Senior Trial Attorney
Environmental Crimes Section

7

6

ORIGINAL
FILED

08 MAY -1 PM 1:18

E-filing

EMC

1   BRUCE A. BEHRENS, Chief Counsel
    DAVID GOSSAGE, Deputy Chief Counsel
2   KARL SCHMIDT, Assistant Chief Counsel
    G. MICHAEL HARRINGTON
3   BELVIN K. SMITH
    WM. DAVID SULLIVAN (SBN 142881)
4   595 Market Street, Suite 1700, San Francisco, CA 94105
    Mail: P. O. Box 7444, San Francisco, CA 94120-7444
5   Telephone: (415) 904-5700, Facsimile: (415) 904-2333

6   Attorneys for Plaintiff The People of the State of California, acting by and through
        the Department of Transportation

7

8                       UNITED STATES DISTRICT COURT

9              FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11  THE PEOPLE OF THE STATE OF          )   IN ADMIRALTY
    CALIFORNIA, acting by and through the )  CV 08 2268
12  Department of Transportation,        )   No.
                                          )
13               Plaintiffs,              )   COMPLAINT FOR ALLISION DAMAGE
                                          )
14       vs.                              )   JURY TRIAL DEMANDED
                                          )
15  REGAL STONE, LTD., HANJIN SHIPPING,   )
    CO., LTD., CONTI CAIRO KG, NSB        )
16  NEIDERELBE, SYNERGY MARITIME, LTD.    )
    *In Personam*; M/V COSCO BUSAN, their )
17  engines, tackle, equipment, appurtenances, )
    freights, and cargo *In Rem*,        )
18                                        )
                 Defendants.              )
19  _____ )

20

21          COMPLAINT IN REM FOR ALLISION DAMAGE.

22  TO THE HONORABLE, THE JUDGES OF THE UNITED STATES DISTRICT COURT FOR

23  THE NORTHERN DISTRICT OF CALIFORNIA IN ADMIRALTY:

24          The complaint of Plaintiff against Defendants, and each of them, in causes of action

25  for damages resulting from allision, civil and maritime, and within the meaning of Rule 9(h) Federal

26  Rules of Civil Procedure, as hereinafter more fully appears, alleges and respectfully shows this

27  Honorable Court, upon information and belief, as follows:

CALIFORNIA DEPARTMENT OF TRANSPORTATION - LEGAL DIVISION
595 Market Street, Suite 1700, San Francisco, California 94105
Mail: P.O. Box 7444, San Francisco, California 94120-7444
Telephone: (415) 904-5700; Facsimile: (415) 904-2333

CALIFORNIA DEPARTMENT OF TRANSPORTATION - LEGAL DIVISION
595A Market Street, Suite 1700, San Francisco, California 94105
Mail: P.O. Box 7444, San Francisco, California 94120-7444
Telephone: (415) 904-5700; Facsimile: (415) 904-2333

1

## JURISDICTION AND VENUE

2     This is an admiralty or maritime claim within the meaning of Rule 9(h) of the Federal

3  Rules of Civil Procedure and is within this Court's admiralty and maritime jurisdiction under 28

4  U.S.C. § 1333 and Article III § 2 of the United States Constitution. Certain causes of action that

5  arise under the laws of California are within this Court's  supplemental jurisdiction 28 U.S.C. § 1367.

6  Further this Court has jurisdiction under the Extension of Admiralty Act.

7     Venue in this Court is proper pursuant to 28 U.S.C. § 1391 in that substantial part of

8  the events or omissions giving rise to the claims asserted herein United States of America and was

9  and now is the owner of that certain highway bridge across the navigable waters of the San Francisco

10  Bay, in the Counties of Alameda and San Francisco, Stat of California, which is known as the

11  SF/Oakland Bay Bridge being a portion of the State highway known as California Interstate 80.

12

## PARTIES

13     1.  At all times herein mentioned, Plaintiff was and now is a sovereign State of the

14  United States of America and was and now is the owner of that certain highway bridge across the

15  navigable waters of the San Francisco Bay, in the Counties of Alameda and San Francisco, State of

16  California, which is known as the SF/Oakland Bay Bridge being a portion of the State highway

17  known as California Interstate 80.

18     2.  Plaintiff is informed and believes and thereupon alleges, that at all times herein

19  mentioned the COSCO BUSAN, her tackle, boilers, fixtures, etc. (hereinafter COSCO BUSAN) was

20  and is a vessel engaged in transporting freight in interstate and international commerce and that said

21  vessel now is or during the pendency of this action will be lying afloat on waters within the

22  jurisdiction of this Honorable Court.

23     3.  Defendant Conti Cairo KG, upon information and belief, is an owner of the vessel

24  COSCO BUSAN with its headquarters in Buxtehude, Germany.  Defendant NSB Neederelbe, upon

25  information and belief, is a ship manager of the vessel COSCO BUSAN with its headquarters in

26  Buxtehude, Germany.

27     4.  Defendant vessel, COSCO BUSAN, their engines, tackle, equipment,

CALIFORNIA DEPARTMENT OF TRANSPORTATION - LEGAL DIVISION
595 Market Street, Suite 1700, San Francisco, California 94105
Mail: P.O. Box 7444, San Francisco, California 94120-7444
Telephone: (415) 904-5700; Facsimile: (415) 904-2333

1   appurtenances, cargo, all freights, and other earnings (the "Vessel") is now, or will be during the

2   pendency of this action, within the district and jurisdiction of this court.

3        5. Defendant Regal Stone, Ltd., upon information and belief, is a Hong Kong based

4   company that claims ownership of the COSCO BUSAN.

5        6. Defendant Hanjin Shipping Co., Ltd. is a large Korean-based shipping company

6   that leases or charters the COSCO BUSAN from Defendant Regal Stone, Ltd. or other owners.

7        7. Defendant Synergy Maritime, Ltd. upon information and belief is a manager, owner

8   and the employer of the .crew of the vessel COSCO BUSAN.

9   <u>FACTS</u>

10       8. On or about November 7, 2007 the COSCO BUSAN was attempting passage

11  beneath the SF/Oakland Bay Bridge when she violently allided with the bridge causing serious

12  damage to the bridge.

13       9. At the time of the allision mentioned herein, the COSCO BUSAN was

14  unseaworthy, was not properly manned, operated or controlled.

15       10. The allision mentioned herein was caused by the unseaworthiness, fault,

16  negligence, want of due care and carelessness on part of the COSCO BUSAN and her owners, crew

17  and officers and not caused by any fault on part of Plaintiff.

18       11. By reason of the allision mentioned, Plaintiff has sustained damages involving the

19  necessary repair of the bridge in the sum of $2,000,000.00, no part of which has been paid by

20  defendant.

21       12. All and singular, the premises are true and correct and within the admiralty and

22  maritime jurisdiction of the United States and of this Court.

23       WHEREFORE, Plaintiff prays:

24       1. That a judgment and decree may be entered in favor of plaintiff against defendant

25  for the amount of plaintiff's damage, together with interest and the costs and disbursements of this

26  suit.

27       2. That this Court will grant plaintiff such other and further relief as may be just and

3

COMPLAINT FOR ALLISION DAMAGE

1 │ proper in the premises.

2

3 │ DATED:  April 30, 2008                      BRUCE A. BEHRENS
                                                DAVID GOSSAGE
4                                               KARL SCHMIDT
                                                G. MICHAEL HARRINGTON
5                                               WM. DAVID SULLIVAN

6

7 │                                    By _____

8 │                                            Attorneys for Defendant
                                               State of California

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

CALIFORNIA DEPARTMENT OF TRANSPORTATION, LEGAL DIVISION
595 Market Street, Suite 1700, San Francisco, California 94105
Mail: P.O. Box 7444, San Francisco, California 94120-7444
Telephone: (415) 904-5700; Facsimile: (415) 904-2333

COMPLAINT FOR ALLISION DAMAGE