IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. CR 08-0160 SI |
| Plaintiff, | **ORDER RE: DEFENDANT JOHN J. COTA'S MOTIONS TO CHANGE VENUE; AND TO SEVER CHARGES AGAINST DEFENDANT FLEET MANAGEMENT OR, ALTERNATIVELY, FOR SPECIAL JURY SELECTION PROCEDURES** |
| v. | |
| JOHN J. COTA and FLEET MANAGEMENT LTD., | |
| Defendants. | |

Defendant John J. Cota moves to transfer this case to the Eastern District of California and to sever the charges pending against him under the Clean Water Act and the Migratory Bird Act from those pending against co-defendant Fleet Management, Inc. Argument on the matter was heard on September 22, 2008. Having considered the arguments of the parties and the papers submitted, the Court hereby DENIES defendant's motion to sever charges, DENIES defendant's motion to change venue, and GRANTS the request for special jury selection procedures.

**BACKGROUND**

On November 7, 2007, the Cosco Busan container ship allided with the San Francisco Bay Bridge, resulting in the discharge of over 50,000 gallons of heavy fuel oil into the San Francisco Bay. Defendant Cota was the pilot of the ship at the time of the allision; defendant Fleet Management, Inc. ("Fleet") is the manager of the vessel. On March 17, 2008, the government charged defendant Cota with violations of the Clean Water Act ("CWA") and the Migratory Bird Treaty Act ("MBTA"), alleging that he negligently operated and navigated the vessel and caused both the discharge of fuel oil into the San

Francisco Bay and the death of migratory birds. The government filed a superseding indictment on April 22, 2008, adding charges that Cota made false statements regarding his prescription drug regimen in order to maintain his piloting license.

On July 21, 2008, the Court granted defendant Cota's motion to sever the false statement charges from the remaining negligence charges. The following day, the government filed a second superseding indictment, adding Fleet as a defendant. The indictment charges Fleet with negligence under the CWA, violations of the MBTA, false statement, and obstruction of justice. Cota has moved to sever the CWA and MBTA charges against him from those pending against defendant Fleet. In light of publicity in the San Francisco Bay Area about the oil spill, Cota also moves to change venue and transfer this case to the Eastern District of California.

**LEGAL STANDARD**

**I.   Change of Venue**

Due process requires that a criminal defendant "receive a trial by an impartial jury free from outside influences." *Sheppard v. Maxwell*, 384 U.S. 333, 362 (1966). The Court must grant a motion to change venue "if prejudicial pretrial publicity makes it impossible to seat an impartial jury." *Ainsworth v. Calderon*, 138 F.3d 787, 795 (9th Cir.1998). The defendant "must demonstrate either actual or presumed prejudice." *Daniels v. Woodford*, 428 F.3d 1181, 1212 (9th Cir. 2005) (citations omitted). Actual prejudice exists where the jurors have "demonstrated actual partiality or hostility that could not be laid aside." *Id.* Prejudice is presumed only in "extreme instances when the record demonstrates that the community where the trial was held was saturated with prejudicial and inflammatory media publicity about the crime." *Id.*

In the Ninth Circuit, Courts must consider three factors in evaluating a presumed prejudice argument: "1) whether there was a barrage of inflammatory publicity immediately prior to trial, amounting to a huge . . . wave of public passion; 2) whether the news accounts were primarily factual because such accounts tend to be less inflammatory than editorials or cartoons; and 3) whether the media accounts contained inflammatory or prejudicial material not admissible at trial." *Id.*

## II. Severance of Co-Defendants

Federal Rule of Criminal Procedure 8(b) provides that the government may jointly charge criminal defendants "if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses." Fed. R. Crim. P. 8(b). Once multiple criminal defendants are jointly charged, a court may grant a severance "[i]f it appears that a defendant or the government is prejudiced by a joinder of . . . defendants . . . for trial together." Fed. R. Crim. P. 14. Severance should only be granted "if there is a serious risk that a joint trial would compromise a specific right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States*, 506 U.S. 534, 539 (1993).

The Ninth Circuit has held that defendants should be severed if their defenses are "mutually exclusive" such that "acquittal of one codefendant would necessarily call for the conviction of the other." *United States v. Tootick*, 952 F.2d 1078, 1081 (9th Cir. 1991). "Antagonism between defenses or the desire of one defendant to exculpate himself by inculpating a codefendant is insufficient to require severance." *United States v. Throckmorton*, 87 F.3d 1069, 1072 (9th Cir. 1996).

## DISCUSSION

## I. Change of Venue

This motion for change of venue has been brought before the voir dire process, so Cota cannot establish actual prejudice. The question before the Court is whether the publicity surrounding the allision and Cota's role in the incident was sufficient to establish presumed prejudice. If the Court finds that transfer of venue is not necessary, Cota alternatively moves for the Court to take measures during jury selection to protect Cota's fair trial rights.

### A. Presumed Prejudice

#### 1. Inflammatory publicity immediately before trial

Cota argues that the San Francisco Bay Area has been saturated with publicity about the allision through 800 newspaper articles. As a threshold matter, the government argues that this coverage cannot amount to media "saturation." The government contends that many of the articles cited by Cota did not

necessarily reach a wide audience. Even accepting Cota's estimate that a total of 800 articles on the allision have been published locally since November 7, 2007, the government argues that 800 articles in regional newspapers and the Associated Press is not a disproportionate amount of reporting, given the magnitude of the oil spill.

In addition to the quantity of the reporting, Cota objects to the nature of the reports. Cota relies on a study performed by Dr. Craig New, a psychologist whom Cota describes as an expert in "content analysis," which is the study of pretrial publicity on juror prejudgment. New has performed a content analysis on the publicity in this case and concludes that it has been inflammatory. New's analysis is based on his study of 228 articles from the on-line version of the *San Francisco Chronicle* from November 8, 2007 until July 2, 2008.

According to New, several aspects of the coverage have been inflammatory. Articles in the *Chronicle* used language such as "crashing," "slamming," "smashing," or "ramming," when describing the allision. Journalists also referred to the oil spill as consisting of "deadly black goo," "tarry gooey black mess," "toxic bunker fuel oil," "black oil spreading for miles," "sprawling contamination," "black blobs in the sand," and "great blobs, some as big as footballs." Cota has been mentioned in connection with the allision in thirty-eight percent of the articles, sometimes with descriptions such as "bay spill pilot," "oil spill pilot," or "the pilot who ran a ship into bridge."

New additionally describes the reporting on other lawsuits arising from the allision as inflammatory and cites the phrases "parade of lawsuits" and "tangle of charges." New also cites as objectionable references to "oil-splattered beaches," "making San Francisco Bay look like a dirty bathtub," and descriptions of birds covered in oil and of the economic impact of the spill on commercial crab fishermen.

The government argues that there are 2.4 million registered voters in California, while the *Chronicle* has a daily circulation of only 375,000, so it would be likely that much of the jury pool has never seen many of the articles New studied. (Cota places the *Chronicle*'s readership at 1.9 million.) In addition, the government points out that many of the articles in New's study do not focus on Cota – according to the government's own study of 93 *Chronicle* articles, 54 do not mention Cota at all and only 28 could be characterized as critical of Cota.

4

The government also takes issue with Cota's characterization of the coverage as inflammatory. As the government interprets the articles, they are better described as straight-forward coverage of a major event.

The publicity surrounding the Cosco Busan oil spill is unlike the coverage in the cases Cota relies on.[1] *Daniels* concerned a trial for the murder of two police officers in Riverside, California. 428 F.3d at 1181. Two thirds of the jury pool remembered press accounts describing the suspect as a black paraplegic, a description matching the defendant. *Id.* at 1121. News accounts reported that a local school board proposed renaming its football stadium after one of the victims. *Id.* One month before the trial, a nine-foot memorial commemorating the officers was erected across the street from the courthouse where the defendant was tried. *Id.* Three thousand people attended the officers' funerals. *Id.* Police stations were "deluged" with calls from citizens offering tips and offering to establish a memorial fund. *Id.* Here, the crime is not a murder and the publicity has not revealed identifying characteristics of a suspect. There is no information before the Court identifying the percentage of potential jurors who are already familiar with the case.

### 2. Factual or editorial content of news accounts

Cota does not directly address whether the coverage of the allision has been primarily editorial or factual. The government characterizes the coverage as "largely factual in nature." (citing *Harris*, 885 F.2d 1354, 1362 (9th Cir. 1989) (news articles that are "largely factual in nature" are not inflammatory). Of the 228 articles New studied, it appears that 53 were letters to the editor, columns or op/ed pieces. (Mot. at Appendix B.) Cota's own sample of the coverage therefore suggests that less than one fourth of the pre-trial publicity has consisted of opinion articles rather than straight news.

---

[1] The defendant in *Sheppard v. Maxwell* was on trial for bludgeoning his pregnant wife to death. 384 U.S. 333, 333 (1966). The unique circumstances, including the "carnival atmosphere at trial," *id.* at 358, that amounted to violations of the defendant's trial rights are set forth at length in the Supreme Court opinion. The publicity surrounding the oil spill does not approach the intensity of the media frenzy before and during the *Sheppard* trial.

In *Marshall v. United States*, the publicity consisted of only two articles, but the reports disclosed two prior convictions that were inadmissible against the defendant at trial. 360 U.S. 310, 310 (1959) (per curiam). Several jurors told the judge that they read the articles during the trial. *Id.* at 312.

### 3. Inclusion of inflammatory or prejudicial material not admissible at trial

Cota describes the coverage of the allision as "extremely prejudicial." According to New's analysis, there have been 97 instances in which responsibility was attributed to Cota, although apparently 56 of these references appeared in just two articles. (Declaration of Craig New ¶¶ 39-41 "New Decl.") One article reported that an investigation by the California Board of Pilot Commissioners found the allision was a "direct result" of Cota's piloting. Ten of the 19 articles on the allision between March 18, 2008 and July 2, 2008 discussed Cota's responsibility for the incident. One article also reported on the transcript of the voice recording device on board the Cosco Busan. According to the article, the transcript revealed that crew members discussed foggy weather conditions and spoke at least rudimentary English, as well as that after the allision, Cota uttered expletives and said that he was "not gonna do well on this one." (New Decl. ¶ 43.)

New's report also analyzes instances in which *Chronicle* articles reported allegations of past piloting errors and substance abuse by Cota. Six articles have reported that Cota has been reprimanded for piloting errors in the past. (New Decl. ¶ 45.) Some of these articles included reports that Cota took medications for depression, anxiety, and sleep apnea, although other articles state that no evidence of drugs or alcohol has been found in connection with the allision. One of the articles reported that Cota was convicted of a drunken driving charge ten years ago. (New Decl. ¶ 46, 47.)

New additionally considers reports of legal actions against Cota and other defendants. Three articles mentioned that Cota faces various sanctions (New Decl. ¶ 48) and three more articles reported that he invoked his Fifth Amendment rights and refused to testify before the pilot's commission. (New Decl. ¶ 15.) In Cota's opinion, jurors form negative opinions of people who face multiple lawsuits and who refuse to testify.

Finally, New analyzed the coverage of the environmental impact of the oil spill. New opines that environmental damage is different from other crimes because it is more likely to be viewed as "a crime against local citizens." (New Decl. ¶¶ 52-56.)[2]

---

[2] Reports also detailed the extensive volunteer clean-up effort. New argues that this coverage is prejudicial to Cota because "[a]ttitudes developed through personal experience and supported by an emotional basis are generally stronger, and more difficult to set aside." (New Decl. ¶ 57.) New does

The government responds that the articles in New's study also include reports that are critical of the federal government for its response to the spill; that many of the articles cite multiple causes for the allision; and the reporting is factual, not unduly prejudicial.

Pretrial publicity can compromise a trial right if it is inflammatory or contains prejudicial information not admissible at trial. *See Daniels*, 428 F.3d at 1212. The reports cited by New do not appear to be inflammatory: they contain factual statements about developments in the investigation. It is premature to assess whether the articles contain information that would not be admissible at trial as evidentiary rulings have not yet been made.

On balance, the pretrial publicity does not require a change in venue. There has been a great deal of public interest in the allision and news outlets have covered the incident accordingly. Publicity alone does not justify a transfer in venue, however. When a criminal case involves a matter a public concern, "scarcely any of those best qualified to serve as jurors will not have found some impression or opinion as to the merits of the case." *Sheppard*, 384 U.S. at 350. While Cota may be correct that environmental damage is a crime that potential jurors feel at least as personally as a violent murder, Cota's own sample shows that the majority of the articles have been factual, not editorial. After evidentiary issues have been resolved, Cota can renew his motion if he can establish that inadmissible evidence has received wide attention in the press.

### B. Jury Selection Procedures

If Cota is tried in this district, he seeks the following measures during jury selection: 1) postponement of the trial, which is now scheduled to begin a week after the one-year anniversary of the allision; 2) submission of a questionnaire to potential jurors before voir dire; 3) individualized, sequestered voir dire; 4) counsel voir dire; and 5) additional peremptory challenges. The government does not respond to Cota's request for a postponement of the trial. As to the other requests, the government responds that it 1) agrees to collaborate on a proposed questionnaire to be submitted to the Court a week before jury selection is to begin; 2) does not oppose individualized, sequestered voir dire;

---

not explain how these reports are prejudicial to Cota; a potential juror who personally volunteered in the cleanup effort could presumably be excluded from serving on the jury.

7

3) reserves the right to object to Cota's proposed voir dire questions once they are submitted to the Court; and 4) takes no position on Cota's request because Cota has not indicated how many additional peremptory challenges he seeks.

In light of the government's willingness to accede to Cota's requests to submit a questionnaire and for individualized, sequestered voir dire, the Court GRANTS the request that some form of special jury selection procedures be used, without at this time specifying which ones. The parties may revisit and clarify the remaining issues of the trial date, proposed counsel voir dire, and peremptory challenges.

## II. Severance of Co-Defendants

When a defendant asserts mutually exclusive defenses as the basis for a severance motion, "the trial court must consider the substantial possibility of prejudice[,] . . . [which] will exist if the jury is unable to assess the guilt or innocence of each defendant on an individual or independent basis." *Tootick*, 952 F.2d at 1081-82. In determining whether a joint trial will cause undue prejudice, the Court must consider several factors, including:

> (1) whether the jury may reasonably be expected to collate and appraise the individual evidence against each defendant; (2) the judge's diligence in instructing the jury on the limited purposes for which certain evidence may be used; (3) whether the nature of the evidence and the legal concepts involved are within the competence of the ordinary juror; and (4) whether [defendants] could show, with some particularity, a risk that the joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence.

*United States v. Fernandez*, 388 F.3d 1199, 1241 (9th Cir. 2004) (citing *United States v. Baker*, 10 F.3d 1374, 1386 (9th Cir. 1993), *rev'd on other grounds by United States v. Nordby*, 225 F.3d 1053 (9th Cir. 2000)).

In the present case, "the nature of the evidence and the legal concepts involved," *Fernandez*, 388 F.3d 1199 at 1241, fall squarely within the ordinary juror's competence. The Court does not anticipate any difficulty in "instructing the jury on the limited purposes," *id*., for which pieces of evidence may be used. Therefore, only two of the four *Fernandez* factors apply here: the jury's ability to "collate and appraise" the separate evidence against defendants Cota and Fleet, and whether a joint trial would render the jury unable to make a reliable judgment as to Cota's guilt or innocence. *See id*.

**A.     Jury's Ability to Independently Evaluate the Evidence Against Each Defendant**

As the manager of the vessel, Fleet's responsibilities may be distinguished from those Cota had as the vessel's pilot. Therefore, negligent conduct under the CWA and MBTA requires different proof as to each defendant. Based on all the charges in the indictment, the government may generally be expected to introduce evidence against Fleet that pertains to the adequacy of the management and supervision of the vessel's crew and course. In contrast, the government will likely seek to introduce evidence against Cota that demonstrates his personal responsibility for the allision. At this stage, before the government has formally sought to introduce any evidence against either defendant, the types of evidence appear sufficiently distinct for the jury to be able to adequately gauge their applicability to each individual defendant.

The indictment charges that Fleet failed to adequately train and prepare the crew, failed to ensure that adequate lookouts were posted, and failed to notify Cota that the vessel went off course; none of these charges applies to Cota. Second Supersed. Indict. at 7-8. The charges that pertain to both Fleet and Cota consist generally of failing to take adequate precautions to avoid the allision. For example, the indictment alleges that Fleet and Cota "failed to navigate an allision free course; . . . failed to prepare and review an adequate passage plan before departure; . . . departed in heavy fog; . . . [and] proceeded at an unsafe speed during the voyage despite limited visibility." Second Supersed. Indict. at 7.

It is unclear at this stage what evidence the government will seek to introduce to prove the various charges, or whether the evidence will confuse the jury in its duty to "collate and appraise." *Fernandez*, 388 F.3d 1199 at 1241. The Court does not have a sufficient basis to conclude that the government's evidence will prevent the jury from "assess[ing] the guilt or innocence of each defendant on an individual and independent basis." *Tootick*, 952 F.2d at 1082. It is therefore premature to sever the defendants' trials based on the remote possibility that the government will introduce confusing or overlapping evidence. Should the Court later find that the government's evidence presents the likelihood that the jury will fail to "collate and appraise the individual evidence against each defendant," *id*. at 1241, the issue of severance may be revisited.

**B.     Risk of an Unfair Trial or Improper Judgment**

9

Defendant Cota asserts that his trial must be severed because defendant Fleet's defense "turns on demonstrating to the jury that Captain Cota is soley [sic] to blame for the incident aboard the COSCO BUSAN." Cota argues that a joint trial "would force him to face two prosecutors at once: the United States and . . . Fleet, the latter having considerably more latitude to present specious, biased and prejudicial arguments to the jury." Cota points to Fleet's Status Conference Statement, in which Fleet repeatedly references Cota's "drug use," "medical condition," and questionable "mental fitness for the job." Cota concludes that "it will be up to Fleet to develop . . . the linkage between [Cota's] drug use and his loss of situational awareness."

Cota also argues that a joint trial would allow Fleet to introduce evidence that would be otherwise inadmissible against Cota. Cota cites Fleet's reference in its Status Conference Statement to Cota's general medical condition. In addition, Fleet suggests in the Status Conference Statement that "Cota's medical condition was apparently an issue in [two prior piloting incidents]." Def. Fleet Status Conf. Stmt. at 2. Fleet then states that it will seek to introduce an expert's testimony during a hearing before the National Transportation Safety Board that indicates that "Cota should not have been licensed as a pilot." *Id.* Attached to the Status Conference Statement is a newspaper article that reported that the expert, Dr. Robert Bourgeois, would not have allowed his children to board a school bus whose driver was taking Cota's medications. *Id.* at Ex. C.

The government argues that most evidence admissible, or inadmissible, in a separate trial would be similarly admissible, or inadmissible, in a joint trial.[3] The Court concurs.

Cota has not met the showing required by *Zafiro*. This motion is brought before evidentiary issues for this trial have been decided. At this time, Cota has not demonstrated that Fleet will introduce evidence that would be excluded if Cota were tried alone. The evidence Cota cites would likely be

---

[3] "Assuming it is Fleet's attention to introduce medical evidence, the Court has yet to rule on its reliability, admissibility or relevance. If evidence of Captain Cota's medical condition and medication regime is relevant to Captain Cota's negligence, then presumably it would be admissible both in the United States case in chief in a joint trial against both defendants or in [a] separate trial against Captain Cota. In that case, the evidence is not unduly prejudicial and severance is not necessary. If, however, medical evidence is unreliable or irrelevant to whether Captain Cota was negligent, it should be inadmissible whether sponsored by Fleet or the United States in a joint trial or the United States in a separate trial. If the medical evidence is inadmissible, then severance is not needed." Gov't Mot. in Opp. to Def. Mot. to Sever Charges, at 7.

admissible against Cota or irrelevant and therefore inadmissible if offered by Fleet. The defenses of Cota and Fleet are neither antagonistic nor irreconcilable. One defendant may argue that the other was negligent without leading the jury to conclude that only one defendant can be liable. It is therefore unnecessary to sever the CWA and MBTA charges against Cota from those pending against Fleet.

## CONCLUSION

For the foregoing reasons and good cause shown, the Court DENIES defendant Cota's motion for severance, DENIES his motion for change in venue, and GRANTS his request for special jury selection procedures.

**IT IS SO ORDERED.**

Dated: October _7_, 2008

SUSAN ILLSTON
United States District Judge