JOSEPH P. RUSSONIELLO (CABN 44332)
United States Attorney
BRIAN J. STRETCH (CABN 163973)
Chief, Criminal Division
STACEY P. GEIS (CABN 181444)
JONATHAN SCHMIDT (CABN 230646)
Assistant United States Attorneys
CHRISTOPHER TRIBOLET
Special Assistant United States Attorney
450 Golden Gate Ave., 11th Floor
San Francisco, CA 94102
(415) 436-6776 (tel)
(415) 436-7234 (fax)
Jonathan.Schmidt@usdoj.gov

IGNACIA S. MORENO
Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice
RICHARD A. UDELL
Senior Trial Attorney
Environmental Crimes Section
P.O. Box 23985
L'Enfant Plaza Station
Washington, DC 20004
(202) 305-0361 (tel)
(202) 514-8865 (fax)
Richard.Udell@usdoj.gov

Attorneys for Plaintiff
United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 08-0160 SI |
| Plaintiff, | |
| v. | UNITED STATES' SENTENCING MEMORANDUM |
| FLEET MANAGEMENT LIMITED, | Hearing Date: February 19, 2010<br>Time: 11:00 a.m. |
| Defendant. | |

SENTENCING MEMORANDUM
UNITED STATES V. FLEET MANAGEMENT LTD.
CR No. 08-0160 SI

# TABLE OF CONTENTS

Page No.

I. INTRODUCTION.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II. TITLE 18 U.S.C. § 3553 SENTENCING FACTORS.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

   A. The nature and circumstances of the offense and the history and characteristics of the defendant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      1. The Crash and its Impact. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      2. Fleet's Negligence.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

         i. Regulatory and Legal Background.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

         ii. Fleets' Systematic Failure to Implement its Safety Management System. . . 5

            1. Training. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

            2. Berth-to-Berth Passage Plan. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

            3. Master Pilot Exchange.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

            4. Electronic Charting System. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

         iii. Post-Crash Cover-up. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

   B. The Need for the Sentence Imposed. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

III. Conclusion.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

# TABLE OF AUTHORITIES

Page No.

FEDERAL STATUTES

18 U.S.C. § 3553. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 12

26 U.S.C. §9509(b)(8). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

FEDERAL RULES

U.S.S.G. § 8C1.1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

JOSEPH P. RUSSONIELLO (CABN 44332)
United States Attorney
BRIAN J. STRETCH (CABN 163973)
Chief, Criminal Division
STACEY P. GEIS (CABN 181444)
JONATHAN SCHMIDT (CABN 230646)
Assistant United States Attorneys
CHRISTOPHER TRIBOLET
Special Assistant United States Attorney
450 Golden Gate Ave., 11th Floor
San Francisco, CA 94102
(415) 436-6776 (tel)
(415) 436-7234 (fax)
Jonathan.Schmidt@usdoj.gov

IGNACIA S. MORENO
Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice
RICHARD A. UDELL
Senior Trial Attorney
Environmental Crimes Section
P.O. Box 23985
L'Enfant Plaza Station
Washington, DC 20004
(202) 305-0361 (tel)
(202) 514-8865 (fax)
Richard.Udell@usdoj.gov

Attorneys for Plaintiff
United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 08-0160 SI |
| Plaintiff, | |
| v. | UNITED STATES' SENTENCING MEMORANDUM |
| FLEET MANAGEMENT LIMITED, | Hearing Date: February 19, 2010 |
| Defendant. | Time: 11:00 a.m. |

SENTENCING MEMORANDUM
UNITED STATES V. FLEET MANAGEMENT LTD.
CR No. 08-0160 SI

**I.      INTRODUCTION**

Fleet Management Limited is scheduled to be sentenced on February 19, 2010, for its conduct related to the *Cosco Busan* oil spill on November 7, 2007.  Fleet's plea was pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure.  The United States urges this Court to accept the terms of the plea agreement which recommends a $10 million total financial penalty and robust remedial measures.  The purpose of this memorandum is to address the sentencing factors set forth in 18 U.S.C. § 3553 and to provide information in support of the recommended sentence.  As set forth below, the high fine and stringent compliance program are needed in this case because of the seriousness of the offense and to address systemic corporate failures.  The government respectfully submits that terms of the proposed plea agreement will also promote respect for the law,  provide needed remediation for this defendant, and serve as both a general and specific deterrent.

**II.     TITLE 18 U.S.C. § 3553 SENTENCING FACTORS**

As noted in the Plea Agreement, the fine calculations set forth in Chapter 8 of the United States Sentencing Guidelines (Organizations) do not apply to environmental crimes or to obstruction offenses.  *See* U.S.S.G. § 8C1.1.  Below is a review of the relevant Section 3553 factors – the nature and circumstances of the offense and the need for the sentence imposed – and the government's position as to why the parties' proposed sentence satisfies those factors and is a just and reasonable sentence.

     **A.     The nature and circumstances of the offense and the history and characteristics of the defendant**

The parties have negotiated a Joint Factual Statement that is part of the plea agreement. (Exhibit 1).  The purpose of the discussion below is not to restate the facts, but, in support of the plea agreement, to place the facts in context and to explain the seriousness of defendant's criminal conduct and the history and characteristics of the defendant**.**

         **1.     The Crash and its Impact**

The *M/V Cosco Busan* is a large container ship – approximately three football fields long from stem to stern  Fully loaded, the *Cosco Busan* displaced over 92 thousand tons

of water and could carry 5,447 standard shipping containers - enough to fill a train over twenty miles long.  On the morning of November 7, 2007, the ship departed the Port of Oakland *en route* to China in dense fog when it collided with a supporting tower of the San Francisco-Oakland Bay Bridge, resulting in the discharge of over 50,000 gallons of bunker fuel into the Bay and causing the death of approximately 2,000 migratory birds.  A last second maneuver averted a head-on crash that could have resulted in far greater damage to the ship and bridge, and a long-term interruption of commerce between the cities of San Francisco and Oakland.  The allision caused a gash measuring approximately 150 feet long by 12 feet high on the port side of the ship, puncturing two fuel tanks.  The discharge of oil required a major clean up.  According to Fleet's reply to the government's opposition to Fleet's nolo contendere motion, at that time, more than $48 million had been spent on the clean-up and that in excess of $21 million had been spent on settling more than 400 claims by individuals, local businesses and local municipalities.  *Docket No*. 160 at 11-12.  The discharge of oil from the *Cosco Busan* resulted in the temporary closure of a fishery on the bay, delayed the start of the crab-fishing season, caused $2.1 in damage to the ship, and also resulted in more than $70 million in environmental cleanup expenses.  *Docket. No*. 269 at 14.  After the accident, Fleet and the vessel owner responded quickly and responsibly to address and minimize the impact of the spill.  They have also continued to address the claims from those affected by the spill.

### 2.  Fleet's Negligence

Fleet was responsible for the operation of the *Cosco Busan* at the time of the allision.  At the time of the offense, Fleet, a subsidiary of an even larger company, was one of the largest ship management firms in the world and managed over 150 vessels.[1]  As ship manager, Fleet generally does not own the vessels it operates or determine the ship's trade routes or its cargo. Instead, Fleet's *raison d'être* is to provide ships with well-trained and qualified crews who operate under a Safety Management System approved in accordance with the International

---

[1] *See* Tanker Operator, October 2004, page 1, available at www.tankeroperator.com (indicating Fleet was 6th largest manager in 2004); http://www.fleetship.com/fleetnews/070509_index.html (indicating Fleet had 160 vessels in May 2007) (last visited Jan 6, 2010 ).

Management Code for the Safe Operation of Ships and for Pollution Prevention, also known as the International Safety Management ("ISM") Code .

Fleet was negligent in myriad respects and was a proximate cause of the crash.[2] For example, and as explained more fully below: Fleet failed to adequately train the crew of the vessel; Fleet's crew was not adequately familiar with certain ship-specific navigational equipment; Fleet did not engage in a berth-to-berth passage planning process or prepare written berth-to-berth passage plans; Fleet did not conduct an adequate Master – Pilot exchange of information; Fleet did not fully utilize or operate the ship's radar and electronic chart system, and did not take fixes during the voyage.

In order to fully appreciate Fleet's negligence and obstruction of justice, and the appropriateness and importance of the proposed remedial measures, it is important to provide some additional background regarding maritime law, piloting practice and how Fleet's systemic failures contributed to the oil spill.

### i. Regulatory and Legal Background

Modern safety rules governing vessels stem from the International Convention for the Safety of Life at Sea ("SOLAS") to which most maritime nations, including the United States, are parties. The first version of SOLAS was adopted in 1914 in response to the Titanic disaster, and it has been updated many times since. SOLAS governs almost every aspect of vessel operations, including navigation, and is also the mechanism that requires compliance with the ISM Code, that addresses ship safety and environmental compliance as well as overall good management practices. Under the ISM Code, a management firm is designated as the "company" responsible for implementing the ISM Code's requirements.

Fleet Management Limited was the designated company for the *Cosco Busan*. The company's Safety Management System ("SMS") required by the ISM Code consisted of manuals governing overall training, bridge procedures and navigation safety. These documents are

---

[2] As the Court is aware from the prosecution of co-defendant John Cota, the ship's pilot, Fleet was not the only proximate cause.

generally consistent with the standard of care in the industry.  For example, the SMS required that the crew be properly trained and familiar with the ship and its equipment as well as Fleet's safety management system.[3]  The written safety management system also required a meaningful Master - Pilot exchange.[4]  And, Fleet's SMS  required that the crew become knowledgeable with the ship's navigational equipment.[5]

### ii. Fleets' Systematic Failure to Implement its Safety Management System[6]

As with many casualties, there are many factors that contributed to the allision.  Some reflect errors by the Master and/or the Pilot or factors that alone may not reflect negligence even though they are attributable to the defendant.  However, other contributing factors are particularly

---

[3] Fleet's Shipboard Management Manual required that "[a]ny officer or crew who joins the vessel newly must be given a period of familiarization . . ." (Section 6.4.2).  The familiarization requirement is an essential requirement in Fleet's SMS and fully consistent with another widely accepted set of requirements set forth in the Standards of Training, Certification and Watchkeeping (STCW) Code, another widely accepted international treaty.   This code, which compliments the ISM Code, details basic safe navigation requirements, including training, passage planning and familiarity with navigation equipment.  Under the STCW Code, Fleet was responsible  to "ensure that each crew can make a knowledgeable and informed contribution to the safe operation of the ship" and "ensure that all seafarers who are newly employed on board the ship are given a reasonable opportunity to become familiar with shipboard equipment. (A-1/14)   The STCW Code imposes the additional obligation that every officer have "full knowledge" of all navigational equipment on the vessel, including its operational limitations.  *See* STCW Code A-VIII/2 paragraphs 25 and 27.

[4] Fleet's Bridge Procedure Manual required that the crew "ensure that the intentions of a Pilot are fully understood and acceptable to the ship's navigational staff."  (Section 1.1.3)   In order to do this, Fleet required that "the Pilot should be clearly consulted on the Passage Plan to be followed. [And] [t]he general aim of the Master should be to ensure that the expertise of the Pilot is fully supported by the ship's 'Bridge Team.'" (Section 1.5.8)

[5] *See, e.g.,* Fleet's Shipboard Management Manual Section 6.4.2 (During the initial familiarization to the ship, officers and crew were to be "suitably instructed by the respective Head of the Department, about the use and operation of the machinery(s) and equipment(s) he is likely to handle, as well as about his specific duties and responsibilities.").

[6]Unless noted otherwise, the facts in this section come from the Plea Agreement's Joint Factual Statement.

5

serious and relevant because they demonstrate Fleet's corporate management failures and the importance of the proposed Enhanced Compliance Program. The following are some examples of Fleet's deviations from its SMS.

### 1. Training

As detailed in the Joint Factual Statement, the *Cosco Busan* set sail from Pusan, Korea on the morning of October 25, 2007, with almost entirely new officers and crew. According to the ship's log, the new officers and crew arrived at the *Cosco Busan* at 7:00 p.m. on October 24, 2007, and the ship departed Pusan for Long Beach at about 9:00 a.m. the following morning. Given this quick turnaround, there was very little transfer of information from the outgoing crew to the new crew. Making matters worse, Fleet failed to provide the officers and crew with training on Fleet's Electronic Charting System, voyage passage planning, and bridge procedures prior to departure.

It is no surprise then that on the morning of November 7, 2008, the officers failed to have an adequate Pilot-Master exchange, failed to engage in adequate passage planning and failed to be familiar with the symbols and operation of the Electronic Chart System. All were factors contributing to the crash.

### 2. Berth-to-Berth Passage Plan

Prudent navigation and maritime law requires that the ship's crew be actively engaged in the ship's navigation even when a pilot is aboard. The coordination of the ship's crew involved in the ship's navigation is known as "bridge team management." Good bridge team management begins with a passage plan. As set forth in the Joint Factual Statement, the new crew set sail from Pusan with only a pilot-to pilot passage plan, as opposed to a berth-to berth passage plan that includes the portion of the voyage through the internal waters and harbor. Though the Master and the Superintendent on board reviewed this inadequate passage plan, when the crew took the second leg of their voyage from Long Beach to Oakland, they again set sail with only a pilot-to pilot passage plan. The Master and the Superintendent reviewed this inadequate passage plan as well.

The failure to prepare and use a berth-to berth plan, as required by Fleet's own SMS,

meant the officers and crew did not have a plan which detailed the route through the harbor, the hazards in the harbor, and the local aids to navigation. Because the officers and crew had not been trained on passage planning and because on their previous legs they had used, with apparent approval, pilot-to pilot passage plans, on the morning of November 7, 2007, the second officer prepared a pilot-to-pilot passage plan. That meant that when the *Cosco Busan* set sail in heavy fog, they had no passage plan for the portion of the voyage from the Oakland berth, under the Bay and Golden Gate bridges, and out to the pilot station in the open seas. They also had no plan detailing the hazards, such as the towers of the Bay Bridge, and the aids to navigation, such as the buoys warning of the Bridge's tower.

This failure to prepare an adequate passage plan, might not have been fatal had the crew discussed the route with the Pilot or if they could read the symbols on their electronic chart. By not participating in passage planning, Fleet relied entirely upon the Pilot, who, as it turned out, was not reliable. This is exactly why navigation is a shared responsibility. The Master deferred to the pilot as to whether to leave port in the fog on the day of the allision. (Six other commercial ships decided otherwise.) Meanwhile, while the Master had ultimate responsibility to assure the safety of the ship, he was concerned that if he caused an unwarranted delay in the ship's departure and resulting expenses, that he could suffer adverse personal consequences. The actions of Fleet's crew demonstrate the failure to instill a corporate culture that put safety first. It is this corporate culture which the proposed remedial measures seek to address.

### 3. Master Pilot Exchange

A Master Pilot exchange about the intended voyage is critical to safe navigation and was required by Fleet's SMS. Though the officers and the crew had no passage plan for the voyage through the San Francisco Bay, the officers and the crew, and the Master especially, never reviewed the route with the Pilot. There was no meaningful Master-Pilot exchange to discuss a passage plan and the pilot never communicated his passage plan with the crew. In addition, the officers and the crew never asked the pilot about the various radar settings he was using to help navigate the ship.

While sailing through the Bay, the ship's officers and crew executed all of the pilot's

maneuvering commands. But, because they did not have a passage plan delineating a route through the Bay and because they did not know the Pilot's intended route through the Bay, they could not comment on or correct the pilot's commands. Indeed, as the *Cosco Busan* sailed through the Bay, the officers and crew neither took fixes to locate the vessel, as required by the ship's Safety Management System, nor used other means to adequately monitor its progress through the Bay.

One of the other means of tracking the ship's progress would have been the Electronic Chart System (ECS).

### 4. Electronic Charting System

On November 7, 2007, the officers lack of training on the ECS had disastrous consequences. The ship's pilot, Captain Cota, apparently became disoriented, and requested assistance interpreting the ship's chart from the ship's crew. About nine minutes before the *Cosco Busan* hit the "D" tower of the Bay Bridge, the "D" tower came into view on the ECS display. On the display near the "D" tower were two red triangles symbolizing the buoys that warn about the tower. The pilot asked the Master about these triangles at both nine minutes and two minutes before the crash.[7] The Master did not know the meaning of the red triangles and instead guessed, giving incorrect information to the pilot. The pilot, then, increased the ship's speed and headed straight toward the red triangles, that is the buoys marking the "D" tower. Though the Master was consulted about the red triangles, neither he nor his crew tried to determine what the red triangles symbolized. Instead, they followed the pilot's commands as he steered them into the tower.

The Electronic Chart System had two features that could have quickly revealed that the red triangles were buoys, but these particular features were not used and the Master and bridge officers were not aware of these features. Had the officers or crew been adequately trained, they would have known what the symbols meant, or would have known how to place a cursor on the features to determine the meaning of the symbols. Even better, had the crew been adequately

---

[7]Attached as Exhibit 2, is a picture of the Electronic Chart taken after the crash, which shows the red triangles and the path the *Cosco Busan* took..

8

trained, they could have pre-loaded the ECS and a radar system with a passage plan much like an automatic piloting system that would have set alarms if the ship deviated from the programed course. Again, the officers and crew were not adequately familiar with these capabilities and did not use them.

### iii. Post-Crash Cover-up

After the crash, as set forth in the Joint Factual Statement, Fleet engaged in multiple acts of obstruction of justice including concealing ship records and creating materially false, fictitious and forged documents with an intent to influence the Coast Guard's investigation. In particular, multiple berth-to-berth passage plans for the three voyages of the Cosco Busan, including the day of the allision, were created after the incident.

The most significant aspect of the various acts of obstruction is that shore based supervisors known as superintendents directed and participated in the obstructive acts as did the Master and other ship officers. On November 8, 2007, a day after the crash, a Fleet Superintendent, who boarded the ship after the accident, told the Second Officer that the November 7, 2007, passage plan should have been a berth-to berth passage plan and directed him create a new passage plan for the day of the crash. This act led to additional obstructive acts. Following the instruction to create a false passage plan for the day of the allision, the Second Officer created fictitious passage plans for the two earlier voyages of the ship and created false passage planning appraisal checklists for each of the three voyages that indicated twenty-one tasks had been performed prior to the voyage. Meanwhile, the official navigational chart for the voyage had already been falsified by the Third Officer to add fixes that were never recorded during the voyage. Fleet produced the false passage plan to the federal grand jury and other investigators. A copy of the false berth-to-berth passage plan submitted to the government and the actual pilot-to-pilot passage plan created for the voyage are attached. (Exhibits 3-4).

The falsification of documents and failure to correct the record created the misleading impression that Fleet was following the law, including its own safety management procedures. If left undiscovered, the false documents potentially could have had an impact on the criminal, civil and safety proceedings that were in progress, including Fleet's civil counterclaims against the

9

United States.  Fleet disclosed the falsification of documents five months after the crash, at a time when the government had already independently obtained the same information.  The obstructive acts prolonged the government's investigation and required that six foreign crew member witnesses remain longer in the United States.

### B.     The Need for the Sentence Imposed

Based on the above, and as further shown below, the government believes that the parties' proposed sentence is a just, reasonable, and needed sentence that reflects the seriousness of the offenses, promotes respect for the law, and provides just punishment for the offenses.  It also affords adequate deterrence, protects the public from further crimes being committed by the defendant, and provides remedial measures where necessary.

The terms of the proposed plea agreement include a significant criminal fine, community service projects with a nexus to the criminal offenses, and ample remedial and compliance measures.   The monetary assessment is to be determined and allocated as follows:

- $8 million criminal fine.  The government recommends that $7 million of this amount be imposed under Count 1.  Pursuant to 26 U.S.C. §9509(b)(8) this amount will be directed to the Oil Spill Liability Trust Fund to help aid in the clean up of future oil spills.  The government recommends a fine of $500,000 for each of the two obstruction counts.
- $2 million organizational community service pursuant to Section 8B1.3 of the Federal Sentencing Guidelines and Title 18, United States Code, Section 3553(a). As set forth in the plea agreement, this money will be earmarked to fund initiatives to restore or benefit the marine environment of San Francisco Bay and its approaches.

The proposed $10 million criminal penalty is appropriate in light of the environmental damage caused by the crash, Fleet's failure to properly train and supervise ship officers, Fleet's failure to follow safe maritime practices and the serious acts of obstruction justice.  Fleet's acts and omissions represent more than isolated or careless errors made on a bad day, but rather represents systemic management failures and a corporate culture that did not put safety first and

then, sought to cover up the company's negligence through the deliberate conduct of shore side managers and ship board employees.

Fleet's failure to adequately train its crew, require berth-to berth passage planning, and ensure the crew's competency on the ship's equipment were major factors in this avoidable tragedy. Accordingly a major component of the plea agreement is an Enhanced Compliance Program (ECP). The ECP includes a requirement for ship audits and audits of crew training performed by an outside and independent firm approved by the government and Court. It also includes a provision for an independent Court Appointed Monitor to serve as the eyes and ears for the Court and the Office of Probation during the period of probation. All expenses for the audits and Court Appointed Monitor are to be paid by Fleet.

The ECP accomplishes three objectives. First, it requires an audit of Fleet Management's existing Safety Management System to ensure internal consistency between various instructions, and also to ensure consistency with international standards. Second, it will ensure that in the future, passage plans are developed for the entire transit, including the portion of the transit where a pilot is on board. The ECP requires that the passage plans be submitted by the ships' captains to Fleet headquarters for review. Third, the ECP is designed to improve level of training of Fleet's masters and watchofficers. This is perhaps the most important aspect of the plan. For example, with respect to masters, Fleet will be required to implement procedures to ensure that masters have a better understanding of the company culture and procedures and that the master is fit for command. For navigation watch officers (including masters), Fleet must provide at least two days of shore-based training on its navigation procedures and a review of certain watchstanding requirements under the STCW Code. Fleet must also provide additional training to ensure that all navigation watch officers and masters are able to operate and have full knowledge of the electronic navigation equipment on the bridge of the ship they are assigned to.

If approved by the Court, the ECP provisions will apply to all Fleet vessels (and vessels operated by Fleet's sister company, Fleet Management Europe) which "trade in the United States" – a term defined to include all Fleet managed vessels that maintain a United States Certificate of Financial Responsibility. In April 2009, 143 of the 170 vessel's managed by Fleet

would be covered by the agreement.

The government submits that the monetary assessment and remedial measures required pursuant to the proposed plea agreement will achieve the goals set forth at Section 3553, including providing adequate deterrence, protecting the public from future crimes by this defendant, and providing needed correctional treatment for the defendant.

### III. Conclusion

For the reasons set forth above, the United States urges the Court to accept the proposed plea agreement. The government respectfully submits that the monetary assessment and remedial measures are consistent with the factors set forth in 18 U.S.C. § 3553 because they reflect the seriousness of the offense, promote respect for law, will protect the public from future criminal acts, and provide needed remediation. The government believes this sentence will provide specific deterrence to Fleet, but it will also provide general deterrence by sending a strong message to other shipping companies that they cannot abdicate their navigational duties when sailing with a pilot, they cannot place profit above safety, and they cannot falsify documents to avoid accountability.

JOSEPH P. RUSSONIELLO
United States Attorney

IGNACIA S. MORENO
Assistant General
Environment and Natural Resources Division
United States Department of Justice

BRIAN J. STRETCH
Chief, Criminal Division

By: /S/
    JONATHAN D. SCHMIDT
    Assistant United States Attorney

By: /S/
    RICHARD A. UDELL
    Senior Trial Attorney
    Environmental Crimes Section

By: /S/
    STACEY GEIS
    Assistant United States Attorney

By: /S/
    CHRISTOPHER TRIBOLET
    Special Assistant U.S. Attorney